UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| U.S. Securities and Exchange Commission, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| v. | ) | Civil No. 11-723 ADM/JSM |
| | ) | |
| | ) | |
| Marlon Quan, Acorn Capital | ) | |
| Group, LLC and Stewardship | ) | |
| Investment Advisors, LLC, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Asset Based Resource | ) | |
| Group, LLC and | ) | |
| Florene Quan, | ) | |
| | ) | |
| Relief Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Nigel Chatterjee, Court-appointed Liquidator | ) | |
| of Stewardship Credit Arbitrage Fund, Ltd., | ) | |
| Putnam Green, Ltd., and SCAF I, Ltd., | ) | |
| | ) | |
| Applicant Intervenor. | ) | |

_____

John E. Birkenheier, Esq., and Charles J. Kerstetter, Esq., United States Securities and Exchange Commission, Chicago, IL, on behalf of Plaintiff United States Securities and Exchange Commission.

Bruce E. Coolidge, Esq., and Brian R. Michael, Esq., Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., on behalf of Defendants Marlon Quan; Acorn Capital Group, LLC; Stewardship Investment Advisors, LLC; and Relief Defendant Florene Quan.

Michael A. Rosow, Esq., and Thomas H. Boyd, Esq., Winthrop & Weinstine, P.A., Minneapolis, MN, on behalf of Relief Defendant Asset Based Resource Group, LLC.

Charles A. Dale III, Esq., K&L Gates LLP, Boston, MA, and John Harper III, Esq., Messerli & Kramer P.A., Minneapolis, MN, on behalf of Applicant Intervenor Nigel Chatterjee, Court-appointed Liquidator of Stewardship Credit Arbitrage Fund, Ltd.; Putnam Green, Ltd.; and SCAF I, Ltd.

---

## I.  INTRODUCTION

On April 14, 2011, the undersigned United States District Judge heard oral argument on the motion [Docket No. 2] of Plaintiff United States Security and Exchange Commission (the "SEC") seeking an asset freeze, appointment of a receiver, preliminary injunction, and other ancillary relief.  The Court also heard oral argument on the motion to intervene [Docket No. 29] by Nigel Chatterjee, the court-appointed liquidator ("Bermuda Liquidator") for the off-shore hedge fund of Stewardship Credit Arbitrage Fund, Ltd. ("SCAF, Ltd.") and its wholly-owned subsidiaries Putnam Green, Ltd. ("PG Ltd.") and SCAF I, Ltd. (collectively, the "Offshore Funds").

The SEC's motion was prompted by the imminent distribution of approximately $14 million pursuant to a court-approved settlement.  Pl.'s Mem. of Law [Docket No. 3] at 1.  The SEC contends Defendant Marlon Quan ("Quan") and his closely held entities Acorn Capital Group, LLC ("Acorn") and Stewardship Investment Advisors, LLC ("SIA") have agreed with Relief Defendant Asset Based Resource Group ("ABRG") and a German bank to divide the settlement proceeds in a manner depriving many of Quan's hedge fund investors of a share of the funds.  The SEC also argues that Quan, Acorn, and SIA have violated federal securities laws, and that an asset freeze, receivership, and other relief are necessary to protect the interests of Quan's hedge fund investors and to preserve assets for their benefit.

Defendants Quan, Acorn, and SIA, and Relief Defendant Florene Quan's response

[Docket No. 35] to the SEC's motion argues the circumstances do not justify the extreme relief requested by the SEC and that the Court lacks jurisdiction to impose an asset freeze and receivership over Florene Quan's assets.

ABRG has filed a response [Docket No. 26] opposing the SEC's request for a receivership and asset freeze over ABRG, arguing *inter alia* that a freeze over ABRG's assets is not justified because there is no evidence of wrongdoing by ABRG and no threat that property held by ABRG will be concealed or diminished. ABRG also argues the appointment of a receiver over ABRG would do more harm than good and is not the least drastic remedy available to the SEC.

The Bermuda Liquidator has moved to intervene for the limited purpose of being heard regarding the disbursement of the settlement proceeds and the appointment of a receiver over ABRG. At the hearing, the Court orally granted the Bermuda Liquidator's motion to argue about disbursement of the settlement proceeds. The Bermuda Liquidator urges that the Offshore Funds' pro rata share of the settlement proceeds be released for distribution to the Offshore Funds' investors.

## II.  BACKGROUND

### A.    The Parties

#### 1.      Defendants Quan, SIA, and Acorn

Quan is a Connecticut-based money manager. Compl. [Docket No. 1] ¶ 3. SIA is an investment advisor firm owned and controlled by Quan. Ryba Decl. [Docket No. 4] ¶ 8. SIA served as advisor to three groups of hedge funds (the "Quan Hedge Funds"), the two largest groups being the Offshore Funds and the group consisting of Stewardship Credit Arbitrage Fund,

LLC ("SCAF LLC") and its subsidiaries (the "Onshore Funds").  Ryba Decl. ¶ 16.  The Offshore

Funds, now managed by the Bermuda Liquidator, are undergoing liquidation through insolvency

proceedings initiated in 2008 in a Bermuda court.  Chatterjee Aff. [Docket No. 32] ¶¶ 6-9;

Sullivan Aff. [Docket No. 27] ¶¶ 23-27.  SIA remains the investment advisor to the Onshore

Funds.  Def.'s Mem. of Law [Docket No. 35] at 5.

Acorn is also owned and controlled by Quan, and is engaged in the business of making

loans.  Ryba Decl. ¶¶ 9, 19; Sullivan Aff. ¶ 10.  Beginning in approximately 2001, Acorn lent

money to, among other borrowers, companies controlled by Thomas Petters (the "Petters

Entities").  Ryba Decl. ¶ 19; Sullivan Aff. ¶¶ 19-22.  Acorn extended a series of loans to the

Petters Entities that were documented by separate notes for each advance (the "Petters Notes").

Ryba Decl. ¶ 19; Sullivan Aff. ¶ 20.

Acorn sold many of the loans it originated to the Offshore and Onshore Funds.  Ryba

Decl. ¶¶ 19-20; Sullivan Aff. ¶ 11.  To facilitate the purchases of the Petters Notes and other

loans from Acorn, wholly-owned subsidiaries were created under the Offshore and Onshore

Funds for the purpose of obtaining lines of credit from German bank DZ Bank AG Deutsche

Zentral-Genossenschaftsbank, Frankfurt am Main ("DZ Bank").[1]  Ryba Decl. ¶¶ 28, 34; Sullivan

Aff. ¶ 15; Chatterjee Aff. ¶ 26.  The DZ Bank lines of credit, secured by Petters Notes, were

separately maintained by the Offshore and Onshore Funds and were not cross-collateralized or

cross-defaulted.  Chatterjee Aff. ¶ 26; Sullivan Aff. ¶ 15.  Acorn also sold or assigned some of

the loans it originated to ACG II, LLC ("ACG II"), a wholly-owned subsidiary of Acorn created

for the purpose of obtaining a secured line of credit with Sovereign Bank.  Sullivan Aff. ¶ 12.

---

[1] DZ Bank serves as an agent for Autobahn Funding Company, LLC ("Autobahn").  Sullivan
Aff. ¶ 3.

Acorn acted as the loan servicer for the loans purchased by the Quan Hedge Funds. Sullivan Aff. ¶ 16. The SEC avers that from 2001 to 2008, the Quan Hedge Funds paid SIA and Acorn a combined sum of over $93 million in performance fees, management fees, origination fees, consulting fees, and servicing fees. Ryba Decl. ¶¶ 20, 25, 29, 35.

### 2.    Relief Defendant ABRG

Relief Defendant Asset Based Resource Group ("ABRG") was created in June 2009 at the request of the Offshore Funds and DZ Bank to replace Acorn as the note servicer for the notes sold by Acorn to the Offshore and Onshore Funds. Sullivan Aff. ¶ 43, Ex. 1 at 1-2. ABRG is managed by two former employees of Acorn and receives compensation from DZ Bank and the Bermuda Liquidator. Sullivan Aff. ¶ 43, Ex. 1 at 4-7, Ex. 2 at 1-2. ABRG also services non-Petters related loans originated by Acorn. Sullivan Aff. ¶ 55.

### 3.    Relief Defendant Florene Quan

Relief Defendant Florene Quan has been married to Quan for twenty-nine years. Michael Decl. [Docket No. 34] Ex. 2 ("Florene Quan Aff.") ¶ 1. She lives in Edison, New Jersey and has owned her New Jersey home since 1984. Florene Quan Aff. ¶ 2. For the past fourteen years, she has worked full time as a high school teacher. Florene Quan Aff. ¶¶ 4-5. She has never been employed by Acorn, SIA, or ABRG. Florene Quan Aff. ¶ 7.

### B.    The Petters Ponzi Scheme

In September 2008, Petters was discovered to have orchestrated a massive fraud of nearly $3.5 billion by inducing investors into believing they were financing the purchase of consumer electronic goods from wholesalers for resale to large retailers. The electronic equipment did not exist, and the payments made to investors under the guise of profits were actually made with

funds from other investors.  When the scheme collapsed, many investors suffered severe financial losses.

An asset freeze and receivership were established for all assets and all entities 100% owned and controlled by Petters.  U.S. v. Petters, Civ. No. 08-5348 ADM/JSM (D. Minn.) [Docket No. 127].  Several Petters Entities that had sold Petters Notes to Acorn filed for bankruptcy relief, including Petters Company, Inc. ("PCI") and its wholly-owned subsidiary PAC Funding, LLC ("PAC Funding"), Polaroid Corporation ("Polaroid"), and Petters Aviation LLC ("Petters Aviation").  Sullivan Aff. ¶ 34.  Petters Aircraft Leasing ("PAL"), an additional Petters Entity that sold Petters Notes to Acorn, did not file for bankruptcy and remains part of the Petters receivership.

At the time the Petters Ponzi scheme collapsed, PAC Funding had allegedly defaulted on over $273 million in principal of Petters Notes purchased by Acorn.  Compl. [Docket No. 1] ¶ 142.

C.      Ensuing Litigation and Global Settlement

After the Petters Entities' bankruptcy filings, three adversary proceedings were brought against Acorn.  Sullivan Aff. ¶ 39.  The adversary proceedings alleged that security interests and payments given to Acorn by Polaroid, Petters Aviation, and PCI prior to bankruptcy constituted preferential or fraudulent transfers.  Sullivan Aff. ¶¶ 40-42.  Acorn disputed these claims.

In the Petters receivership case, Acorn and ABRG asserted claims to PAL's assets that were opposed by the Petters Receiver.

After protracted litigation, ABRG, as the successor loan servicer to Acorn, negotiated a global settlement (the "Settlement Agreement") resolving the disputes in the PCI, Polaroid, and

Petters Aviation bankruptcy cases and in the Petters receivership case.  See Ryba Decl. Ex. Z

("Settlement Agreement").  The Settlement Agreement provides that ABRG, as servicer for the

Petters Notes, receive payment of $11,500,000 from the Polaroid bankruptcy estate and

$2,376,900 from the PAL receivership estate (the "Upfront Payments").[2]  Settlement Agreement

¶¶ 1, 3(a).  Additionally, the Settlement Agreement requires the Petters Receiver to make

additional pro rata payments to ABRG from PAL's receivership estate upon the liquidation of

PAL's non-cash assets (the "Future Payments").  Settlement Agreement, ¶ 3(b).  The Settlement

Agreement also resolves certain claim disputes in the Petters Aviation bankruptcy case.

Settlement Agreement ¶ 2.

       In obtaining authorization to enter into the Settlement Agreement, ABRG procured a

Noteholder Consent Agreement (the "Noteholder Consent") executed by: (1) the Bermuda

Liquidator on behalf of the Offshore Funds, (2) Quan on behalf of Acorn, ACG II, and the

Onshore Funds, (3) DZ Bank, (4) Autobahn, and (5) Sovereign Bank.  The Noteholder Consent

includes an exhibit specifying the ownership percentage of the Petters Notes among Acorn, ACG

II, and the Offshore and Onshore Funds and their subsidiaries.[3]   Sullivan Aff. ¶¶ 65-66, Ex. 5.

       The Settlement Agreement was approved by the bankruptcy courts overseeing the Petters

bankruptcy proceedings, the district court overseeing the Petters receivership case, and the

Bermuda court overseeing the liquidation of the Offshore Fund.

       **D.**     **Proposed Disbursement of Settlement Proceeds**

_____

       [2]   These amounts comprise the approximately $14 million in Settlement Proceeds that
triggered the filing of the present Motion.

       [3]   The accuracy of the exhibit was independently confirmed by ABRG, the Bermuda
Liquidator, and Pinnacle Fund Administration LLC ("Pinnacle"), a third party administrator for the
Onshore Funds and a service provider to the Offshore Funds.  Sullivan Aff. ¶¶ 17, 76-78.

The Bermuda Liquidator calculated that the Offshore Funds would receive $8,146,832 of the Upfront Payments of the Settlement Proceeds, based on their percentage of ownership in the Petters Notes.  See Chatterjee Aff. ¶ 33.

With regard to Acorn and the Onshore Funds' shares of the Settlement Proceeds, Quan, acting on behalf of those entities, entered into a letter agreement (the "Letter Agreement") with ABRG, DZ Bank, and Autobahn regarding how the proceeds would be distributed.  See Ryba Decl. Ex. AA.  Under the Letter Agreement, Acorn and the Onshore Funds agreed to pay all but $862,500 of their share of Settlement Proceeds to DZ Bank, based on DZ Bank's asserted security interests in the Petters Notes.  Letter Agreement ¶ 2.A.  The remaining $862,500 was to be used by the Onshore Funds to repay debts owed by them or SIA to creditors other than Quan or entities in his control.  Letter Agreement ¶ 2.A.  The $862,500 could also be used to reimburse Quan for out-of-pocket legal expenses or other related costs or fees paid by him on behalf of the Onshore Funds or SIA.  Letter Agreement ¶ 2.A.  The SEC avers that, under the terms of the Letter Agreement, approximately $5.9 million of the Settlement Proceeds will be paid to DZ Bank, $862,500 will be paid to Quan or the Onshore Funds' or SIA's creditors, and nothing will be paid to the Onshore Funds' investors.  Ryba Decl. ¶ 86.

Quan, acting on behalf of ACG II, also entered into a letter agreement with Sovereign Bank acknowledging Sovereign Bank's status as a creditor of ACG II, and agreeing that ACG II's share of the Upfront and Future Settlement Payments would be paid to Sovereign Bank. Sullivan Aff. Ex. 6.

### E.    SEC Investigation and Allegations

In October 2008, the SEC began investigating how Acorn and SIA had protected the

interests of investors.  Michael Aff. Ex. 11.  Following a two-year investigation, the SEC alleges

that Quan, SIA, and Acorn violated federal securities laws.  Specifically, the SEC alleges the

defendants misled investors by falsely promising that the defendants were protecting the

investments through a lock box account, retaining auditors to examine Petters' Entities,

purchasing insurance to guard against risk to collateral, and performing extensive due diligence.

Compl. ¶¶ 64-83; Ryba Decl. ¶¶ 43-52, 61-62, 70-77.  The SEC also alleges Quan concealed

defaults and extensions on Petters Notes, and allowed investors to believe that certain payments

made to them in February 2008 were from interest on Petters Notes when payments instead were

cash collateral from a segregated account.  Compl. ¶¶ 84-115; Ryba Decl. ¶¶ 53-60, 65-69, 70-

73.

The SEC further contends Quan made transfers in 2008 to dissipate and conceal his

assets.  The transfers include: (1) payments in May through July 2008 of more than $7.5 million

to a hedge fund run by Quan's business associate Timothy Ng ("Ng"), even though redemptions

were no longer being paid to investors at that time, Ryba Supp. Decl. [Docket No. 42] at ¶ 24;

and (2) the July 2008 transfer of two real estate properties in Maui, Hawaii from Quan to his

wife for nominal value.  Compl. ¶ 140; Ryba Decl. ¶ 69.  The SEC also alleges the proposed

division of the Settlement Proceeds further dissipates assets to be preserved for victimized

investors.

Quan denies the SEC's allegations of securities violations and improper transfers.

**F.    Emergency Hearing**

In early March 2011, prior to the filing of the Complaint and while the SEC and the

Defendants were engaged in settlement negotiations, the SEC learned of the Settlement

Agreement and subsequent Letter Agreement addressing the payment of the Settlement

Proceeds.  The SEC contends Quan failed to disclose the Letter Agreement during the SEC's

investigation.

The SEC objects to the proposed distribution of the Settlement Proceeds because nearly

all of the funds will be paid to DZ Bank and the Offshore Funds, and the Onshore Funds will

receive nothing.  The proposed distribution also entitles Quan to $862,500 that the SEC argues

should be preserved for investors.

On March 24, 2011, the SEC filed this civil action and brought the present motion

seeking an asset freeze, receivership, and other relief.  The next day, the date the Upfront

Payments of $14 million in Settlement Proceeds were to be made to ABRG, an expedited

hearing was held during which the Court orally ordered that all Settlement Proceeds received by

ABRG be placed in a segregated account pending further order of the Court.[4]  The parties were

allowed additional time to respond to the issue of the asset freeze and the SEC's remaining

requests for relief.

## III.  DISCUSSION

The SEC urges that to protect Quan's investors and preserve assets for disgorgement, the

Court should: (1) impose an asset freeze and receivership over the Quans' estates, Acorn, SIA,

the Onshore Funds, and ABRG; (2) maintain the asset freeze over the Settlement Proceeds; (3)

order ancillary relief including expedited discovery, an accounting, document preservation, and

repatriation of foreign assets; and (4) enter a preliminary injunction over Quan, Acorn, and SIA

---

[4]  At the hearing held April 14, 2011, the Court orally ordered that all Future Payments made to ABRG under the Settlement Agreement be placed in ABRG's segregated account until further order of the Court.

enjoining them from future violations of securities laws.  Pl.'s Mem. of Law at 18-22;  Pl.'s Reply [Docket No. 41] at 2-3.

A.      **Asset Freeze**

"[T]he decision to order a temporary freeze on defendants' assets as ancillary relief in an SEC enforcement action requires particularly careful consideration by the district court."  SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1105 (2d Cir. 1972).  In determining whether an asset freeze is appropriate, a court must weigh "the disadvantages and possible deleterious effect of a freeze . . . against the considerations indicating a need for such relief."  Id. at 1106.

1.      **The Quans, Acorn, and SIA**

The SEC contends an asset freeze over the Quans' estates, Acorn, and SIA is necessary because: (1) Quan's transfer of two Maui properties to his wife and payments to Ng's hedge fund in 2008 are evidence Quan is dissipating his assets; and (2) Quan has failed to provide the SEC with requested financial information, including a statement of his assets and liabilities, and an accounting of fees earned and expenses incurred by him, SIA, and Acorn from the Quan Hedge Funds.

Quan's 2008 transfers, while not without suspicion, occurred more than two years ago and do not convince the Court that an immediate freeze of the Quans', Acorn's, and SIA's assets is necessary.  Instead, the Court will grant the SEC's request for expedited discovery and a court-ordered accounting, and will entertain a renewed motion for an asset freeze in the event the Defendants fail to furnish the required information.

2.      **ABRG**

The SEC contends the asset freeze over ABRG is necessary because without such a

freeze, the assets held by ABRG that rightfully belong to Quan's investors will be wired

overseas, and Quan's U.S. investors will receive nothing.  ABRG opposes a freeze of its assets,

arguing it has not engaged in wrongdoing and that an asset freeze would disrupt its business

operations which include servicing non-Petters Notes.

### a.    Assets Unrelated to Petters Notes

With regard to the assets owned or controlled by ABRG that are unrelated to the Petters

Notes or Settlement Proceeds, there is no argument or showing by the SEC that such assets are in

danger of being concealed or dissipated.  Therefore, a freeze over such assets is not justified.

### b.    Settlement Proceeds

The SEC does not seek to unwind the Settlement Agreement, but requests the Settlement

Proceeds being held by ABRG remain frozen until an equitable distribution plan can be

fashioned which will:  (1) enable investors presently excluded from the proposed distribution to

share in the proceeds, and (2) prohibit payment to Quan, Acorn, and SIA based on their alleged

violations of federal securities laws.

ABRG, along with the Bermuda Liquidator, contend the proposed disbursement allocates

payment of the Settlement Proceeds in direct proportion to the ownership percentage in the

Petters Notes, and thus provides for a pro rata distribution of the Settlement Proceeds.  The

Bermuda Liquidator requests the Court to unfreeze the Settlement Proceeds allocated to the

Offshore Funds so they may be distributed to the Offshore Funds' investors.

### i.    Settlement Proceeds Allocated to Offshore Funds

The SEC argues that unless the Settlement Proceeds are frozen, the interests of certain

Offshore Funds investors will be harmed because the Bermuda Liquidator intends to limit the

distribution of the Offshore Funds' share of Settlement Proceeds to only the investors submitting withdrawal demands before March 31, 2008.  This Court's concern is limited to whether the proper portion of the Settlement Proceeds is being directed to the Offshore Funds.  Objections to the fairness of the Bermuda Liquidator's distribution among the Offshore Funds' claimholders in the Bermuda liquidation proceedings are matters to be resolved by the Bermuda Court overseeing those proceedings.

On the record before this Court, the portion of the Settlement Proceeds being directed to the Offshore Funds appears fair and equitable.  The Bermuda Liquidator represented the interests of the Offshore Funds' investors throughout the negotiations of the Settlement Agreement and Noteholder Consent, and there is no evidence that his representation was inadequate.  There is also no showing that the Offshore Funds will receive an unfairly high proportion of the Settlement Proceeds in comparison to the Onshore Funds.  The Settlement Proceeds are proposed to be divided in strict proportion to the ownership of the Petters Notes, and the calculations of ownership percentages have been independently verified by ABRG, the Bermuda Liquidator, and third party fund administrator Pinnacle.

The SEC argues the ownership calculations are distorted because they are based on incorrect accounting data provided by Quan.  If an accurate calculation were to show the Offshore Funds' ownership percentage to be less than that specified in the Noteholder Consent, the Onshore Funds' investors and creditors would be harmed by a distribution of the Settlement Proceeds to the Offshore Funds in the amount presently proposed.

Accordingly, the asset freeze over the Offshore Funds' share of  Settlement Proceeds shall continue for sixty (60) days from the date of this Order.  During this time, the SEC may

object to the amount to be distributed to the Offshore Funds if it can be factually established that the Offshore Funds are receiving an unfairly high share of the Settlement Proceeds in proportion to their actual Note ownership. Upon the expiration of the sixty-day period, if no such objection is filed, the ABRG shall pay the Offshore Funds' pro rata share of the Settlement Proceeds to the Bermuda Liquidator. If an objection is timely filed, the Offshore Fund's share of the Settlement Proceeds shall remain frozen until further order of the Court.

### ii.     Remaining Settlement Proceeds

The SEC argues the interests of the Onshore Funds' investors were not adequately represented by Quan and SIA when negotiating the Settlement Agreement, Noteholder Consent, and Letter Agreement, and that payment of the Settlement Proceeds to Quan and DZ Bank will dissipate assets that rightfully belong to Quan's investors. The Court agrees the Onshore Funds' investors may suffer irreparable harm if the Settlement Proceeds are transferred overseas or to Quan and it is later determined that the Onshore Funds' investors hold a superior interest in the funds. Therefore, the shares of the Settlement Proceeds apportioned to the Onshore Funds, Acorn, and ACG II, including Future Payments, shall remain frozen until further order of the Court. After completion of the discovery and accounting required under this Order, a party claiming an interest in these Settlement Proceeds may make a motion for their disbursement.

### B.     Receiver

"A receiver is an extraordinary equitable remedy that is only justified in extreme situations." Aviation Supply Corp. v. R.S.B.I. Aerorospace, Inc., 999 F.2d 314, 316 (8th Cir. 1993). Factors considered in determining whether a receiver may be appointed include: (1) the validity of the claim asserted by the party seeking appointment, (2) "the probability that

fraudulent conduct has occurred or will occur to frustrate that claim," (3) the "imminent danger

that property will be concealed, lost, or diminished in value," (4) the inadequacy of other

available legal remedies, (5) the "lack of a less drastic equitable remedy," and (6) and the

"likelihood that appointing the receiver will do more good than harm." Id. at 316-17.

### 1.    Defendants Quan, Acorn, and SIA

The SEC argues a receiver must be appointed over the Quans' estates and Quan's closely

held entities because Quan cannot be trusted to manage SIA, Acorn, and the Onshore Funds in a

manner that will protect the investors' interests.  On the present record, however, the Court is not

convinced of the "likelihood that appointing [a] receiver will do more good than harm." Id.  Any

good that may be achieved by appointing a receiver can also be achieved by other means.

Quan's investors are able to monitor these public proceedings and seek appropriate recourse if

they feel Quan is not adequately protecting their interests.  On the other hand, the expense of a

receiver will likely harm investors by eroding assets that would otherwise be used to compensate

Quan's investors for their heavy losses in the event the SEC prevails in this action.

Additionally, the SEC's request for a receiver is based in part on "a host of troubling

questions" regarding fees and expenses charged by SIA to the Onshore Funds over the past two

years and on Quan's failure to provide the SEC with an adequate accounting of investor funds

and a statement of his personal assets and liabilities.[5]  Pl.'s Reply Brief [Docket No. 41] at 13,

16.  The discovery and accounting required by this Order will serve as a less drastic equitable

remedy for providing the SEC with the information it seeks.  Accordingly, the SEC's request for

---

[5]  Quan disputes the SEC's allegations that he has not been cooperative. See Def.'s Mem.
of Law at 13 (describing materials produced by Quan during the course of the SEC's investigation).

an appointment of a receiver over the Quans, Acorn, and SIA  is denied without prejudice to renewing the request following further discovery.

### 2.      Relief Defendant ABRG

The SEC argues a receiver is required because ABRG has unresolvable conflicts of interest making ABRG unable to act fairly on behalf of all of Quan's investors.  As support for this argument, the SEC relates that ABRG's expenses are paid by DZ Bank and the Bermuda Liquidator, and that ABRG is owned and operated by two of Quan's former Acorn employees who knew of and assisted in Quan's alleged misconduct.  However, given the asset freeze over the Settlement Proceeds, there is no imminent danger that property held by Acorn "will be concealed, lost, or diminished in value."  Aviation Supply Corp., 999 F.2d at 317.  Additionally, the present asset freeze over the Settlement Proceeds provides for the Court's oversight of their distribution and serves as a less drastic remedy for ensuring that the interests of Quan's investors are protected.  Under these circumstances, the Court is not persuaded of the likelihood that a receiver would do more good than harm, and the request to appoint a receiver over ABRG is denied.

### C.      Ancillary Relief

Expedited discovery, an accounting, and document preservation will be ordered to address the SEC's concerns that it has not been provided with a complete financial record.  The SEC's request for repatriation is denied without prejudice because there is no evidence on the present record that the Defendants hold ill-gotten gains overseas.

### D.      Preliminary Injunction

The SEC requests a preliminary injunction enjoining Quan, Acorn, and SIA from future

violations of federal securities laws.  To obtain such relief, the SEC must show that the

Defendants violated the law and that there exists a reasonable likelihood of future violations.

SEC v. Comserv Corp., 908 F.2d 1407, 1412 (8th Cir. 1990); see also Manor Nursing, 458 F.2d

at 1100 (stating the "critical question" for determining whether to grant injunctive relief in view

of past violations "is whether there is a reasonable likelihood that the wrong will be repeated").

The Court declines to impose a preliminary injunction at this time.  The public nature of these

proceedings will lead to increased scrutiny of the Defendants' actions.  The Court's oversight of

the frozen Settlement Proceeds is a further barrier to future violations.  However, the Defendants

are forewarned that their actions going forward will be watched carefully, and the SEC is entitled

to renew the request for a preliminary injunction if the SEC believes there are ongoing violations

of federal securities laws.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

A.    The Bermuda Liquidator's motion [Docket No. 29] to intervene is GRANTED for

the limited purpose of being heard with regard to the disbursement of settlement proceeds; and

B.    The SEC's motion [Docket No. 2] is GRANTED IN PART and DENIED IN PART

as follows:

1.    With the exception of the restraint on the Settlement Proceeds as provided

in Section IV.B.5 below, the requests for an asset freeze, appointment of a receiver, preliminary

injunction and repatriation of assets are denied without prejudice to renewing the requests

following the completion of the expedited discovery and accounting required by this Order.

2.    <u>Accounting</u>

a.    Defendants shall serve a sworn accounting on the Commission within 30 calendar days of the issuance of this Order.  The sworn accounting shall cover the period from January 1, 2001 through the present.

b.    The sworn accounting shall reflect the following:

i.      the receipt and use of all assets, funds and property received, directly or indirectly, in connection with offers, sales or purchases of (a) Notes issued by the Petters Entities and/or (b) interests in Funds managed by Stewardship IA, Acorn and/or Quan ("the Quan Funds");

ii.     the receipt and use of any fees or other compensation paid in connection with the offer, sale, or purchase of the (a) Notes issued by the Petters Entites and/or (b) interests in the Quan Funds; and

iii.    for all moneys identified in Paragraphs IV.B.2.a-b, a list of any and all accounts at any financial institution into which such moneys have ever been deposited, including the name and address of the bank or other financial institution, the account name, and the account number.

c.    The sworn accounting shall further reflect all of a Defendant's assets and liabilities, wherever such assets and liabilities are located.  For each such asset and liability, the accounting shall include: (1) a

description of the asset or liability; (2) the amount or value of the asset or liability; (3) the location of the asset or liability, including when appropriate the name and address of the bank, financial or brokerage institution in which the asset or liability is located, the account name, and the account number; (4) the date the asset was acquired or the date the liability was incurred; and (5) whether the asset is encumbered and, if so, the nature of the encumbrance, including the identity of the creditor or lien-holder.

3.   <u>Expedited Discovery</u>

a.   Immediately upon entry of this Order, the parties are granted leave to serve interrogatories, requests for documents, and requests for admissions, take depositions and issue subpoenas immediately, and the time allowed to respond to such discovery requests is shortened to 10 calendar days after a request is served unless otherwise ordered by the Court.  Service of all discovery, including subpoenas, may be effected via overnight mail, facsimile, or electronic means.  Nothing contained in this section of this Order shall prevent Defendants from asserting a Fifth Amendment privilege against self-incrimination and, in turn, nothing contained in this section of the Order shall prevent the Commission from opposing or challenging Defendants' assertion of a Fifth Amendment privilege against self-incrimination.

b.   Should a party fail to respond to a request for admission within 10

calendar days of service, that request may be deemed admitted for all purposes in this action.

c.      Should a party fail to respond to an interrogatory within 10 calendar days of service, that party may be prohibited from introducing any evidence concerning the subject of the interrogatory for any purpose in this action.

d.      Should a party fail to produce a responsive document within 10 calendar days of service, that party may be prohibited from introducing the withheld document for any purpose in this action.

e.      All other discovery rules contained in the Federal Rules of Civil Procedure and Local Rules for the District of Minnesota shall apply unless otherwise ordered by this Court.

f.      All responses to the Commission's discovery requests shall be delivered to the Securities and Exchange Commission, Chicago Regional Office, Attention: Sally Hewitt, 175 W. Jackson Blvd., Suite 900, Chicago, Illinois 60604 by the most expeditious means available, including via facsimile to (312) 353-7398.  Service of discovery requests shall be sufficient if made upon the parties by facsimile, electronic means or overnight courier and depositions may be taken by telephone or other remote electronic means.

4.      Document Preservation

Until further order of this Court, Defendants and Relief Defendants and their officers,

agents, servants, employees, attorneys, trustees, depositories, banks, and those persons in active

concert or participation with them who receive notice of this Order, are hereby temporarily

restrained and enjoined from, directly or indirectly, destroying, mutilating, concealing, altering,

disposing of, or otherwise rendering illegible in any manner, any of the books, papers, emails, or

communications, records, documents, correspondence, ledgers, accounts, statements, files,

electronically stored information, and other property, in  their possession, custody or control that

refer or relate to the allegations described in the Commission's Complaint, including but not

limited to, all documents and electronically stored information or relating to any of the following

entities: The Quan Hedge Funds, the Defendants, the Relief Defendants, AG Deutsche Zentral-

Genossenschaftsbank Frankfurt Am Main ("DZ Bank"), the Bermuda Liquidator for the

Offshore funds, Thomas Petters, Polaroid Corporation, Thousand Lakes LLC, RWB Services,

LLC, Enchanted Family Buying Co. and Nationwide International Resources, Inc.  Such

documents include, but are not limited to, handwritten notes, memoranda, emails, and any other

documents or information, whether stored electronically or in "hard copy."  In addition,

Defendants and Relief Defendants are prohibited from attempting to have any such evidence in

the possession, custody, or control of third parties destroyed or compromised in any manner.

5.      Settlement Proceeds

a.     The Offshore Funds' pro rata share of all Settlement Proceeds

according to the Note ownership percentages set forth in the Noteholder

Consent shall remain frozen for sixty (60) days from the date of this

Order.  Upon expiration of the sixty-day period, if no objection to the Offshore Funds' share of the Settlement Proceeds is filed, ABRG shall pay to the Bermuda Liquidator the Offshore Funds' pro rata share of the Settlement Proceeds, along with the Offshore Funds' pro rata share of Future Payments as such payments become available to ABRG.  If an objection to the distribution is filed within the sixty-day period, the Offshore Funds' pro rata share of the Settlement Proceeds shall remain frozen until further order of the Court.

b.    Remaining Settlement Proceeds:  All Settlement Proceeds not described in Paragraph IV.B.5.a., shall remain frozen in ABRG's segregated, frozen account until further order of the Court.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  May 3, 2011.