# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| U.S. Securities and Exchange Commission,    ) | |
| )  | |
| Plaintiff,    ) | **MEMORANDUM OPINION** |
| )  | **AND ORDER** |
| v.    ) | Civil No. 11-723 ADM/JSM |
| )  | |
| Marlon Quan, Acorn Capital    ) | |
| Group, LLC and Stewardship    ) | |
| Investment Advisors, LLC,    ) | |
| )  | |
| Defendants,    ) | |
| )  | |
| Florene Quan,    ) | |
| )  | |
| Relief Defendant,    ) | |
| )  | |
| DZ Bank AG Deutsche    ) | |
| Zentral-Genossenschaftsbank,    ) | |
| Frankfurt am Main,    ) | |
| )  | |
| Intervenor,    ) | |
| )  | |
| and    ) | |
| )  | |
| Sovereign Bank,    ) | |
| )  | |
| Applicant Intervenor.    ) | |

Timothy S. Leiman, Esq., and John E. Birkenheier, Esq., U.S. Securities and Exchange Commission, Chicago, IL, on behalf of Plaintiff U.S. Securities and Exchange Commission.

Bruce E. Coolidge, Esq., and Brian R. Michael, Esq., Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., and Thomas Radio, Esq., Best & Flanagan LLP, Minneapolis, MN, on behalf of Defendants Marlon Quan; Acorn Capital Group, LLC; and Stewardship Investment Advisors.

Hille R. Sheppard, Esq., Sidley Austin LLP, Chicago, IL, on behalf of Intervenor DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt am Main.

Ben M. Krowicki, Esq., Bingham McCutchen LLP, Hartford, CT, and Nicholas J. Eugster, Esq., Messerli & Kramer P.A., Minneapolis, MN, on behalf of Applicant Intervenor Sovereign Bank.

## I.  INTRODUCTION

On March 15, 2012, the undersigned United States District Judge heard oral argument on Intervenor DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt am Main's ("DZ Bank") Motion (1) to Approve the Allocation of the Onshore Funds and (2) to Establish a Court-Administered Claims Process [Docket No. 107]; and Plaintiff U.S. Securities and Exchange Commission's ("SEC") Motion for (1) Appointment of a Receiver and (2) an Anti-Suit Injunction [Docket No. 111].[1]  For the reasons set forth below, DZ Bank's Motion is denied and the SEC's Motion is granted.

## II.  BACKGROUND

This SEC enforcement action alleges Defendant Marlon Quan ("Quan"), along with entities owned and controlled by him, defrauded investors in hedge funds that he founded and managed.  See generally Compl. [Docket No. 1].  Approximately $18 million in recoveries from the hedge funds' failed investments are frozen in the Court's Registry Account ("Registry Account") pending a determination of whether Quan's investors hold a superior interest over other claimants to the frozen funds.  See Order, May 3, 2011 [Docket No. 51] ("May 3, 2011 Order") at 14; Order, Dec. 12, 2011 [Docket No. 76]; Order, December 15, 2011 [Docket No. 78].  The present Motions address whether the frozen funds should now be allocated among various Quan-related entities and distributed in accordance with the absolute priority rule, or alternatively, whether a receiver should be appointed to wind down the entities still managed by

---

[1]  The Court also heard oral argument on Sovereign Bank's Motion to Intervene [Docket No. 132] under Federal Rule of Civil Procedure 24(a)(2).  Sovereign Bank asserts an interest in funds presently frozen by the Court in this action.  No opposition was filed or raised at the hearing.  The Court grants Sovereign Bank's Motion to Intervene based on the files and records in this case and the oral argument of counsel.

Quan and to provide the Court with a proposed claims process and plan for distributing the frozen funds.

**A.      Defendants and SCAF**

Quan is a Connecticut-based money manager.  Compl. ¶ 3.  He owns and manages Defendant Stewardship Investment Advisors, LLC ("SIA"), an investment advisor firm.  Ryba Decl., March 24, 2011 [Docket No. 4] ("First Ryba Decl.") ¶ 8.  Defendant Acorn Capital Group, LLC ("Acorn") is also owned and managed by Quan.  Id. ¶ 9.  Acorn is engaged in the business of making loans.  Id. ¶ 19; Sullivan Aff., April 7, 2011 [Docket No. 27] ¶ 10.[2]  Stewardship Credit Arbitrage Fund, LLC ("SCAF") is a domestic hedge fund managed by Quan through SIA. First Ryba Decl. ¶¶ 14, 16, 38.

**B.      Petters Notes**

Beginning in approximately 2001, Acorn loaned money to companies controlled by Thomas Petters (the "Petters Entities") as well as other borrowers.  The loans from Acorn to the Petters Entities were documented by separate notes for each advance (the "Petters Notes"). Sullivan Aff. ¶¶ 20-22.  Acorn sold many of the loans it originated to SCAF and to Stewardship Credit Arbitrage Fund, Ltd., a hedge fund based in Bermuda (the "Offshore Funds").  First Ryba Decl. ¶¶ 19-20; Sullivan Aff. ¶ 11.  To facilitate the purchases of the Petters Notes and other loans from Acorn, wholly-owned subsidiaries were created for SCAF and the Offshore Funds for the purpose of obtaining lines of credit from DZ Bank.  First Ryba Decl. ¶ 34; Sullivan Aff. ¶ 15. SCAF's subsidiaries are Putnam Green LLC ("PG") and Livingston Acres ("LA").  First Ryba Decl. ¶ 34.  The DZ Bank lines of credit were secured by Petters Notes.  Id.  Acorn also sold or

---

[2] Quan, SIA, and Acorn are collectively referred to as "Defendants."

assigned some of the loans it originated to ACG II, LLC ("ACG II"), a wholly-owned subsidiary of Acorn created for the purpose of obtaining a secured line of credit with Sovereign Bank. Sullivan Aff. ¶ 12.  Acorn acted as the loan servicer for the loans purchased by the Offshore Funds and onshore entities including ACG II, SCAF, and SCAF's subsidiaries.[3]  Sullivan Aff. ¶ 16.

In September 2008, Petters was discovered to have orchestrated a massive Ponzi scheme involving nearly $3.5 billion.  At the time the scheme collapsed, the Petters Entities had allegedly defaulted on over $273 million in principal of loans originated by Acorn.  Compl. ¶ 42. A receiver was appointed over Petters' assets, and several of the Petters Entities filed for bankruptcy.  Sullivan Aff. ¶¶ 32, 34.

Also in 2008, liquidation proceedings were initiated against the Offshore Funds in a Bermuda Court.  Chatterjee Aff. [Docket No. 32] ¶¶ 13-16.  The Bermuda Court appointed a liquidator (the "Bermuda Liquidator") to oversee the Offshore Funds' liquidation.  Id. ¶¶ 14-15, 17-19.  Quan, through SIA, continues to manage SCAF.  At the insistence of the Bermuda Liquidator and DZ Bank, Acorn was replaced by Asset Based Resources Group, LLC ("ABRG") to be the loan servicer for the Offshore Funds and the Onshore Entities.  Id. ¶¶ 40-43.

## C.    Petters Settlement

Following the collapse of the Petters Ponzi scheme, Acorn engaged in protracted litigation with the Petters receivership and some of the bankrupt Petters Entities.  See  Sullivan Aff. ¶¶ 39-42 (listing adversary proceedings filed by bankrupt Petters Entities against Acorn and ABRG).  In January 2011, a settlement (the "Settlement Agreement") was reached among the

---

[3]  SCAF, PG, LA, ACG II, and Acorn are collectively referred to as "the Onshore Entities."

Petters receiver, Petters bankruptcy trustees, ABRG, and Acorn.  See First Ryba Decl. Ex. Z

(Settlement Agreement).  The Settlement Agreement provided for up-front and future payments

to ABRG from the Petters receivership and bankruptcy estates.  The Settlement Agreement was

approved by the bankruptcy court overseeing the bankruptcy proceedings, the district court

overseeing the Petters receivership case, and the Bermuda Court overseeing the liquidation of the

Offshore Fund.

On or about February 4, 2011, Quan, acting on behalf of the Onshore Entities, entered

into a letter agreement ("DZ Bank Letter Agreement") with DZ Bank, Autobahn Funding

Company, LLC, and ABRG regarding the distribution of SCAF's $5.9 million share of the

settlement payments.  Id. Ex. AA.  Under the Letter Agreement, Quan agreed to pay the

substantial majority of SCAF's settlement payments to DZ Bank.  Id. Ex. AA ¶¶ 2.A.-2.B.  The

amounts not paid to DZ Bank were to be used to repay debts owed by SCAF or SIA to creditors

other than Quan or entities in his control, but could also be used to reimburse Quan for out-of-

pocket legal expenses or other related costs or fees paid by him on behalf of SCAF or SIA.  Id.

Quan, acting on behalf of ACG II, also entered into a letter agreement with Sovereign

Bank ("Sovereign Bank Letter Agreement") acknowledging Sovereign Bank's status as a

creditor of ACG II, and agreeing that ACG II's share of the up-front and future settlement

payments would be paid to Sovereign Bank.  Sullivan Aff. ¶ 83, Ex. 6.  The Petters receiver and

Petters bankruptcy trustees were not parties to the DZ Bank and Sovereign Bank Letter

Agreements, and the Letter Agreements were not filed with or approved by the Court.

**D.      SEC Action, Asset Freeze**

On March 24, 2011, the SEC filed this action alleging Defendants violated federal

securities laws by making false statements, misrepresentations, and material omissions to investors about the Petters Notes.  <u>See</u> <u>generally</u> Compl.  The Complaint alleges Defendants misled investors by falsely promising that their investments in Petters Notes were safeguarded by a lockbox arrangement requiring retailers to make Note payments directly into to a lockbox account.  <u>Id.</u> ¶¶ 65-74.  According to the SEC, Quan had known since 2001 that payments into the lockbox account were being made by a Petters Entity, rather than by retailers.  <u>Id.</u> ¶ 72.  Quan had allegedly also been warned by DZ Bank in 2005 that a Petters Entity was making payments into the lockbox.  <u>Id.</u> ¶ 73.  Defendants allegedly made false representations they were: protecting the investments in the Petters Notes by retaining auditors to examine Petters' Entities; purchasing insurance to guard against risk to collateral; and performing extensive due diligence.  <u>Id.</u> ¶¶ 75-84.  Quan also allegedly concealed defaults and extensions on Petters Notes.  <u>Id.</u> ¶¶ 85-129.

Contemporaneous with the filing of the Complaint, the SEC filed an expedited motion to appoint a receiver and impose an asset freeze over all Defendants and the settlement proceeds.  SEC's Mot. for Asset Freeze, Appointment of a Receiver, Prelim. Inj., and other Ancillary Relief [Docket No. 2].  The request was prompted by the SEC's discovery that Quan intended to disburse the settlement proceeds in a manner that would deprive SCAF's investors of a share of the settlement payments.  Mem. in Supp. of SEC's Mot. [Docket No. 3] at 1-3.

The Court denied without prejudice the SEC's request for a receiver and instead ordered expedited discovery and an accounting.  May 3, 2011 Order at 14-16.  The Court imposed a freeze on the settlement proceeds to prevent their dissipation if it was later determined that investors held a superior interest in the funds.  <u>Id.</u> at 10, 14.  The asset freeze allowed for the

release of the Offshore Funds' asserted share of the settlement proceeds to the Bermuda

Liquidator after sixty days unless the SEC could show the amount to be distributed to the

Bermuda Liquidator was unfairly high.[4]  Id. at 12-14.  On July 18, 2011, the Court approved a

stipulation among the SEC, the Bermuda Liquidator, and ABRG allowing for payment to the

Bermuda Liquidator of an agreed-upon portion of the frozen funds and future settlement

payments.  Order, July 18, 2011 [Docket No. 62] ¶¶ 1-4.

The Onshore Entities' share of the settlement proceeds remains frozen in the Registry

Account.  The Registry Account also includes funds recovered from SCAF's investments in non-

Petters notes and other investments.  See Order, Dec. 12, 2011; Order, Dec. 15, 2011.  Presently,

the amount frozen in the Registry Account is approximately $18 million, an increase of $4

million from the amount frozen in March 2011.  Ryba Supp. Decl. [Docket No. 113] ¶¶ 8-9.  The

SEC estimates the Onshore Entities' investors and creditors will file claims totaling more than

$150 million against the frozen funds.  Id. ¶¶ 16-19, Ex. 11.

**E.     Ancillary SCAF Litigation**

SCAF has been named as a party in civil lawsuits to recover assets or defend against

claims filed by third parties.  Ryba Supp. Decl. ¶¶ 10-14; Quan Decl., March 2, 2012 [Docket

No. 125] ¶¶ 3-6.  Because Quan continues to be responsible for managing the business of SCAF,

he oversees the efforts by the various law firms litigating these actions.  Coolidge Decl., March

2, 2012 [Docket No. 123] ¶ 5.  The litigation has been funded by SCAF's non-frozen assets and

funds from interested parties including DZ Bank, the Bermuda Liquidator, SIA, Acorn, and

---

[4]   The amount of the Offshore Funds' asserted share was based on ABRG's calculations of
the Offshore Funds' ownership percentage in the Petters Notes, as verified by third parties and the
Bermuda Liquidator.  May 3, 2011 Order at 13.

Quan himself.  Mem. of Law in Supp. of Defs.' Mot. for Release of Funds [Docket No. 86] at 10.

Quan recently requested the release of a limited amount of the frozen funds to pay for SCAF's

defense in a civil action alleging fraud by SCAF, Quan, Acorn, and the Offshore Funds.  See

Order, Feb. 16, 2012 [Docket No. 104].  The Court denied the request, reasoning in part that

Quan is not the best party to oversee the litigation against SCAF where he is the actor accused of

defrauding SCAF's investors.  Id. at 7.

**F.      Present Motions**

**1.      DZ Bank[5]**

DZ Bank requests the Court allocate the frozen funds among the Onshore Entities and to

establish a Court-administered claims process for the frozen funds.  DZ Bank argues the Court

has all the information it needs to apportion the frozen funds among the Onshore Entities

because ABRG has already calculated each of the Onshore Entities' ownership percentages in

the Petters and non-Petters recoveries that constitute the frozen funds.  DZ Bank contends the

Court relied on ABRG's calculations of note ownership interest when it approved the

distribution of the Offshore Funds' share of the frozen funds to the Bermuda Liquidator, and that

these calculations should be similarly relied upon to allocate the remaining funds among the

Onshore Entities.

DZ Bank further requests that, after allocating the frozen funds, a claims process be

established to allow creditors and investors of the various Onshore Entities to submit claims for

payment from the frozen funds.  Under DZ Bank's proposed claims process, interested parties

would have a specified time period during which to challenge claims to the frozen funds.  Upon

---

[5]  Sovereign Bank joins in DZ Bank's Motion.  [Docket No. 141].

expiration of the time period, challenged claims would be decided by the Court after briefing and oral argument. Unchallenged claims would be paid in accordance with the absolute priority rule. DZ Bank argues the proposed claims process eliminates the need for a costly receiver and provides an efficient mechanism for distributing the frozen funds to interested parties.

The SEC opposes DZ Bank's Motion, arguing DZ Bank's proposed allocation and claims process fails to address that it is Quan who remains in control of SCAF, and that the interests of SCAF's investors should no longer be represented by the individual who allegedly defrauded them. The SEC also argues that distribution of the frozen funds under the absolute priority rule is not equitable, because such a distribution would provide DZ Bank with two-thirds of the frozen funds despite holding only 8% of outstanding claims, and would potentially leave defrauded investors with no recovery. The SEC contends an equitable distribution plan, as opposed to the absolute priority rule, is appropriate here because SCAF was used as a vehicle for Quan's fraud, and thus the frozen funds may be disgorged and paid to SCAF's defrauded investors.

### 2.    SEC

The SEC argues the issues related to the frozen funds are better resolved by the appointment of a receiver and an anti-suit injunction over SCAF, SCAF's subsidiaries, and the frozen funds. The SEC contends Quan's alleged securities violations make him unfit to manage SCAF, and that a receiver is necessary to provide SCAF's investors with neutral representation, conduct an orderly wind-down of SCAF's operations, and propose a distribution plan for the frozen funds that treats defrauded investors equitably.

The SEC also seeks an anti-suit injunction that would include a stay of actions to: (1)

enforce competing judgments against the frozen funds, SCAF, and SCAF's subsidiaries; and (2) enjoin the filing of any voluntary or involuntary bankruptcy petitions naming SCAF or its subsidiaries as debtors.  The SEC argues the injunction would reduce the costs of the receivership by allowing the receiver to focus on winding up SCAF's affairs and distributing frozen assets, rather than spending time and money defending satellite litigation.  The SEC further contends the stay would preserve the Court's sole jurisdiction over the funds and ensure a distribution process that resolves claims based solely on equitable principles rather than under the laws of bankruptcy or secured transactions.

DZ Bank and Defendants oppose the SEC's request for a receiver.[6]  They argue a receiver is not warranted because the task of recovering assets on behalf of SCAF has largely been completed by ABRG, and that optimum recoveries were obtained due to the overlap of interests among SCAF, DZ Bank, and the Bermuda Liquidator.  For example, DZ Bank argues its status as a creditor of the Onshore Entities motivated it to ensure SCAF recoveries were vigorously pursued so that DZ Bank would be paid in full, and the frozen funds are the result of recovery efforts that were largely funded by DZ Bank.  Similarly, Defendants argue the Bermuda Liquidator sought the maximum possible return on the Petters Notes for the Offshore Funds, which had the effect of optimizing SCAF's recovery on the Petters Notes.  Defendants also assert they have cooperated with the SEC's discovery requests by providing the SEC with extensive documents and testimony concerning SCAF's assets and financial affairs, and that the discovery has not revealed the existence of additional SCAF assets.  Thus, DZ Bank and

---

[6] Sovereign Bank joins in DZ Bank's opposition. [Docket No. 140].  DZ Bank and Sovereign Bank do not oppose the SEC's request for an anti-suit injunction, and Defendants support the request.  DZ Bank's Mem. in Opp. [Docket No. 138] at 3 n.3; Defs.' Mem. in Opp. [Docket No. 127] at 1 n.1.

Defendants contend appointing a receiver with the broad powers requested by the SEC would unnecessarily deplete the funds available for distribution to investors and creditors by allowing the receiver to conduct unlimited discovery in a quest for additional SCAF assets without a basis for believing such assets exist.

DZ Bank and Defendants also argue that if the Court requires assistance with the claims process, it should appoint a Disbursement Agent with a narrowly defined mandate instead of a receiver. Defendants further urge that if a receiver is appointed, the SEC's proposed order should be modified to: (1) eliminate provisions requiring Quan and his attorneys to cooperate with and assist the receiver; (2) narrow the scope of the receiver's potential liability and subpoena powers; and (3) clarify when the receiver's actions require Court approval.

DZ Bank also disputes the SEC's contention that the frozen funds should be distributed under an equitable plan. DZ Bank argues the SEC's attempt to characterize the frozen funds as "disgorgement" is erroneous, because the funds are recoveries on the Onshore Entities' investments and were not obtained as the result of the SEC's proof or settlement of its security fraud allegations. DZ Bank, therefore, argues that principles that may apply to disgorged funds are not applicable here, and the frozen funds should be distributed to SCAF's creditors and investors in accordance with SCAF's governing documents and caselaw requiring creditors to be paid ahead of equity holders.

## III. DISCUSSION

### A.    Appointment of Receiver

"A receiver is an extraordinary equitable remedy that is only justified in extreme situations." <u>Aviation Supply Corp. v. R.S.B.I. Aeorospace, Inc.</u>, 999 F.2d 314, 316 (8th Cir.

1993).  In an SEC enforcement action, a district court may appoint a receiver "to protect the estate property and ultimately return that property to the proper parties in interest."  <u>SEC v. Credit Bancorp, LTD</u>, 93 F. Supp. 2d 475, 476 (S.D.N.Y. 2000).  A receiver's duties include "marshaling and preserving the assets of the estate in order to effectuate an orderly, efficient, and equitable administration of the estate."  <u>Id.</u> at 476-77.  A receiver may also clarify the receivership entity's financial affairs for the benefit of innocent shareholders and conduct an independent investigation of claims the entity may have against former management or other parties.  <u>SEC v. Wencke</u>, 622 F.2d 1363, 1372 (9th Cir. 1980).

Factors considered by the Eighth Circuit in determining whether a receiver may be appointed include: (1) the validity of the claim asserted by the party seeking appointment, (2) "the probability that fraudulent conduct has occurred or will occur to frustrate that claim," (3) the "imminent danger that property will be concealed, lost, or diminished in value," (4) the inadequacy of other available legal remedies, (5) the "lack of a less drastic equitable remedy," and (6) and the "likelihood that appointing the receiver will do more good than harm."  <u>Id.</u> at 316-17.

Here, the SEC has asserted a claim against Quan for securities violations.  The SEC alleges Quan and his entities engaged in fraudulent conduct by making false statements, misrepresentations, and material omissions to investors regarding the Petters Notes.  The SEC further contends Quan's Letter Agreements with DZ Bank and Sovereign Bank would have deprived SCAF's investors of a share of the recoveries from the Petters Notes if the SEC had not intervened.  These allegations raise serious concerns whether Quan can be expected to act in the best interests of SCAF and its investors in collecting SCAF's remaining assets, investigating

claims SCAF may have against other parties, and overseeing satellite litigation involving SCAF.

Additionally, because the $18 million of presently frozen assets falls far short of the estimated

$150 million in claims held by the Onshore Entities' creditors and investors, there is an

imminent danger that investors who may be entitled to a portion of the frozen funds will be

deprived of their rightful share if the frozen funds are distributed before an independent fiduciary

has clarified SCAF's finances.

Further, the less drastic remedies already imposed – expedited discovery and an

accounting – have failed to provide adequate assurance that Quan is properly representing the

interests of SCAF's investors or that SCAF's assets have been fully pursued.  For example, the

SEC alleges Acorn continues to owe SCAF more than $12 million in past due loans.  Ryba

Decl., Feb. 1, 2012 ("Second Ryba Decl.") [Docket No. 90] ¶¶ 12-20.

Finally, there is a strong likelihood that a receiver will do more good than harm.  Not

only will a receiver prevent the harm that would result if funds are distributed before a receiver

has clarified SCAF's finances, a receiver will also ensure that SCAF's assets have been fully

identified and collected by a neutral fiduciary.  Although DZ Bank and Quan insist the collection

process has been largely completed, the parties overseeing the recovery efforts thus far have

been: (1) DZ Bank, who was acting in its own self interest; (2) the Bermuda Liquidator, who had

no duty to investigate or pursue assets or claims belonging exclusively to SCAF; and (3) Quan,

who is accused of defrauding investors.  Thus, SCAF will benefit from an independent

fiduciary's clarification of SCAF's financial affairs and investigation of whether SCAF has

remaining assets or claims that have not been collected or pursued.

Accordingly, just as the Bermuda Liquidator provided fiduciary oversight in winding

down of the Offshore Funds and distributing its assets, a receiver will be appointed here to wind

down SCAF and its subsidiaries, marshal any remaining assets, and distribute the frozen funds to

their rightful owners.

To address the concern over receivership costs, the Court will appoint a receiver who

arrives at the task already well versed in the background of this case,[7] and will place a cap on the

maximum hourly billing rate for the receiver and his retained professionals.  The Court will also

require requests for compensation of receivership services be made monthly and by motion, with

the opportunity for interested parties to object.  In conjunction with the fee requests, the receiver

will be required to provide the Court with all billing statements underlying the requests.  The

billing statements will be reviewed by the Court *in camera* to determine whether the services

performed were reasonable and necessary.  The receiver will also be required to obtain Court

approval prior to filing litigation on behalf of SCAF.

The Court declines DZ Bank and Defendants' requests to limit the receiver's discovery

powers, and will not exclude the requirement that Defendants cooperate with and assist the

receiver.  These provisions are necessary to ensure the receiver is fully able to accomplish his

tasks.  However, Defendants' counsel will not be expressly required to cooperate with and assist

the receiver, as counsel already holds a duty of fairness to opposing party and counsel.  See, e.g.,

Minn. R. Prof. Conduct 3.4.

**B.      Anti-Suit Injunction**

A receivership court has the inherent power to stay actions and proceedings that interfere

---

[7] The Court will appoint Gary Hansen of Oppenheimer, Wolff & Donnelly, LLC, who served as the receiver for Frank E. Vennes, Jr. and his companies in the related civil receivership case against Petters, Vennes, and others.  See U.S. v.Petters, Civ. No. 08-5348 ADM/JSM (D. Minn.) ("Petters Civil") [Petters Civil Docket No. 59] at 7.

with the administration of the receivership estate.  <u>Wencke</u>, 622 F.2d at 1369;  <u>Credit Bancorp</u>, 93 F. Supp. 2d at 477.  This power "has been recognized specifically in the context of securities fraud cases."  <u>Credit Bancorp</u>, 93 F. Supp. 2d at 477.

The SEC's unopposed request for an anti-suit injunction will be granted to reduce receivership costs, allow the receiver to perform his duties without the distraction of satellite litigation, and preserve this Court's jurisdiction over the ultimate distribution of SCAF's assets and the frozen funds.

**C.     DZ Bank's Motion**

DZ Bank's Motion to allocate funds and establish a claims process is denied based on the Court's finding that a receiver is necessary to investigate the financial status of the receivership estate before the frozen funds are distributed.

Additionally, a distribution plan is premature at this stage, because the merits of the SEC's case have not been resolved.  A determination has not yet been made as to whether the frozen funds will be disgorged.  DZ Bank argues disgorgement is not applicable here because SCAF is not a defendant in this action, but is instead a victim of Quan's fraud.  However, the SEC alleges SCAF was used by Quan to fraudulently solicit investments.  <u>See</u> Compl. ¶ 45 ("Quan . . . raised over $252,000,000 by selling interests in SCAF LLC to investors"); ¶¶ 61-129 (alleging falsehoods by Quan to induce investments in SCAF).  The SEC also alleges the settlement payments from the Petters Notes constitute ill-gotten gains belonging to investors.  <u>Id.</u> ¶¶ 23, 168.  Further, the SEC has recently moved to amend the Complaint to add SCAF and others as Defendants in this action.  <u>See</u> Pl.'s Mot. for Leave to File First Am. Compl. [Docket No. 143].  Accordingly, because the potential for disgorgement exists, the funds will not be

distributed at this time.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Sovereign Bank's Motion to Intervene [Docket No. 132] is **GRANTED**; the SEC's Motion [Docket No. 111] is **GRANTED**; and DZ Bank's Motion [Docket No. 107] is **DENIED**.

The Court appoints Gary Hansen of Oppenheimer, Wolff & Donnelly, LLC, as Receiver for (1) Stewardship Credit Arbitrage Fund, LLC, Livingston Acres, LLC and Putnam Green, LLC ("the Receivership Entities"); and (2) all money and assets held by this Court in connection with this proceeding, including all money and assets received by the Court in the future in connection with this proceeding.  The Receivership Entities and the money and assets held by this Court, for which Gary Hansen is hereby appointed Receiver, are hereinafter referred to as the "Receivership Estate."

**IT IS FURTHER ORDERED THAT:**

**I.**

The Receiver shall have the following powers and duties:

A.   To use reasonable efforts to determine the nature, location and value of all assets and property which the Receivership Estate owns, possesses, has a beneficial interest in, or controls;

B.   To engage and employ, with the prior approval of the Court, any individuals or entities the Receiver deems reasonably necessary to assist in his duties ("Retained Personnel");

C.   To take custody, control and possession of all the funds, property, premises,

16

leases, and other assets of or in the possession, or under the direct or indirect control of the Receivership Estate; to manage, control, operate and maintain the Receivership Estate for the purpose of winding down the activities of the Receivership Entities; to use income, earnings, rents and profits of the Receivership Estate for the purpose of managing, controlling, operating and maintaining the Receivership Estate;

D.   With the prior approval of the Court, to dissolve the Receivership Entities;

E.   With the prior approval of the Court, to bring such legal actions based on law or equity in any state, federal, or foreign court as he deems reasonably necessary or appropriate in discharging his duties as Receiver;

F.   To resist and defend all suits, actions, claims and demands which may now be pending or which may be brought or asserted against the Receivership Estate;

G.   To make such payments and disbursements from the funds so taken into his custody, control and possession or thereafter received, and to incur such expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

H.   To take such action as necessary and appropriate to prevent the dissipation or concealment of any funds or assets or for the preservation of any such funds and assets of the Receivership Estate;

I.   To have the authority to issue subpoenas to compel testimony of persons or production of records, consistent with the Federal Rules of Civil Procedure and the Local Rules for the United States District Court for the District of Minnesota (without being subject to the limits imposed by Fed. R. Civ. P. 26(d)(1)), concerning any subject matter relating to the identification, preservation, collection and/or liquidation of the Receivership Estate, except that

17

notice of a subpoena does not have to be provided by the Receiver to any party;

      J.    To take any action which could be taken by the officers, directors, partners, members, shareholders, and trustees of the Receivership Entities;

      K.    To suspend, terminate or grant a leave of absence to any employees or independent contractors of the Receivership Entities; and

      L.    To take such other action as may be approved by this Court.

## II.

The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estate.  Such compensation shall be in amounts commensurate with the services performed by the Receiver and Retained Personnel, and shall be subject to approval of the Court.  The billing rates of the Receiver and his Retained professionals may not be increased during the existence of the Receivership Estate and may not exceed $500 per hour.  The Receiver and Retained Personnel shall apply to the Court monthly for compensation and expense reimbursement.  All such applications shall be filed electronically and shall be supported by billing statements to be reviewed by the Court *in camera*.  Interested parties, including the Commission, shall have the opportunity to object to any application of the Receiver and Retained Personnel for compensation.

## III.

The Receiver and Retained Personnel are entitled to rely on all outstanding rules of law and Court orders and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree.  In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as

18

Receiver or Retained Personnel, nor shall the Receiver or Retained Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties.

## IV.

The Receiver shall establish one or more bank account(s), in his discretion, to deposit the Receivership Estate's frozen funds and any other funds the Receiver may recover.  The Receiver shall use such funds for any legitimate purpose consistent with the Receiver's powers and duties and this Order, including paying fees and expenses of the Receiver and Retained Personnel, as approved by the Court.

## V.

The Defendants, the Relief Defendant, their members, partners, officers, agents, servants, employees, independent contractors, and any persons acting for or on behalf of the Receivership Estate, a Defendant, or a Relief Defendant, are required to assist the Receiver in fulfilling his duties and obligations.  As such, they must respond promptly and truthfully to all requests for information and documents from the Receiver.

## VI.

All investors, members, partners, borrowers, creditors, and other persons, and all others acting on behalf of any such investor, member, partner, borrower, creditor or other persons, including sheriffs, marshals, other officers, deputies, servants, agents, employees, independent contractors, and attorneys, are stayed from:

A.   Taking any action to enforce any judgment against the Receivership Estate;

B.    Taking any action to collect any debt allegedly owed by the Receivership Estate;

C.    Filing any voluntary or involuntary petition under the Bankruptcy Code on behalf of the Receivership Estate;

D.    Using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any assets of the Receivership Estate, wherever situated;

E.    Attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement or other agreement with or otherwise affecting the Receivership Estate, without the agreement of the Receiver; and

F.    Doing any act to interfere with the taking control, possession, or management, by the Receiver, of any assets of the Receivership Estate, or to in any way interfere with or harass the Receiver, or to interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estate.

## VII.

From time to time, upon application of the Receiver, the Court shall reissue this Order and upon applications of the Receiver may amend this Order.

## VIII.

All persons, and all others acting on behalf of any such persons, including sheriffs, marshals, other officers, deputies, servants, agents, employees, independent contractors, and attorneys, are ordered to turn over to the Receiver any and all property, including records of any nature, of which the Receivership Estate is the owner or has an interest in promptly upon

20

receiving notice of the entry of this Order.

## IX.

No person holding or claiming any position of any sort with any of the Receivership Entities shall possess any authority to act by or on behalf of the Receivership Entities.

## X.

No officers, directors, partners, members, shareholders, and trustees of any corporations, partnerships, companies, trusts and/or other entity (regardless of form) that are among the Receivership Estate shall exercise any of their rights or powers with respect to the Receivership Entities until further order of the Court.

## XI.

The Defendants, the Relief Defendant, their agents, servants, employees, independent contractors, attorneys, any persons acting for or on behalf of the Receivership Estate, and any persons receiving notice of this Order by personal service or otherwise, are hereby restrained and enjoined from disposing, transferring, exchanging, assigning, or in any way conveying any property or assets of the Receivership Estate, and are restrained and enjoined from transacting any business of the Receivership Estate, except with the prior approval of the Receiver.

## XII.

The Defendants, the Relief Defendant, their agents, servants, employees, independent contractors, and attorneys, any persons acting for or on behalf of the Receivership Estate, and any persons receiving notice of this Order by personal service or otherwise, having possession of the property, business, books, records, accounts or assets of the Receivership Estate, are hereby directed to deliver the same to the Receiver, his agents and/or employees.

**XIII.**

The Defendants, the Relief Defendant, their agents, servants, employees, independent contractors, any persons acting for or on behalf of the Receivership Entities, and entities under their direct or indirect control shall cooperate with and assist the Receiver and shall take no action, directly or indirectly, to hinder, obstruct, or otherwise interfere with the Receiver, in the performance of his duties.

**XIV.**

Any brokerage institution, financial institution, bank, savings and loan, mutual fund, or any other person, partnership, or corporation maintaining or having custody or control of any brokerage or deposit account or other assets of the Receivership Estate, that receives actual notice of this Order by personal service, facsimile transmission or otherwise shall, within three (3) business days of receipt of that notice, serve on the Receiver and counsel for the Commission a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice.

**XV.**

The Receiver is authorized to communicate with all such persons as he deems appropriate to inform them of the status of this matter and the financial condition of the Receivership Estate.  The Receiver is further authorized to record this Order with government offices and to serve this Order on any person as he deems appropriate in furtherance of his responsibilities in this matter.   All government offices which maintain public files of security interests in real and personal property are hereby ordered to record this Order when requested to

do so by the Receiver or the Commission.

## XVI.

The Receiver shall promptly notify the Court and counsel for the Commission of any failure or apparent failure of the Defendants or the Relief Defendant to comply in any way with the terms of this Order.

## XVII.

Within 45 days of entry of any order for disgorgement of funds in this case, the Receiver shall propose to this Court and to the Commission a transparent claims and distribution process that provides all interested parties – including the Commission – with notice, an opportunity to submit their claims, and an opportunity to be heard before the Receiver and the Commission jointly or separately submit their recommended distribution plan(s) to the Court.

## XVIII.

No provision of this Order shall require the waiver of, or otherwise impinge upon, any person's rights to assert any applicable Constitutional or other privilege in lieu of complying with the terms of this Order.

## XIX.

The Receiver shall file with the Clerk of this Court a bond in the sum of $100,000 with sureties to be approved by the Court, conditioned that the Receiver will well and truly perform the duties of the office and abide by and perform all acts at the Court's discretion.

**SO ORDERED.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  April 30, 2012.