UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,  Plaintiff,  v.  MARLON QUAN *et al.*,  Defendants. | Civil No. 11-723 ADM/JSM |

**DECLARATION OF BRUCE E. COOLIDGE**

1.  My name is Bruce Coolidge. I am a partner in the law firm Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"). WilmerHale represents Marlon Quan and other defendants in this case.

2.  In October 2009, Mr. Quan retained WilmerHale to represent him and his companies Stewardship Investment Advisors, LLC ("SIA") and Acorn Capital Group, LLC ("Acorn") in connection with a formal investigation of the United States Securities and Exchange Commission ("SEC"). After the SEC sued Mr. Quan and his companies in March 2011, WilmerHale agreed to represent them in the lawsuit on a fixed fee basis in light of Mr. Quan's financial resources. The management committee of the firm approved the engagement on that basis, although it expected the engagement to be

unprofitable, because the firm had represented Mr. Quan in the SEC investigation. To the best of our understanding, the amount of the fixed fee represented all of the proceeds of the sole significant liquid asset remaining at Mr. Quan's disposal.

3. In connection with my responsibilities as the senior lawyer in the representation, I have supervised several junior attorneys and, both directly and indirectly, legal assistants and other WilmerHale employees assisting primarily in gathering, producing and organizing documents for production to the SEC and for use in the defense of the case. The information in this declaration is based on knowledge I obtained in the course of my supervision of the representation, including our clients' responses to document requests and subpoenas. In addition, the information in this declaration is based in part on information I received in order to prepare this declaration, including from legal assistants directly responsible for document management, from an attorney representing Ricoh USA Inc., and from an attorney at the Connecticut law firm of Axinn Veltrop, who specializes in document management and production and played a significant role in coordinating document production in connection with the SEC investigation and other litigation arising out of the collapse of the Petters fraud.

4. Shortly after WilmerHale's engagement in October 2009, I learned that Mr. Quan's companies had already engaged well-respected e-discovery providers to assist him and his companies in connection with a number of private lawsuits in various venues arising out of the collapse of the Petters Ponzi scheme and to centralize the management of documents. Those companies included IKON Office Solutions (part of

2

Ricoh USA, Inc.) and De Novo Legal LLC.  In addition, I understood that IKON had contracted with another e-discovery firm, Catalyst, to provide hosting services for the data collected.  I learned in addition that the Connecticut law firm of Axinn Veltrop was acting as counsel responsible for overseeing and coordinating document requests from law firms responsible for handling individual matters, including several civil lawsuits filed against Mr. Quan and the other entity defendants.  I understand that, among other tasks, IKON was engaged in a process of collecting substantially all paper and electronic records of SIA and Acorn that might be relevant to litigation and to enable their clients to search for and produce records requested in discovery efficiently and cost effectively.

5.     I learned also during the early period of WilmerHale's engagement that long before the collapse of the Petters fraud, SIA had contracted with a company called Smarsh for email archiving services.  Smarsh holds itself out as a "best in class" provider of email archiving systems, specializing in providing such services for regulated entities such as SIA, a registered investment advisory firm.  According to Smarsh's website:

> The Smarsh email archiving and compliance solution will capture every email (and attachment) that enters or leaves your organization, as well as internal messages, and preserve them all in evidentiary-quality form in a central repository. Within the Web-based Smarsh Management Console, administrators leverage best-in-class search, supervision and on-demand export functionality.[1]

It was my understanding that the Smarsh email capture system had been integrated into the IKON database to ensure that emails would be included among the documents that could be searched for and produced via the IKON database and Catalyst platform.

---

[1]     See http://www.smarsh.com/registered-investment-advisor/email-archiving (viewed on December 16, 2012).

6. During the period of the SEC investigation, my understanding was that IKON was charged with the responsibility, working with others, to place Mr. Quan and his companies in a position to comply in a professional and efficient manner with anticipated demands for documents from multiple sources. I understood that Catalyst provided hosting services for the IKON database and a software platform for permitting attorney review of documents to determine whether they were responsive to document demands and other purposes. In addition, I understood that IKON and Catalyst worked with De Novo Legal, which provided attorneys to conduct the physical review of documents (on computer screens) and to make determinations whether the documents were responsive to document requests. My understanding, in addition, was that De Novo employees made initial determinations whether documents were subject to a claim of attorney-client privilege. IKON and De Novo employees worked directly with lawyers at Axinn Veltrop who specialized in document management. WilmerHale attorneys (and legal assistants) who received the document requests from the SEC interacted with IKON, De Novo and Axinn Veltrop.

7. To the best of my knowledge and belief, IKON was primarily or exclusively responsible for the task of document collection in order to create a database that could be manipulated and searched for responsive productions. My understanding is that IKON made collections of both hard copy documents and documents stored in electronic form. In addition, it is my understanding that the electronic documents included both documents that resided on computers owned by Acorn and SIA and emails

that were available in the Smarsh system (which was intended to capture all internal and external emails).  To the best of my knowledge and understanding, IKON incorporated information from computer drives (including desktop computers and servers) into its searchable database.

8.  My general understanding and belief about the scope of IKON's work was that it conformed to standard document management practices in the context of litigation involving large amounts of hard copy and electronic data.  Furthermore, my understanding was that IKON was engaged primarily to ensure that all documents that might reasonably be required to be produced in litigation were available in database format, so that ultimately attorneys might review documents on screen based on computerized search parameters.  I understood that hard copy documents were subject to optical character recognition protocols to make them electronically searchable as well.  To the best of my understanding, the process for document production in the SEC investigation (and other litigation matters) was that attorneys employed by De Novo Legal LLC had access to the IKON database or databases and performed searches for responsive documents, including, among other things, tagging documents as potentially privileged (again based on electronic screens such as lists of attorney names and email addresses).

9.  In connection with preparation of this declaration, I was informed by Axinn Veltrop that one of the early steps taken by IKON in about July 2009 (before WilmerHale's engagement in October) was also to create "forensic images" of computer

drives. My general understanding is that creating such images is a common practice of firms such as IKON, and that the reason for doing so is to create a "frozen" image reflecting the exact state of the computer drives at a given point in time. Creating such an image can avoid or mitigate later questions about destruction of data and provides a disaster recovery backup system. While I do not recall learning previously that IKON had taken that step, I am aware that it is not uncommon for firms like IKON to do so.

10. Mr. Quan and his companies have not been able to obtain the assistance of IKON or De Novo Legal LLC since March 2011 because of their lack of financial resources. Mr. Quan's companies then owed approximately $400,000 to De Novo and $100,000 to IKON. The total fees for De Novo exceeded $1.8 million and for IKON exceeded $500,000.

11. Notwithstanding the inability to pay for and obtain the continued assistance of IKON or De Novo, WilmerHale also sought to cooperate with the SEC in permitting the SEC to obtain access to the IKON database. That issue arose in connection with the SEC's requests that Mr. Quan provide financial information in connection with settlement efforts. Since WilmerHale did not have access to the database, it agreed to cooperate with the SEC in permitting the SEC itself to search the database, subject only to making appropriate arrangements for a "clawback" of privileged documents that might be responsive but subject to a claim of attorney-client privilege or work product protection. In July 2012, the SEC sent a proposed clawback agreement to WilmerHale, which WilmerHale agreed to sign. The SEC never sent a proposed execution copy to

finalize the agreement. (After discussions about whether the SEC should use a "taint team" the SEC proposed additional terms, to which WilmerHale also agreed. However, the SEC again did not follow through to finalize the agreement.) *See* Exhibits 1, 2.

12. In June 2011 WilmerHale had occasion to confirm to the SEC that some computer drives were still accessible. Specifically, on June 28, 2011, a WilmerHale lawyer working under my supervision wrote to SEC counsel as follows, disclosing the current status of the main company servers:

> Mr. Quan has advised us that the data storage company providing backup service for the SIA and Acorn servers is going out of business. He plans to move the live and archived data to a company called Jungle Disk LLC, which provides "cloud" storage for business and personal data. I am providing you this information in light of the document preservation order. It is our understanding that the data will continue to be maintained in a manner that is consistent with that order. Please let me know if you have any questions.

A copy of the email is attached as Exhibit 3 to this declaration.

13. Notwithstanding the confirmation that the SIA and Acorn servers continued in existence, and that Quan planned to create a backup of them, the SEC never inquired about these servers, or requested an opportunity to conduct a forensic examination of them. Nor did it inquire about the current availability of other computer drives.

14. WilmerHale, on behalf of its clients, has produced close to two million pages of documents belonging primarily to and in the custody of Acorn and SIA. The production has included approximately 600,000 emails.

15. Before the present motion, however, the SEC never sought access to metadata that is available solely from forensic images of computer drives. It never

7

specified parameters for production of documents stored in electronic form, or raised any questions about metadata or storage media. Although the SEC in March 2011 sought and obtained a broad order against the destruction of documents and information, it never inquired whether computer drives maintained by SIA and Acorn remained available or had been destroyed before or after entry of that order.

16. The SEC first wrote to Acorn asking for documents in October 2008. *See* Exhibit 4. After that initial letter inquiry, Mr. Quan, SIA and Acorn received a number of requests for documents. These requests included (1) requests for documents from the SEC's Office of Compliance Inspections and Examinations ("OCIE") located in Boston, which coordinated with the SEC's Division of Enforcement staff located in Chicago, (2) informal requests for documents and information from Enforcement staff in Chicago, and (3) subpoenas for documents from same Enforcement staff.

17. OCIE submitted a total of eighteen requests for documents. These requests occurred both before and after WilmerHale's engagement. Samples of these requests are appended to this declaration as Exhibits 5 and 6. Exhibit 5 is the first OCIE request.

18. Enforcement staff on a number of occasions made written informal requests for documents and information. Samples of these requests are appended as Exhibits 7 and 8.

19. In addition, the SEC Enforcement staff sent to Mr. Quan, his companies and some employees subpoenas for documents. Samples of these subpoenas are appended as Exhibits 9 and 10.

20. The SEC has in recent years sometimes provided very detailed specifications for the format of responses to subpoenas, including specifications of metadata required to accompany documents or files being produced. Some of these specifications include extremely detailed technical specifications for metadata. In the present case, the SEC Enforcement attorneys never provided any specifications with respect to the parameters for production of electronic records. Likewise, nothing in any of the SEC requests for documents suggested that they wanted to conduct a forensic examination of the media on which documents were stored. The SEC never complained about defendants' failure to provide metadata.

21. WilmerHale informed the SEC that the IKON database was not the only source of information that could potentially relate to the business of Acorn and SIA. Counsel for Quan and his companies disclosed that hundreds of boxes of documents were maintained by Westy's Storage in Connecticut. WilmerHale advised the SEC that while they understood that IKON had converted a very large number of paper documents into images that were searchable in the IKON database, it had no ability to assure the SEC that all documents in storage were in fact also available in the database. There were discussions between WilmerHale and the SEC about arranging for a visit to the warehouse facilities, but no time was ever set for such a visit. Although I was unaware of it at the time, I understand that to the best of Mr. Quan's knowledge all of the Acorn and SIA computers used by individual employees are located at the facility.

22. In May 2011 I wrote to the SEC seeking its view about what should be done with documents in warehouse storage, and advising that WilmerHale's clients "are not in a position to continue to pay storage charges." *See* Exhibit 11. To the best of my recollection and belief, the SEC did not respond to this inquiry and writing, although there continued to be discussions about the warehouse and the SEC subsequently contacted Westy's directly.

23. In its response to the SEC's request for production of documents filed in this case, the defendants disclaimed custody of documents that were held by its third party document vendors, explaining that these vendors would not provide Quan access to them without payment of outstanding unpaid bills. *See* Exhibit 12.

24. The SEC has in several cases failed to produce documents to the defendants until the defendants notified the SEC that it was aware of them from third parties. For example, the defendants learned that in May 2011 the SEC had sent an "investor questionnaire" and received approximately twenty responses including documents in June 2011. The SEC's explanation was simply that it had "inadvertently" overlooked

10

that database in producing documents to defendants – though the vast bulk of the SEC production had been a production to WilmerHale of the same documents the SEC had received from WilmerHale. *See* Exhibits 13, 14.

I declare under penalties of perjury that the foregoing statements are true to the best of my knowledge, information and belief.

_____
Bruce E. Coolidge

Executed this 21st day of December, 2012.