UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | CIVIL NO. 11-723 (ADM/JSM) |
| Plaintiff, | |
| v. | ORDER |
| MARLON QUAN, et.al. | |
| Defendants. | |

This matter came before the Court on Plaintiff's Rule 16(b) Motion for Extension of Discovery Deadlines [Docket No. 202]. John Birkenheier, Esq. and Timothy S. Leiman, Esq. appeared on behalf of plaintiff; Bruce E. Coolidge, Esq. appeared on behalf of defendants.

The Court, being duly advised in the premises, upon all the files, records and proceedings herein, for the reasons described in the memorandum below, now makes and enters the following Order.

**IT IS HEREBY ORDERED THAT** Plaintiff's Rule 16(b) Motion for Extension of Discovery Deadlines [Docket No. 202] is **DENIED.**

Dated:   March 4, 2013          *s/ Janie S. Mayeron*
                                JANIE S. MAYERON
                                United States Magistrate Judge

**MEMORANDUM**

I.   **BACKGROUND**

On March 24, 2011, the SEC brought this enforcement action against defendant Marlon Quan and companies Quan controlled, alleging that Quan, a Connecticut-based hedge fund manager, "funneled hundreds of millions of dollars to Tom Petters[1] and his notorious Ponzi scheme." Complaint, ¶¶1, 3. [Docket No. 1]. Quan owned and controlled defendant corporations Stewardship Investment Advisors, LLC ("SIA") and Acorn Capital Group, LLC ("Acorn"). Declaration of Donald A. Ryba in Support of Plaintiff's Emergency Motion for an Asset Freeze Order and Other Relief, ¶¶8, 9 [Docket No. 4].

Pursuant to Fed. R. Civ. P. 16(b)(4), the SEC has moved for an order extending discovery deadlines,[2] alleging that it only recently learned from a third party, Ricoh USA, Inc. ("Ricoh") that Ricoh possesses forensic images of 30 computer hard drives, along with the hard drives of the computers used by Quan and "other material witnesses" in

---

[1]   Petters was convicted of wire and mail fraud, conspiracy to commit mail and wire fraud, conspiracy to commit money laundering and money laundering, and is incarcerated. United States of America v. Petters, Crim. No. 08-364 (RHK/AJB) [Docket No. 400] (Judgment in a Criminal Case).

[2]   The fact discovery cutoff was January 1, 2013. Pretrial Scheduling Order, p. 2 [Docket No. 159]. This cutoff was extended to January 4, 2013, for the limited purpose of allowing intervenor Sovereign Bank to complete its production of documents to the SEC, and to January 18, 2013, for the limited purpose of allowing the SEC to take Sovereign Bank's 30(b)(6) deposition. Amended Pretrial Scheduling Order, p. 2 [Docket No. 214]. Expert disclosures by the parties were scheduled to take place in January, February and March of 2013, and all expert depositions to be completed by April 1, 2013. Id.

the case, which contain at least a terabyte of ESI.[3]  Plaintiff's Memorandum of Law in Support of its Rule 16(b)(4) Motion for Extension of Discovery Deadlines ("Pl. Mem."), pp. 1-2 [Docket No. 203].  According to the SEC, defendants consistently represented that there were only two forms of relevant information available: paper documents and an electronic database created by Ricoh ("Ricoh Database") by scanning "some portion" of the paper records.  Id., p. 2.

The SEC argued:

> Rule 26(f)(3) requires the discussion of "any issues about disclosure or discovery of <u>electronically stored information</u>, including the form or forms in which it should be produced (emphasis added)."  During the conference, defense counsel advised counsel for the SEC of two collections of relevant documents and ESI: the Paper Records at the New York storage facility and the Ricoh Database.  Defense counsel did not disclose the forensic images during the Rule 26(f) conference.

Id., p. 3 (citations omitted).  Defendants stated in their Rule 26(f) disclosures that they had already produced "<u>all known documents and tangible things</u> that could be located with reasonable diligence and which may be used to support the claims or defenses in this action (emphasis added)."  Id. (quoting Declaration of Sally J. Hewitt ("Hewitt Decl."), Ex. A, defendants' Rule 26 disclosures) [Docket No. 203-3] (emphasis added by SEC).

On September 28, 2012, the SEC issued document requests asking defendants to identify documents no longer within defendants' possession, custody or control, their

---

[3]   The SEC described a terabyte as "amounting to millions of pages of typewritten text." Pl. Mem., p. 5.  Defendants believe that this estimate is unduly conservative and noted that depending on the format, a terabyte of data might equal a billion pages of text.  Defendants' Opposition to Motion of the Securities and Exchange Commission for Extension of Discovery Deadlines ("Def. Mem."), p. 13, fn. 4 [Docket No. 209].

present or last known custodian and why they were not being produced. Id., p. 5. The defendants answered, stating that they could no longer access the Paper Records or Ricoh Database because they had not paid the vendors. Id. Defendants did not mention the existence of forensic images. Id.

The SEC learned of the forensic images and hard drives in November, 2012, after serving a subpoena on Ricoh seeking production of the Ricoh Database it had created for defendants. Pl. Mem., p. 5.[4] The SEC claimed it had no notice that the images and hard drives existed until a conversation with Ricoh's counsel on November 16, 2012, at which time Ricoh's counsel informed the SEC's counsel that in addition to the Ricoh Database, Ricoh had "complete bit-for-bit images of a number of computer hard drives belonging to Acorn, [SIA] and its individuals" and the hard drives were in a Ricoh facility in Texas. Declaration of Timothy S. Leiman ("Leiman Decl."), ¶¶12, 13.[5]

In response to the subpoena, Ricoh has agreed to produce to and the SEC is obtaining from Ricoh the Ricoh Database and the forensic images of the 30 computers. The SEC now wants to amend the scheduling order to extend various deadlines to give it time to absorb the data on the forensic images of the 30 hard drives, arguing that these forensic images "could" contain critical information such as deleted files and deletion attempts and tracked changes on documents. Pl. Mem., pp. 6-7. The SEC seeks to extend discovery in two phases. Id., pp. 11-12. In the first phase, the forensic images and Ricoh Database would be produced to the SEC. Id. In the second phase,

---

[4] A subpoena to Ricoh was necessary because defendants lost access to the documents. Pl. Mem., p. 4.

[5] Leiman did not explicitly state that the SEC had no notice of the hard drives until November, 2012, but that was clearly his implication.

the SEC would propose a framework for searching the forensic images and Ricoh Database, including steps to address privilege issues, and propose a revised schedule for completion of the case. Id., p. 12. At oral argument on the motion, the SEC's counsel could not say how long the additional discovery might take nor could he propose a new discovery cutoff date.

The SEC argued that this Court should grant its motion because: (1) it had acted diligently in conducting discovery; (2) factors beyond the SEC's control delayed the discovery of the new evidence (i.e. it was defendants' failure to disclose the existence of the forensic images and hard drives that triggered the motion, not the SEC's lack of diligence); and (3) the proposed modifications to the scheduling order were reasonable under the circumstances. Pl. Mem. pp. 8-12.

Defendants opposed the SEC's motion, arguing that in the dozens of written requests for information and subpoenas for the production of documents, the SEC never asked for metadata and never sought to examine the original computer hard drives. Def. Mem., p. 5. Further, before the lawsuit began, defendants responded to the SEC's request for the preservation of documents by retaining Ricoh, its ediscovery partner Catalyst and De Novo Legal Solutions, LLC. Declaration of Bruce E. Coolidge ("Coolidge Decl."), ¶¶6-8 [Docket No. 210].[6]

Defendants noted that they had produced nearly two million pages of documents to the SEC and the SEC never once sought metadata or complained about defendants' failure to produce it. Def. Mem., p. 6. Furthermore, defendants had offered to facilitate

---

[6] Catalyst provided hosting services for the data and software for data review. Coolidge Decl., ¶6.

the SEC's inspection of hundreds boxes of paper documents held in commercial storage units in Connecticut (where Quan believed the Acorn and SIA computers used by individuals employees were located), but the SEC never took the opportunity offered. Id.; Coolidge Decl., ¶21.

According to the defendants, the SEC's instant motion "makes no sense" because after having been informed all along regarding the existence of the Ricoh Database and the existence of millions of pages of documents, it was inconceivable that the SEC would not know that the defendant companies used computers until Ricoh told the SEC lawyers that it had images of the hard drives. Def. Mem., p. 7. Further, defendants told the SEC more than eighteen months ago that the data storage company providing back-up service for the SIA and Acorn servers was going out of business. Coolidge Decl., Ex. 3 (email correspondence from defendants' counsel to the SEC's counsel dated June 28, 2011). Defendants maintained that the SEC's counsel and the staff prosecuting the case "know how to ask for metadata when they want it, and they know how to demand access to physical things like computer drives." Def. Mem., pp. 10-11. Defendants further submitted the "SEC has received in response [to requests and subpoenas in this case] close to two million pages of documents that contained no metadata of the type they now assert to be 'critical.'" Id., p. 11.

Defendants also argued that the SEC had completely failed to make a case for why the metadata was important or relevant, other than its bald assertion that it was. Id., p. 13. The SEC had not identified any missing documents or information that it believed the metadata would identify. Id.

In response to this latter argument, at the motion hearing, the SEC's counsel indicated that based on witness testimony, the SEC had learned that Quan may have been involved in drafting documents sent to investors such as newsletters and private placement memos. Quan has testified that he did not see these materials, which were drafted by others. The SEC noted that metadata would reveal whether Quan read or edited these materials or whether documents had been deleted from the hard drives.

Finally, defendants objected to the SEC's proposal for an open-ended extension of the discovery schedule and noted that to the extent that the SEC engaged in forensic examination of metadata, defendants would be forced to do the same, including a costly privilege review of the material. Id., p. 14. At the motion hearing, the SEC minimized this concern by arguing that because the hard drives were in the custody and control of Ricoh, a third party vendor, the defendants had waived their right to assert any privileges over the material, rendering a privilege review unnecessary.

## II. STANDARD OF REVIEW

Pursuant to Rule 16(b), a schedule "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Similarly, Local Rule 16.3(b) states that a party who moves to modify a scheduling order must: (1) establish good cause for the proposed modification, and (2) explain the proposed modification's effect on any deadlines.[7] Scheduling orders pursuant to Rule 16(b)(1) "assure[] that at some point both the parties and the pleadings will be fixed, . . ." Rule 16(b), Federal Rules of Civil

---

[7] In addition to this requirement, a party moving to modify a scheduling order's discovery deadline must also: "(1) describe what discovery remains to be completed; (2) describe the discovery that has been completed; (3) explain why not all discovery has been completed; and (4) state how long it will take to complete discovery." Local Rule 16.3(c).

7

Procedure, Advisory Committee Notes--1983 Amendment.

"The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements." Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 717 (8th Cir. 2008) (quoting Rahn v. Hawkins, 464 F.3d 813, 822 (8th Cir. 2006)). "The 'exacting' standard set by Rule 16(b) requires that a moving party first make the requisite good cause showing. Shukh v. Seagate Tech., LLC, Civ. No. 10-404 (JRT/JJK), 2013 WL 53835 at *3 (D. Minn. Jan. 3, 2013) (citing E.E.O.C. v. Hibbing Taconite, 266 F.R.D. 260, 265 (D. Minn. 2009)).

While the prejudice to the nonmovant resulting from modification of the scheduling order may also be a relevant factor, generally, a court will not consider prejudice if the movant has not been diligent in meeting the scheduling order's deadlines. See Bradford v. DANA Corp., 249 F.3d 807, 809 (8th Cir. 2001) (concluding that there was "no need to explore beyond the first criterion, [diligence,] because the record clearly demonstrate[d] that Bradford made only minimal efforts to satisfy the [scheduling ] order.")

"Rule 16(b) focuses on "the diligence of the party seeking to modify a Scheduling Order, as opposed to the litany of unpersuasive excuses, inclusive of inadvertence and neglect, which commonly undergird an untimely Motion to Amend." Scheidecker v. Arvig Enterprises, 193 F.R.D. 630, 632 n. 1 (D. Minn. 2000) (citations omitted). "It hardly bears mentioning. . . that carelessness is not compatible with a finding of diligence and offers no reason for a grant for relief." Hibbing Taconite, 266 F.R.D. at 265; see also C.H. Robinson Co. v. Zurich American Ins. Co., Civ. No. 02-4794 (PAM/RLE), 2004 WL 1765320 at *1 (D. Minn. Aug. 05, 2004) ("Carelessness does not

excuse dilatoriness and 'offers no reason for a grant of relief.'") (quoting North Star Mut. Ins. Co. v. Zurich Ins. Co., 269 F. Supp.2d 1140, 1144 (D. Minn. 2003)); Rosati v. Cleveland-Cliffs, Inc., 259 F. Supp.2d 861, 875 (D. Minn. 2003) ("'[C]arelessness is not compatible with a finding of diligence and offers no reason for a grant of relief.'") (quoting Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir. 1992));. Parker v. Columbia Pictures Indus., 204 F.3d 326, 340-41 (2nd Cir. 2000) (a party does not meet the good cause standard under Rule 16(b) if the relevant information on which it based the amended claim was available to it earlier in the litigation) (citation omitted).

In short, Rule 16(b) focuses on the diligence of the party seeking to change the scheduling order, not prejudice to the non-moving party.

### III.   ANALYSIS

This case commenced on March 23, 2011 [Docket No. 1]. The deadline for fact discovery was January 1, 2013, subject to the exception for discovery involving Sovereign Bank. Amended Pretrial Scheduling Order, p. 2. Yet the SEC's involvement in and investigation of this matter dates back to 2008. Coolidge Decl., ¶16, Ex. 4. In September 2008, the FBI raided Petters' businesses. On October 3, 2008, the SEC wrote to Acorn, requesting that it preserve all ESI pertaining to Petters. Coolidge Decl., Ex. 4. In 2009 and 2010, the SEC requested and subpoenaed documents and information, including ESI, from Quan, SIA, Acorn and Robert Bucci (Acorn's CFO and SIA' assistant portfolio manager). Id., Exs. 5-10. None of these requests sought to examine defendants' computers, forensic images of computer hard drives or metadata.

Immediately following commencement of the suit, the SEC sought and obtained an order from Judge Montgomery directing defendants not to destroy documents and

information, including ESI.  See SEC's Memorandum in Support of Motion for Asset Freeze, p. 20 ("At this point, any information relating to this case should be preserved, period.") [Docket No. 3]; Memorandum Order and Opinion, May 3, 2011, p. 21 (ordering document preservation, including electronically stored information.).  Certainly, the SEC could have requested at that time or at any time during the suit, production of the computers or a forensic image of the hard drives, or pursued discovery to learn if the computers, forensic images or metadata existed.  It did not do so.  Indeed, at the motion hearing the SEC's counsel conceded that during depositions of Quan and others, the SEC never inquired as to the existence of their computers or forensic images of the hard drives of the computers.

The lynchpin to the SEC's diligence argument is that it was misled by defendants' Rule 26(f) disclosures, in which the defendants did not disclose to the SEC the forensic images.  In short, the SEC maintained that had defendants just told it about the existence of their computers and hard drives, it would have asked for them.  This Court rejects the SEC's argument that it was the defendants' conduct, not the SEC's lack of diligence, that has triggered the instant motion.

Federal Rule of Civil Procedure 26(f)(C)(3) requires that "a discovery plan must state the parties' views and proposals on: . . . any issues about disclosure or discovery of electronically stored information, including the form or forms in which it should be produced."  Rule 26(a)(1)(A)(ii) provides that a party must, without awaiting a discovery request, provide to the other parties "a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its

claims or defenses, unless the use would be solely for impeachment."). Section (e)(2) of Form 3 of the Local Rules (Rule 26(f) report form) provides: "Discovery of Electronically Stored Information.  The parties have discussed issues about disclosure or discovery of electronically stored information as required by Fed. R. Civ. P. 26(f), including the form or forms in which it should be produced. . . ."

Neither the discovery rules nor Form 3 require a party to identify the repositories or "containers" of relevant documents or information – i.e. where relevant documents are housed (e.g. on a computer, in a drawer or in a file cabinet.).  However, even if the Rules did require such disclosure, or even if the defendants' statements at the Rule 26(f) conference or in their disclosures caused the SEC to believe that there were no forensic images or hard drives (or, at worst, actively misled the SEC into such a belief), the diligence required by Rule 16(b) required the SEC to test those beliefs through discovery.  Discovery is an adversarial process that depends upon the full and truthful answers of the responding party.  Discovery does not, however, require the responding party to suggest paths of discovery not identified by the inquiring party.  This conclusion is particularly warranted here, where the SEC has alleged intentional and deliberate misconduct by Quan and where the SEC maintains that the information contained in the forensic images or hard drives is critical to show Quan's culpability.

As previously noted, the SEC has been aware since October, 2008 that defendants used computers to generate relevant information and to communicate. Further, the SEC was aware early on in this suit that at least some computers still existed.  See Coolidge Decl., ¶ 12, Ex. 3 (email from Quan's counsel to the SEC's counsel informing the SEC that the data storage company providing backup service for

11

the SIA and Acorn servers was going out of business and that Quan planned to move the data to another company.). In sum, a diligent and experienced lawyer who was seeking ESI and taking steps to preserve ESI in a suit alleging fraud would have asked (or at least confirmed) in what form the raw ESI still existed. Here, the SEC failed to do that and the fault lies with the SEC, not defendants.

Based on the foregoing, this Court concludes that the SEC was not diligent in pursuing the forensic images, computer hard drives or metadata. Whether its failure to do so was carelessness or based on a strategic considerations unknown to this Court is of no consequence. The fact of the matter is that the SEC waited until shortly before the close of fact discovery to request this material, when it knew or should have known all along that it existed. It is inconceivable to this Court that any party conducting discovery in the 21st century and knowing as the SEC did here, that the documents and data which defendants were producing had been generated by a computers, would not ask about the existence of computers or hard drives if it believed the metadata was relevant or could lead to the discovery of admissible evidence. The Court will not amend the scheduling order to compensate for the SEC's lack of diligence in how it has conducted discovery.[8]

---

[8] Having concluded that the SEC was not diligent in its pursuit of this information the Court need not consider the prejudice to the defendants if the Court was to grant the SEC's motion. That said, the Court cannot help but observe that the defendants would be extremely prejudiced by what would essentially become an open-ended discovery process. Further, any suggestion that defendants would not have to review whatever the SEC obtained whether for substance or privilege, borders on the ridiculous. For example, the fact that defendants' computers have been held hostage due to nonpayment does not render any privileges to the contents of these computers waived. But the Court also notes that by denying the SEC's request for additional time to receive and process the information produced by Ricoh, the Court is not preventing Ricoh from producing this information to the SEC or the SEC from using this information. Indeed,

In addition to finding that the SEC was not diligent in seeking to pursue the data contained on the forensic images or 30 hard drives in Ricoh's possession, this Court also finds that the SEC's request for an extension of the discovery schedule for an unknown period of time is unreasonable in light of the following factors: (1) the voluminous discovery that defendants have already produced to the SEC; (2) the discovery that is available for the SEC to review (hard copy documents being housed in commercial storage units), which the SEC has not yet reviewed despite knowing of the existence of these documents; (3) the amount of data at issue (one terabyte or more); (4) the cost to defendants in allowing the requested discovery; (5) the lack of evidence to support the SEC's belief that the forensic images will produce critical or material information; and (6) the significant delay that will result if the Court grants the relief requested.

Unlike most plaintiffs who cannot conduct discovery against their opponent before commencement of a lawsuit, before filing the instant suit the SEC spent more than 2 ½ years investigating and obtaining information from defendants bearing on the claims asserted in the suit. In response, to address this investigation and in anticipation of litigation, defendants created an electronic database of information to respond to requests for information and documents from the SEC at a cost of nearly $2.0 million. Coolidge Decl., ¶10. Defendants have represented to this Court that the documents and emails that resided on computers owned by Acorn and SIA and the email archiving system were collected by Ricoh and placed on the Ricoh database. See Coolidge

---

had defendants wanted to object to Ricoh producing documents to the SEC's subpoena, that is a matter they could have taken up with the court issuing the subpoena.

Decl., ¶¶ 4, 5, 7. Then, in response to numerous requests and subpoenas from the SEC, following examination of documents for privilege, defendants produced to the SEC during the investigation approximately 1.6 million pages of documents and 600,000 emails. See Coolidge Decl., ¶¶ 6, 14, 16, 17, 19. The SEC has not disputed these representations. Nor has the SEC provided any evidence to this Court that defendants' previous production of documents to the SEC was been lacking or was not responsive to its document requests in this suit.[9] Instead, what the SEC has submitted to the Court is its belief that "the 30 imaged hard drives likely contain material evidence, such as deleted documents; user activity logs; and metadata, revealing what documents were read and edited, by whom, and when." Pl. Mem., p. 10. The SEC provided no concrete evidence to support its belief. Even counsel's example at the motion hearing regarding Quan's possible involvement in the writing or editing of investor communications was speculative.

This case has been ongoing since March 2011, nearly 21 months. Now, on the eve of the deadline for fact discovery and based on nothing more than pure speculation that the forensic images will produce material information its case, the SEC seeks to

---

[9] Since the suit began, the SEC has been on notice that defendants were relying on the documents produced to the SEC during the investigation for their Rule 26(a)(1) disclosures and responses to the SEC's document requests. Hewitt Decl., Exs. A, B; Coolidge Decl., Ex. 12. Further, the SEC has been on notice that defendants could not obtain documents on the Ricoh Database to respond to the SEC's document requests because Ricoh would not permit access to the Database without payment of an outstanding bill of $100,000. Hewitt Decl., Ex. B; Coolidge Decl., Ex. 12. Coolidge Decl., ¶23, Ex. 12. Nevertheless, despite its awareness of this database and that defendants could not access it because of their failure to pay the outstanding bill to Ricoh, the SEC only recently subpoenaed (and will be receiving) the database from Ricoh. Why the SEC did not subpoena the database from the outset is inexplicable. Had it done so, it could have had access to all documents and emails that were on defendants' computer systems and not just 1.6 million pages of documents and 600,000 emails produced during the investigation.

place this case into free fall for an unknown period of time while it first examines the forensic images and Ricoh Database, develops a protocol for searching these sources and addressing issues of privilege, and only then will proceed to propose a revised schedule to complete the case. SEC Mem., pp. 11-12.

Based on this record, this Court concludes that the SEC has failed to show good cause to amend the Amended Pretrial Scheduling Order to allow it to digest all of the information obtained from Ricoh before it proceeds to conclude discovery.

J.S.M.