# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| U.S. Securities and Exchange Commission, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | **AND ORDER** |
| | ) | Civil No. 11-723 ADM/JSM |
| Marlon Quan; Acorn Capital | ) | |
| Group, LLC; Stewardship Investment | ) | |
| Advisors, LLC; Stewardship Credit | ) | |
| Arbitrage Fund, LLC; Putnam Green, LLC; | ) | |
| Livingston Acres, LLC; and ACG II, LLC, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| Florene Quan, | ) | |
| | ) | |
| Relief Defendant, | ) | |
| | ) | |
| Nigel Chatterjee; DZ Bank AG Deutsche | ) | |
| Zentral-Genossenschaftsbank, Frankfurt | ) | |
| am Main; Sovereign Bank; Topwater | ) | |
| Exclusive Fund III, LLC; Freestone Low | ) | |
| Volatility Partners, LP; and Freestone | ) | |
| Low Volatility Qualified Partners, LP; | ) | |
| | ) | |
| Intervenors, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Gary Hansen, | ) | |
| | ) | |
| Receiver. | ) | |

Timothy S. Leiman, Esq., John E. Birkenheier, Esq., Charles J. Kerstetter, Esq., and Sally J. Hewitt, Esq., U.S. Securities and Exchange Commission, Chicago, IL, and James Alexander, Esq., United States Attorney's Office, Minneapolis, MN, on behalf of Plaintiff U.S. Securities and Exchange Commission.

Bruce E. Coolidge, Esq., and Laura Schwalbe, Esq., Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., and Sanket Bulsara, Esq., Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, on behalf of Defendants Marlon Quan, Stewardship Investment Advisors, LLC, Acorn Capital Group, LLC, ACG II, LLC, and Relief Defendant Florene Quan.

Gary Hansen, Esq., and Ranelle Leier, Esq., Oppenheimer Wolff & Donnelly LLP, Minneapolis, MN, on behalf of Receiver Gary Hansen, Receiver for Stewardship Credit Arbitrage Fund, LLC, Putnam Green, LLC, and Livingston Acres, LLC.

Jonathan T. Shepard, Esq., Robert M. Fleischer, Esq., and Eric M. Fishman, Esq., Pryor Cashman LLP, New York, NY, and George E. Warner, Esq., Warner Law, LLC, Minneapolis, MN, on behalf of Intervenors Topwater Exclusive Fund III, LLC; Freestone Low Volatility Partners, LP; and Freestone Low Volatility Qualified Partners, LP.

James A. Fortosis, Esq., Hille R. Sheppard, Esq., Stephen C. Carlson, Esq., and Mark Borrelli, Esq., Sidley Austin LLP, Chicago, IL, on behalf of Intervenor DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt am Main.

Ben M. Krowicki, Esq., Bingham McCutchen LLP, Hartford, CT, and Joshua A. Hasko, Esq., Messerli & Kramer P.A., Minneapolis, MN, on behalf of Intervenor Sovereign Bank.

_____

## I. INTRODUCTION

On July 24, 2013, the undersigned United States District Judge heard oral argument on Plaintiff United States Securities and Exchange Commission's ("SEC") Motion for Partial Summary Judgment [Docket No. 258]; Defendant Marlon Quan's Motion for Partial Summary Judgment [Docket No. 271]; Relief Defendant Florene Quan's Motion for Summary Judgment [Docket No. 269]; Defendants Marlon Quan, Acorn Capital Group, LLC, Stewardship Investment Advisors, LLC, and ACG II, LLC's Motion to Exclude Expert Opinion Testimony [Docket No. 286]; Defendants Stewardship Credit Arbitrage Fund, LLC, Putnam Green, LLC, and Livingston Acres, LLC's (collectively, the "Receivership Defendants") Motion to Approve Stipulation [Docket No. 277]; and Intervenors Topwater Exclusive Fund III, LLC, Freestone Low Volatility Partners, LP, and Freestone Low Volatility Qualified Partners, LP's (collectively, "Preferred Investors") Motion to Dismiss [Docket No. 263].

For the reasons set forth below, the SEC's Motion for Partial Summary Judgment is denied; Marlon Quan's Motion for Partial Summary Judgment is denied; Florene Quan's Motion

for Summary Judgment is denied in part and stayed in part; the Motion to Exclude Expert

Opinion is denied; the Receivership Defendants' Motion to Approve Stipulation is granted; and

the Preferred Investors' Motion to Dismiss is denied.

## II.  BACKGROUND

This SEC enforcement action alleges Marlon Quan ("Quan"), along with entities owned

and controlled by him, violated securities laws by: (1) fraudulently selling membership interests

in hedge funds through the use of offering and marketing materials that included materially false

or misleading representations; and (2) concealing defaults on the hedge funds' core

investments—promissory notes issued by Thomas J. Petters' companies (the "Petters

Notes")—when those investments began failing in December 2007.  See generally Am. Compl.

[Docket No. 160].  In September 2008, a Petters employee and confidant informed federal agents

that Petters was operating a multi-billion dollar Ponzi scheme.  Pl.'s App. Supp. Summ. J., Vol. I

("Pl.'s Summ. J. App. I") [Docket No. 261] at 8.  When the scheme collapsed, many investors,

including the hedge funds founded by Quan, suffered severe financial losses.

For the purposes of the present motions, the SEC does not argue that Quan knew of

Petters' fraud.  Rather, the SEC contends Quan and his entities lied to existing and prospective

hedge fund investors about anti-fraud measures that would be taken to safeguard their

investments.  The SEC alleges Defendants' marketing materials and private placement

memoranda ("PPMs") promised to use risk management techniques that were never

implemented.  The SEC further contends when the Petters Notes began to fail, Quan and his

entities concealed the defaults by secretly restructuring the Petters Notes while informing

investors through newsletters and account statements that all was well.

The SEC alleges the representations and actions by Quan and his entities violated Sections 17(a)(1)-(3) of the Securities Act of 1933 ("Securities Act"), see 15 U.S.C. §§ 77q(a)(1)-(3); Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), see 15 U.S.C. §§ 78j(b), 78t(a); Rule 10b-5 promulgated under the Exchange Act, see 17 C.F.R. § 240.10b-5; Section 206(4) of the Investment Advisers Act of 1940 ("Advisers Act"), see 15 U.S.C. § 80b-6(4); and Rule 206(4)-8 promulgated under the Advisers Act, see 17 C.F.R. § 275.206(4)-8. The SEC also alleges Quan is liable for aiding and abetting violations of the Exchange Act and Advisers Act. The relief sought by the SEC includes a permanent injunction enjoining Defendants from future violations of securities laws, an order requiring Defendants and Relief Defendant Florene Quan to disgorge all ill-gotten gains, and civil penalties.

## A. The Quans

Marlon Quan is a Connecticut-based investment manager. Defs.' Answer to First Am. Compl. ("Quan Ans.") [Docket No. 161] ¶¶ 2, 47. Florene Quan has been married to Marlon Quan for 33 years and is the mother of their three children. F. Quan Summ. J. Mot. Exs. ("F. Quan Summ. J. Ex.") [Docket No. 275] Ex. 1 ("F. Quan Decl.") ¶¶ 2, 7. She has resided in the Quans' home in Edison, New Jersey for over thirty years, and has worked as a high school mathematics and computer science teacher since at least the year 2000. Id. ¶¶ 4, 6. She has never been employed by, or had any role in, the corporate entities named as defendants in this action. Id. ¶ 5.

## B. Acorn, SIA, and the SCAF Funds

In 2001, Marlon Quan founded Defendants Stewardship Investment Advisors, LLC ("SIA") and Acorn Capital Group, LLC ("Acorn") as Delaware limited liability companies.

Quan Ans. ¶¶ 47-49.  The two companies shared an office space in Greenwich, Connecticut.  Id. ¶ 49.  Quan owned virtually the entire equity interest in both SIA and Acorn, and controlled their day-to-day activities.  Id. ¶¶ 3, 48-49; F. Quan Summ. J. Ex. 2 ("First M. Quan Decl.") ¶ 3.

Acorn is a commercial finance business that extended credit to various companies, including companies owned by Petters.  Quan Ans. ¶¶ 49, 74.  SIA, an investment advisory business, was registered with the SEC as an investment advisor in 2005.  Pl.'s Summ. J. App. I at 25.  SIA is the managing member of and investment adviser to several private hedge funds, including Defendant Stewardship Credit Arbitrage Fund, LLC ("SCAF, LLC") and Stewardship Credit Arbitrage Fund, Ltd. ("SCAF, Ltd.") (together, the "SCAF Funds").  Quan Ans. ¶¶ 3-5, 47-48.  Through SIA, Quan controlled the SCAF Funds.  Id. ¶¶ 4, 47-48.

From 2001 to May 2008, Quan raised over $578 million from approximately 110 investors in the SCAF Funds.  Pl.'s Summ. J. App. I at 281-95.  More than half of the SCAF Funds' portfolio was invested in the Petters Notes.  Quan Ans. ¶ 73.  The loans were provided to Petters as asset-based financing for his merchandise distribution business.  See Pl.'s Summ. J. App. I at 8-9, 12.  Petters purportedly used the funds to purchase electronic goods from wholesalers and resell the goods at a markup to "big box" retailers such as Sam's Club.  Id. at 8. A portion of the resulting revenue would be returned to investors as interest.  Id. at 9.  The loans were to be secured by a security interest in the underlying inventory and receivables.  Id. at 8.  In reality, the electronic goods did not exist, and payments made by Petters to investors under the guise of profits were actually made with funds from other investors, a prototypical Ponzi scheme.  Id. at 12.

Quan, acting through SIA and Acorn, invested the SCAF Funds' assets in the Petters

Notes using the following structure: Acorn (1) purchased the Petters Notes from PAC Funding, LLC ("PAC Funding"), an entity established by Petters for the purpose of selling Petters Notes to Acorn, (2) re-sold the Petters Notes to the SCAF Funds at a markup, (3) monitored and received payments on the Petters Notes, and then (4) distributed interest and principal payments to the SCAF Funds.  Id. at 222, 227, 267-68; Pl.'s App. Supp. Summ. J., Vol. II ("Pl.'s Summ. J. App. II") [Docket No. 262] at 553-56.

From 2001 to 2009, SIA and Acorn collected over $94 million in management, origination, and servicing fees from the SCAF Funds' investors.  Pl.'s Summ. J. App. I at 130, 265-66, 268-69.  Of this amount, Quan received nearly $28 million as cash disbursements.  Id. at 102, 130.

## C.  Private Placement Memoranda and Marketing Materials

The SEC's allegations of securities fraud are based in part on representations in PPMs and marketing materials that Quan and his entities distributed to investors and potential investors.  Quan, SIA and SCAF, LLC distributed PPMs in the name of the SCAF Funds to investors and prospective investors beginning in May 2001.  Pl.'s Summ. J. App. I at 262-77; Pl.'s Summ. J. App. II at 421-22.  Quan and SIA also sent prospective investors and some existing investors marketing materials that included a printed version of a marketing Power Point presentation, which was referred to by SIA employees as a "flipbook."  Pl.'s Summ. J. App. I at 217-61; Pl.'s Summ. J. App. II at 425, 575-76; Quan Ans. ¶ 11.  The marketing flipbooks were issued by SIA.  Pl.'s Summ. J. App. I at 217-61.  Quan, in his role as investment manager to SIA, reviewed and approved each iteration of the PPMs and marketing flipbooks, and made all final decisions as to the materials distributed to investors and potential investors.  Pl.'s Summ. J.

App. II at 470, 576.

The PPMs and marketing flipbooks included representations that Acorn implemented the following techniques to control risk to the SCAF Funds: use of a "lockbox account," audits of "intermediaries" by a major accounting firm, performance of due diligence, procurement of insurance on short-term notes, and retention of borrowers' cash collateral in a segregated account.  See, e.g., Pl.'s Summ. J. App. I at 210-11, 245-47, 268.  The SEC argues these representations, which are set forth in more detail in Section III of this memorandum, were false or misleading because Acorn did not employ the protective measures as promised.  The Quans argue the SEC misconstrues the representations, and that the challenged representations were not misstatements of fact.

**D.  Default and Renegotiations of Petters Notes**

In addition to the alleged misrepresentations in the PPMs and flipbooks, the SEC claims Quan violated securities laws by engaging in a scheme to conceal defaults on the Petters Notes.  In or around December 2007, payments on the Petters Notes were becoming past due.  Pl.'s Summ. J. App. II at 526.  Petters told Quan the delay in payments was due to poor holiday sales that had caused retailers to be slow in making payments to PAC Funding.  Defs.' Mem. Opp'n Summ. J. Exs. ("Defs.' Opp'n Ex.") [Docket No. 303] Ex. 1 ("Second M. Quan Decl.") ¶ 2.  By February 21, 2008, approximately $119 million in Petters Notes were past due.  Pl.'s Summ. J. App. I at 297.  This amount comprised approximately 30% of the entire SCAF Funds' portfolio.  Id. at 278-80.

To address the overdue obligations, Quan negotiated the February 29, 2008 forbearance agreement ("Forbearance Agreement").  See id. at 307-17.  Under the Forbearance Agreement,

Acorn agreed to forgo exercising its remedies on the defaulted Petters Notes. Id. at 307-08. In exchange, PAC Funding agreed to replace the collateral securing the defaulted Petters Notes with "fresh" collateral in the form of new purchase order obligations by different "big box" retailers. Id.; Second M. Quan Decl. ¶ 4; Defs.' Opp'n Ex. 4 ("Seidenwar Dep.") at 129:14-22. As part of the same transaction, Acorn extended a $15 million loan to Polaroid Corporation ("Polaroid"), a company also owned by Petters. Polaroid pledged its domestic inventory and accounts receivable to secure the Petters Notes and the new Polaroid obligations. Pl.'s Summ. J. App. I at 318, 321; Second M. Quan Decl. ¶ 6; Seidenwar Dep. at 129:11-14.

The Polaroid loan was funded by cash from a cash collateral account in PAC Funding's name that was controlled solely by Acorn (the "Blocked Account"). Pl.'s Summ. J. App. I at 210-11. The Blocked Account served as additional cash collateral for the PAC Funding obligations in the event of default. See id. This risk management technique was referenced in SIA's marketing flipbooks, which stated that "[a]dditional cash collateral is held in a segregated account." Id. at 225, 244. Prior to the renegotiation, the Blocked Account held approximately $28 million. Pl.'s Summ. J. App. II at 605. On February 29, 2008, Acorn transferred over $20 million of these funds to Petters Company, Inc. as required under the Forbearance Agreement. Id. at 605-07; Pl.'s Summ. J. App. I at 308. Additionally, over $6.9 million from the Blocked Account was used to pay interest to the investors on the overdue Petters Notes. Id. at 308; Pl.'s Summ. J. App. II at 608-11. The Forbearance Agreement required PAC Funding to replenish the Blocked Account at the rate of $3 million per month, starting on April 15, 2008. Pl.'s Summ. J. App. I at 309. Quan and his entities did not inform investors that a payment default had occurred on the Petters Notes, that the Petters Notes had been renegotiated, that an interest payment had

been made from the Blocked Account rather than from PAC Funding's income stream, or that the Blocked Account had been emptied of its cash.  Pl.'s Summ. J. App. II at 581, 586.

Approximately ten days after the Petters Notes had been renegotiated and the Blocked Account had been depleted, SIA mailed investors a March 2008 newsletter stating that "few defaults have occurred" and "the Funds have experienced little to no writedowns."  Id. at 596. Monthly performance reports distributed to investors in the SCAF Funds for the months of February, March, and April 2008 showed uninterrupted earnings and did not mention that a payment default had occurred on the Petters Notes or that the Blocked Account had been depleted of funds.  Id. at 601-04.  The SCAF Funds continued to be marketed to prospective investors until May 2008.  Investors placed nearly $10 million in additional investments into the SCAF Funds from January through May 1, 2008.  Pl.'s Summ. J. App. I at 160-61.

Defaults on the Petters Notes continued, and on May 12, 2008, Acorn and PAC Funding agreed to cancel the outstanding Petters Notes and issue new notes (the "New Notes").  See id. at 336-37.  The New Notes had 180-day maturity dates, as opposed to the short-term 60-day maturity dates of the former Petters Notes.  Id. at 337.  The New Notes were secured by a lien on Polaroid's trademarks.  Id. at 355-61.  There is no evidence of sales to new SCAF Funds investors after the May 2008 renegotiation of the Petters Notes.

**E.  Gottex Lawsuit, Transfer of Hawaiian Properties from Marlon to Florene Quan**

On May 23, 2008, Quan and SIA were sued by the Gottex Funds ("Gottex") after Gottex attempted to redeem its investment and was informed the redemptions would not be honored in cash but instead through an "in kind" distribution.  See BNY AIS Nominees Ltd. v. Quan, No. 08-cv-796 (D. Conn. May 23, 2008).  Gottex was SCAF, Ltd.'s largest shareholder, with over

$92 million invested as of December 31, 2007.  Pl.'s Summ. J. App. II at 618-23.

Less than two months after Gottex filed suit, Quan transferred to Florene Quan two properties in Hawaii that he had purchased in November 2004 and May 2006.  Pl.'s Summ. J. App. II at 384-93; F. Quan Decl. ¶ 9.  One of the properties was a vacant land parcel recently valued at $972,600.  Pl.'s Summ. J. App. II at 383.  The other property included a residence built in 2007 that was financed with a construction loan made to Marlon Quan from HSBC Bank.  Id. at 588.  The home's appraised value was over $2.5 million in 2008.  Id. at 379.  The properties were transferred from Marlon to Florene Quan in separate warranty deeds for a total of $20.  Id. at 384, 389.  Quan avers he made the transfers for estate tax purposes after obtaining estate planning advice from counsel in February and April 2007 and in May 2008.  Id. at 589-90.  Marlon Quan and his family still use the residential property as a vacation home.  Id. at 590-91.

## F.  Relevant Procedural History

The SEC filed this action on March 24, 2011.  In April 2012, the Court determined a receiver was necessary to oversee the financial affairs of SCAF, LLC and its subsidiaries Putnam Green, LLC ("Putnam") and Livingston Acres, LLC ("Livingston") (collectively with SCAF, LLC, the "Receivership Defendants").  Order, Apr. 30, 2012 ("Receivership Order") [Docket No. 149].  Gary Hansen ("Receiver Hansen") was appointed as receiver.  Id. at 16.

On May 14, 2012, the SEC filed a First Amended Complaint adding additional claims and defendants, including the Receivership Defendants, to this suit.  See generally Am. Compl. On May 17, 2012, Receiver Hansen acknowledged service of the First Amended Complaint on the Receivership Defendants, and on or about June 8, 2012, he and the SEC agreed that the Receivership Defendants would have an indefinite extension of any obligation they might

10

otherwise have to respond to the First Amended Complaint.  See Hansen Aff. [Docket No. 296]

Ex. 1.

### III.  DISCUSSION

**A.  Summary Judgment Motions**

Before the Court are three separate summary judgment motions.  The SEC moves for

partial summary judgment on its claims that Quan, SIA, Acorn, and SCAF, LLC violated anti-

fraud provisions of the Securities Act, Exchange Act, and Adviser Act by: (1) representing that

they would require receivables to be paid to a lockbox account and would retain a major

accounting firm to audit the books of intermediaries; and (2) engaging in a scheme to conceal

defaults on the Petters Notes when payments were not made in late 2007.  The SEC also requests

a permanent injunction against Quan; disgorgement of ill-gotten gains and prejudgment interest

against Quan, Acorn, SIA, and SCAF, LLC; disgorgement of the Hawaiian properties from

Florene Quan; and imposition of a civil penalty on Quan, SIA, and Acorn.  Defendants Quan,

SIA, Acorn, and Relief Defendant Florene Quan oppose the motion.[1]

Florene Quan moves for summary judgment on two independent grounds.  First, she

argues she is not a proper relief defendant because she has a legitimate property interest in the

Hawaiian properties the SEC seeks to disgorge from her.  Second, she contends she does not

hold assets that are the proceeds of fraud, because the only allegations of fraud that predate the

acquisition of the Hawaiian properties are the statements in the SCAF Funds' PPMs.  Florene

---

[1] In a stipulation signed by all parties except the intervenors in this case ("Stipulation") , the SEC agreed to "hold its summary judgment motion as to SCAF[, LLC] in abeyance pending resolution of the claims against Quan, whether at summary judgment or at trial."  Stip. [Docket No. 276] ¶ 2.  Therefore, SCAF, LLC has not filed a response to the SEC's summary judgment motion.

Quan argues those statements were not fraudulent because they did not include false statements of fact with respect to: (1) Acorn's due diligence, (2) Acorn's use of a lockbox account, (3) Acorn's use of credit default insurance, or (4) audits of intermediaries.  The SEC opposes Florene Quan's motion.

Defendant Marlon Quan moves for partial summary judgment on the issue of whether he made or was responsible for false representations on or before June 1, 2006.  For the same reasons as those argued in Florene Quan's motion, Marlon Quan argues the PPMs did not include false statements of fact.  The SEC opposes Marlon Quan's motion as well.

**1.  Standard of Review**

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**2.  Securities Act § 17(a), Exchange Act § 10(b) and Rule 10b-5 (Counts I-V)**

Section 17(a) of the Securities Act prohibits fraud in the offer or sale of securities, and Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder prohibit fraud in connection with the purchase or sale of securities.  Specifically,  Section 17(a) makes it unlawful:

> for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q.  Additionally, Section 10(b) states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
> . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device . . . .

15 U.S.C. § 78j.  Finally, Rule 10b-5 makes it unlawful:

> for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Courts apply "nearly identical tests" for determining liability under Section 17(a), Section 10(b), and Rule 10b-5. SEC v. True North Fin. Corp., 909 F. Supp. 2d 1073, 1122 (D. Minn. 2012); see also SEC v. Haligiannis, 470 F. Supp. 2d 373, 381 (S.D.N.Y. 2007) (stating the standard for establishing the violation of Section 17(a) is "essentially the same" as that for Section 10(b) and Rule 10b-5).

To establish a violation under these anti-fraud provisions, the SEC must prove a defendant: (1) made a material misstatement or omission or engaged in deceptive conduct, (2) in connection with the offer, sale, or purchase of a security, (3) by means of interstate commerce. See SEC v. Shanahan, 646 F.3d 536, 541 (8th Cir. 2011) (involving misstatements and omissions); SEC v. Lucent Techs., Inc., 610 F. Supp. 2d 342, 350 (D.N.J. 2009) (involving deceptive conduct). Further, scienter is required to prove a violation of Section 17(a)(1), Section 10(b), and Rule 10b-5, while Sections 17(a)(2) and (3) are proven by showing a defendant acted negligently. Shanahan, 646 F.3d at 541 (citing Aaron v. SEC, 446 U.S. 680, 695 (1980)); True North, 909 F. Supp. 2d at 1122.

A misstatement is material if a reasonable investor would view it as "substantially altering the mix of information available to the investor." Gebhardt v. ConAgra Foods, Inc., 335

14

F.3d 824, 829 (8th Cir. 2003).  The information must be viewed from the perspective of a reasonable investor at the time the misrepresentation was made, not from the perspective of a reasonable investor with the benefit of hindsight.  Id. at 830-31.  Materiality is ordinarily a question of fact for the jury.  Id. at 829.

Scienter is the "intent to deceive, manipulate, or defraud."  Shanahan, 646 F.3d at 543 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)).  Scienter may also be based on "severe recklessness," which is shown by "highly unreasonable omissions or misinterpretations that involve . . . an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  Shanahan, 646 F.3d at 543 (quoting Fla. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 654 (8th Cir. 2001)).  Intent is generally a question of fact for the jury.  In re: K-tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 894 (8th Cir. 2002).

Negligence means "fail[ure] to use the degree of care and skill that a reasonable person of ordinary prudence and intelligence would be expected to exercise in the situation."  True North, 909 F. Supp. 2d at 1122.  A jury's "unique competence" in applying the reasonable person standard will ordinarily preclude summary judgment on the issue of negligence.  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 n.12 (1976).

### a.  PPM and Flipbook Representations

The SEC's allegations of fraud are based in part on allegedly false or misleading representations made in the SCAF Funds' PPMs and in SIA's flipbooks.  As an initial matter, Marlon and Florene Quan argue the SEC's reliance on the flipbooks is misplaced, because each

investor in the SCAF Funds signed a subscription agreement stating the investor had relied

solely on the representations in the PPM when deciding to invest.  See F. Quan Summ. J. Ex. 21

at SIASEC 626192.  The flipbooks recite that "[a]ny investment decision with request [sic] to the

Funds . . . should be based solely upon the information contained in the PPM for the applicable

Fund."  See id. Ex. 22 at SIASEC 40.  The Quans' argument is unavailing because, unlike a

private action for securities fraud, reliance is not a required element of the SEC's claims under

Section 17(a), Section 10(b), or Rule 10b-5.  See True North, 909 F. Supp. 2d at 1097 (rejecting

similar argument).  Thus, the representations in the marketing flipbooks will be considered in

determining whether Defendants made false or misleading statements that violated federal

securities laws.

### i.  Lockbox

The SEC, Marlon Quan, and Florene Quan all move for summary judgment on the issue

of whether representations in the PPMs and flipbooks concerning the use of lockbox accounts

were actionable misrepresentations.  The PPMs state in relevant part:

> As an example of the procedures Acorn will follow with respect to
> structuring Acorn Financed Note transactions, Acorn has informed
> the Company [i.e., SCAF, LLC] that it intends generally to undertake
> the following procedures with respect to each Distribution Company
> and related transactions:
> . . .
>
> •       require payment of the accounts receivable into a lock-box
>         account; . . . .

Pl.'s Summ. J. App. I at 268, 275-76.  SIA's marketing flipbooks include the following diagram:



Id. at 246.

The SEC contends the PPM statement and flipbook diagram led investors to believe that payments into the lockbox account would be made by the buyers in the Petters Notes transactions (i.e., retailers such as Costco or Sam's Club), rather than by the borrower (i.e., PAC Funding).  The SEC contends the representations were false, because it is undisputed that payments to the bank lockbox account for the Petters Notes were made by Petters entities, and not by retailers.  See Pl.'s Summ. J. App. II at 569-71.

The SEC argues Petters' direct payment of funds into the lockbox was a critical departure from the methodology of using a lockbox to prevent fraud in asset-based lending transactions. According to the SEC's expert, a lockbox typically operates in the following manner: (1) the lender establishes a lockbox account in its name, (2) the borrower's customers—here, the "big

box" retailers—make payments directly into the lockbox, and (3) the lender subtracts the loan

interest and principal from the payments and sends the remaining funds to the borrower.  The

requirement that customers make payments directly into the lockbox is crucial to controlling risk

and preventing fraud, argues the SEC, because it gives the lender control over the borrower's

income stream and enables the lender to: (1) understand how the collateral has performed by

knowing when customers paid for the goods; (2) ensure the proceeds from the collateral are not

being used by the borrower for other purposes; and (3) verify the existence of the borrower's

receivables.

The SEC contends the lockbox diagram in the flipbooks is consistent with this

conventional lockbox structure because the diagram depicts buyers making payments directly to

the lockbox account.  The SEC argues that Quan, having illustrated in the lockbox diagram how

the flow of lockbox funds would be structured to control risk, was obligated to disclose that the

lockbox account for the Petters Notes did not operate as depicted, and that payments to the

lockbox came from Petters directly, rather than from his "big box" retail customers.  The SEC

further argues that if Quan, SIA, and Acorn had required retailers to make payments directly into

the lockbox account, they would have discovered that the purported business transactions had

been fabricated by Petters and that he was not actually conducting business with those retailers.

The Quans argue there were no material misrepresentations with respect to the lockbox

account.  They contend the lockbox safeguard was merely cited in the PPMs as "an example of

the procedures Acorn . . . intend[ed] generally to undertake . . . ."  See Pl.'s Summ. J. App. I at

268, 275 (emphases added).  The Quans contend that specifying something as a general example

does not entitle an investor to assume the example will be used in all cases.  The Quans also

argue that neither the PPMs nor the flipbooks stated that buyers would be required to submit payments directly to the lockbox.  They note that the PPMs merely state that Acorn would "require payment of the accounts receivable into a lock-box account," and do not specify who would be required to make the payments.  They further insist the lockbox diagram does not depict buyers submitting payments directly to the lockbox account.  They contend that not all lockbox accounts operate in the same manner, and there is no universal requirement that payments into a lockbox come directly from buyers.

A genuine fact issue exists as to whether the PPM and lockbox diagram were false or misleading.  Although the PPM lists techniques that would "generally" be used, a reasonable jury could conclude the representation was misleading because the lockbox procedure that was to be <u>generally</u> undertaken was not the actual procedure used for the <u>majority</u> of the SCAF Funds' investments.  Further, while the PPM does not specifically state that lockbox payments must be made by <u>buyers</u>, this requirement might be reasonably inferred from the understood purpose of the lockbox.

Additionally, the lockbox diagram is subject to more than one reasonable interpretation. The diagram can be reasonably interpreted as requiring buyers to make payments directly into the lockbox.  This interpretation is supported by the absence of a box labeled "Borrower" or "Intermediary" between the boxes labeled "Buyers" and "Bank Lock Box," which suggests that payments from a buyer do not pass through a borrower or intermediary before being deposited into the lockbox account.  <u>See</u> Pl.'s Summ. J. App. I at 246.  If a jury were to adopt this interpretation, the diagram would be misleading, because payments to the lockbox for the Petters Notes—which comprised the majority of the SCAF Funds' portfolio—were made by the

borrower and not the buyer.  The misleading diagram would have placed Quan under an affirmative duty to speak as to how the lockbox for the Petters Notes actually worked, rather than remaining silent unless asked.  See K-tel, 300 F.3d at 897-98 (stating "a party who discloses material facts in connection with securities transactions assume[s] a duty to speak fully and truthfully on those subjects"); Sailors v. N. States Power Co., 4 F.3d 610, 612 (8th Cir. 1993) (stating a duty to disclose arises where inaccurate, incomplete or misleading disclosures have been made).

On the other hand, the lockbox diagram can also be reasonably interpreted as not requiring a retailer to pay funds directly into the lockbox.  This interpretation is supported by the existence of two arrows separating the box labeled "Buyers" from the box labeled "Bank Lock Box."  See Pl.'s Summ. J. App. I at 246.  The first arrow runs horizontally from "Buyers" to the word "Payment."  Id.  The second arrow runs vertically from "Payment" to the "Bank Lock Box."  Id.  The existence of multiple arrows and the change in the direction of the arrows suggest an additional step in which a "Payment" made by a "Buyer" is received by an intermediary and then redirected to the "Bank Lock Box."  This interpretation is further bolstered by the text below the diagram box labeled "Proceeds," which states: "Remaining Proceeds Back to Intermediary."  Id. (emphasis added).  The text implies the proceeds initially came from the Intermediary (i.e., PAC Funding).

Thus, genuine issues of fact exist as to whether the lockbox representations were false or misleading, and the SEC and the Quans' summary judgment motions on this issue are denied.

### ii.  Audit of Intermediaries

The SEC, Marlon Quan, and Florene Quan also move for summary judgment on the issue

of whether a  representation concerning auditing the books of intermediaries was fraudulent. The challenged statement appears in the flipbooks on a page titled, "Borrower Risk Management."  Pl.'s Summ. J. App. I at 226, 245.  A bullet point on that page provides that a "[m]ajor accounting firm has been retained to examine the books of intermediaries."  Id. at 226, 245.

The SEC contends the term "intermediary" refers to borrowers such as PAC Funding.  It is undisputed that an accounting firm was not hired to examine the books of PAC Funding.  Pl.'s Summ. J. App. II at 577.  The Quans argue the term "intermediaries" was meant to refer to the finance company (i.e., Acorn), not to borrowers.  Ernst & Young was retained to audit Acorn and the SCAF Funds.  Id.  Thus, whether the representation was false or misleading depends on whether "intermediaries" meant "borrowers," as the SEC argues, or "finance company," as the Quans argue.

The Quans contend the term "intermediaries" is a vague term that cannot not mean "borrowers" on the page at issue, because the term "borrowers" is used elsewhere on the page, yet the page does not refer to audits of "borrowers."  Under this rationale, however, "intermediaries" could not mean "finance company" (i.e., Acorn)—the meaning advocated by the Quans—because the term "finance company" also appears on the page at issue, yet the page does not refer to audits of the "finance company."  See Pl.'s Summ. J. App. I at 226, 245.

Additionally, "intermediaries" is not a vague term when read in context with the entire flipbook.  Rather, "intermediary" is used repeatedly and consistently elsewhere in the flipbooks to refer to borrowers like Petters as intermediaries.  See, e.g., id. at 220, 222, 227, 229, 242-43, 246, 248.  Indeed, the flipbooks include a page specifically titled "Intermediaries" that states:

"We purchase high quality asset-based securities from financing companies that lend to intermediaries . . . ."  Id. at 220, 243 (emphasis added, emphasis in original omitted).  The page includes a diagram showing the "Intermediary" and "Finance Company" as two distinct entities. Id. at 220, 243.  Significantly, the marketing materials never use the term "intermediary" to identify Acorn, the Funds, or any other entity.  Id. at 217-261.

Moreover, the page referencing audits is titled, "Borrower Risk Management," and describes precautions taken to limit "exposure to the borrower."  Id. at 226, 245 (emphasis added).  Auditing the books of the finance company would not minimize an investor's exposure to risk from a borrower.  Therefore, the only reasonable conclusion to be drawn from the context in which the representation about auditing intermediaries is made is that "intermediaries" meant "borrowers," not the finance company.

Although the SEC has established that the representation about audits was misleading, a fact issue remains as to whether Quan acted with scienter when making the statement.  The SEC argues scienter is established because Quan reviewed and approved the contents of the SCAF Funds' marketing materials and then failed to tell investors that the auditing procedure described in those materials did not apply to the Petters Notes.  However, it is "insufficient to show that [Quan] should have known that [the] material statement or omission was false or misleading." Shanahan, 646 F.3d at 544 (emphasis in original) (internal citations and quotations omitted). Rather, the SEC must demonstrate actual intent or severe recklessness.  Id.  Quan's testimony is that he did not know the statement was misleading, because he believed in good faith that the term "intermediary" was used on the page at issue to refer to Acorn, and not to borrowers such as PAC Funding.  See First M. Quan Decl. ¶ 21 ("The reference . . . was intended to be a

22

reference to Ernst & Young, the auditor of Acorn. . . . I thought that some investors would believe that audited financial statements from Acorn would significantly enhance its credibility . . . .  It never would have occurred to me to suggest that Acorn was somehow obtaining audits of its borrowers . . . .").  If a jury were to accept this testimony, then Quan did not act with the requisite scienter, which requires "something more egregious than even white heart/empty head good faith."  <u>Shanahan</u>, 646 F.3d at 544 (internal quotation marks omitted).

The SEC argues Quan's testimony regarding his good faith is not sufficient to raise a genuine fact issue for trial because his explanation is so improbable that no reasonable juror could find it credible.  However, the rare cases in which courts have found scienter as a matter of law involve more egregious facts where the evidence of a defendant's deceptive intent was so incredible that no reasonable jury could conclude otherwise.  <u>See, e.g.</u>, <u>SEC v. Brown</u>, 658 F.3d 858, 863 (8th Cir. 2011) (finding that where defendant had diverted over half of investor funds and attempted to conceal the diversion, "no reasonable jury could doubt that [defendant] had acted with scienter"); <u>SEC v. Lyttle</u>, 538 F.3d 601, 604 (7th Cir. 2008) (finding the "mountain of circumstantial evidence" as to defendants' intent and the absence of contrary evidence "would have left a reasonable jury with no alternative to inferring scienter").  Here, in comparison, the evidence showing Quan may have known the statements about audits were false or misleading is the circumstantial evidence offered by the flipbooks.  Additionally, considering the multiple parties involved in Acorn's lending transactions (i.e., the retailers, borrowers, finance company, and note holders) Quan's testimony that he believed the term "intermediaries" meant "finance company" is not so highly unreasonable or inconceivable that a reasonable jury would necessarily infer scienter.

Finally, the SEC has not argued that Quan was negligent in failing to recognize that the auditing procedure identified in the flipbooks did not apply to the Petters Notes.  See Pl.'s Mem. Supp. Summ. J. ("Pl.'s Summ. J. Br.") [Docket No. 260] at 38-39.[2]  Therefore, the Court will not consider whether Quan was negligent for the purposes of establishing a violation of Sections 17(a)(2) or (3).  See SEC v. Betta, No. 09-80803-Civ., 2011 WL 4369012, at *11 (S.D. Fla. Sept. 19, 2011) ("Generally, when it comes to negligence, summary judgments should be cautiously granted.") (internal quotation marks and alterations omitted).  Accordingly, the SEC and the Quans' motions for summary judgment as to the statements about auditing "intermediaries" are denied.

### iii.  Due Diligence

The Quans move for summary judgment on the issue of whether the due diligence representations in the PPMs and flipbooks were fraudulent.[3]  The PPMs stated, in pertinent part:

> As an example of the procedures Acorn will follow with respect to structuring Acorn Financed Note transactions, Acorn has informed the Company [i.e., SCAF, LLC] that it intends generally to undertake the following procedures with respect to each Distribution Company and related transactions:
> . . .
>
> • perform ongoing quantitative and qualitative analysis or similar protracted procedure to determine the fair market value of underlying assets of the short-term commercial credit market and the financial conditions of the borrowers and its customers.

Pl.'s Summ. J. App. I at 268, 275-76.  The flipbooks stated that Acorn would perform "Full Due

---

[2] The SEC's only argument as to negligence pertained to the representations about the lockbox.  See id. at 38 n.18.

[3] As the SEC has not moved for summary judgment on this issue, the evidence is viewed in the light most favorable to the SEC.

Diligence on Borrower prior to commitment," and that due diligence would include an inventory summary analysis, periodic asset appraisals of the borrower, on-site field examinations, and an accounts receivable aging summary and analysis. Id. at 247; Pl.'s App. Supp. Resp. ("Pl.'s Resp. App.") [Docket No. 301] at 46. The SEC alleges the promised due diligence was not performed, because Acorn failed to inspect the merchandise collateral and never contacted retailers to independently verify the existence of the underlying receivables.

The Quans advance two arguments for why the due diligence representations were not fraudulent. First, they argue the statements about due diligence were "mere puffery" and are therefore not actionable representations under federal securities laws. The law recognizes that "some statements are so vague and such obvious hyperbole that no reasonable investor would rely on them." Parnes v. Gateway 2000, Inc., 122 F.3d 539, 547 (8th Cir. 1997). However, the representations here included specific due diligence measures that may have been material to a reasonable investor in making a decision to invest, and thus were not so vague as to constitute "mere puffery."

Second, the Quans argue the due diligence statements were not false because Acorn conducted full due diligence on its loans to Petters' entities. The record presents a triable issue of fact as to whether Acorn performed the due diligence specified in the PPMs and flipbooks. An Acorn employee made quarterly visits to the Petters entities' office facility in Minnesota to review purchase orders and invoices (later discovered to be fraudulently fabricated by Petters' employees) and verify that the purchase orders matched the descriptions of loan requests. Pl.'s Resp. App. at 30. However, during the seven year period that investors invested in the SCAF Funds, Acorn conducted only one warehouse site visit to visually inspect and verify the

25

existence of the inventory collateral securing the Petters Notes. Defs.' Reply Mem. Exs. ("Defs.' Reply Ex.") [Docket No. 311] Ex. 1; Pl.'s Resp. App. at 28. That visit was performed in June 2003, by an Acorn agent who inspected four warehouses in California. Defs.' Reply Ex. 1. Additionally, the record shows only one instance where Acorn corresponded directly with an outside party to confirm Petters' merchandise business. That correspondence was received in June 2003 from a vendor who supplied merchandise to Petters. F. Quan Summ. J. Ex. 10. It is undisputed that in the five years following the June 2003 verifications with outside sources, while new investors were solicited and existing investors continued to invest in the SCAF Funds, no further warehouse inspections were performed and no third parties were contacted to confirm the transactions underlying the Petters Notes. Moreover, there is no evidence Acorn ever contacted a retailer to directly confirm the existence of Petters' receivables, even after Petters told Quan that the defaults on $119 million in Petters Notes by February 2008 were due to slow-paying retailers.[4]

Thus, with two early and isolated exceptions, Acorn's due diligence with respect to the existence, quality, and quantity of the merchandise and receivables securing the Petters Notes was based entirely on information provided by Petters. Whether this level of diligence satisfies the SCAF Funds' due diligence representations presents a fact issue for the jury. Accordingly, the Quans' motions for summary judgment on the due diligence representations are denied.

---

[4] Quan avers Acorn had entered into a confidentiality agreement with Petters that prevented Acorn from contacting customers of Petters' entities. Pl.'s Resp. App. at 32. A copy of the agreement is not of record in this litigation, and there is no evidence that Quan or his employees warned investors that a confidentiality agreement precluded Acorn from conducting third-party due diligence on the majority of SCAF, LLC's investments.

### iv.  Credit Insurance

The Quans move for summary judgment on the SEC's claim that the PPMs fraudulently represented Acorn would use credit insurance to protect the Petters Notes against the risk of loss due to default.[5]  The PPMs include the following representations about insurance:

> As an example of the procedures Acorn will follow with respect to structuring Acorn Financed Note transactions, Acorn has informed the Company [i.e., SCAF, LLC] that it intends generally to undertake the following procedures with respect to each Distribution Company and related transactions:
>
> . . .
>
> •  be designated as a co-beneficiary on policies of insurance with respect to various defaults or other risks of loss on the Short-Term Notes;
>
> . . .
>
> •  confirm that the accounts receivable counterparty [i.e., the retailer] has an "A" or higher credit rating prior to acquisition, inclusive of any credit insurance coverage; . . . .

Pl.'s Summ. J. App. I at 268, 275.  The SEC contends the statement in the first bullet point—that Acorn would be the co-beneficiary of "insurance with respect to various defaults or other risks of loss"—represented that Acorn would procure credit insurance[6] for the Petters Notes.  The SEC argues this statement was false, because it is undisputed that credit insurance was not purchased for the Petters Notes.  See Pl.'s Resp. App. at 25-26.  The SEC contends that if Acorn had purchased credit insurance as promised, the consequences of Petters' fraud would have been mitigated.

---

[5]  As the SEC has not moved for summary judgment on this issue, the evidence is viewed in the light most favorable to the SEC.

[6]  Credit insurance protects against default due to to an account debtor's financial inability to pay.  Pl.'s Summ. J. App. I at 68.

The Quans argue the statement in the first bullet point was not a promise to procure credit insurance on the Petters Notes; rather, the statement is included among a list of several safeguards that the PPMs cite "as an <u>example</u>" of the procedures Acorn would "<u>generally</u>" follow.  Pl.'s Summ. J. App. I at 268 (emphases added).  The Quans argue the PPMs did not state that <u>every</u> example would be applied to <u>every</u> investment.  Again, however, a reasonable jury could conclude the representation was nevertheless misleading because the procedure to be "generally" undertaken (i.e., insuring against loss on short-term notes) was not taken for the <u>majority</u> of the SCAF Funds' investments.

The Quans also argue the language in the first bullet point does not refer solely to credit default insurance, but also refers to "other risks of loss."  <u>Id.</u> at 268, 275.  They contend Acorn complied with this representation because it was designated as co-beneficiary on a $50 million key man life insurance policy insuring Petters' life.  <u>See</u> F. Quan Summ. J. Ex. 29 at 196.  However, the first bullet point specifically contemplates insurance against "defaults or other risks of loss on the "<u>Short-Term Notes</u>."  Pl.'s Summ. J. App. I at 268, 275 (emphasis added).  A reasonable jury could conclude that key man life insurance is not insurance against loss on short-term notes.  Indeed, Acorn's Vice President of Operations, Mark Sullivan, testified that to his knowledge, the procedure set forth in the first bullet point was not followed for PAC Funding deals.[7]  Pl.'s Resp. App. at 21-23.

The Quans further argue that the first bullet point addressing insurance against defaults must be read in conjunction with an the additional bullet point stating Acorn would "confirm the

---

[7] Sullivan further testified that on other deals, Acorn was named as a loss payee on certain insurance policies, and also had credit insurance on at least one other deal.  Pl.'s Resp. App. at 22-23.

accounts receivable counterparty [i.e., the retailer] has an 'A' or higher credit rating prior to acquisition, <u>inclusive of any credit insurance coverage</u>." <u>Id.</u> at 268, 275 (emphasis added).  The Quans argue the additional bullet point allows Acorn to enter into transactions with counterparties having a below-"A" credit rating if Acorn purchases credit insurance to protect it from the risk caused by the lower rating.  Based on this interpretation, the Quans argue Acorn was <u>not</u> required to purchase credit insurance for the PAC Funding transactions, as the counterparties to the PAC Funding transactions were all "big box" retailers with "A" credit ratings.  <u>See</u> Pl.'s Resp. App. at 26.  However, a reasonable jury could conclude that the bullet point requiring Acorn to purchase credit insurance for transactions involving lower-rated counterparties did not excuse Acorn from complying with the first bullet point, which represented that Acorn would procure insurance against default or other loss on the short-term notes, and which did not include an exception for notes involving "A"-rated counterparties.

Thus, a genuine issue of fact exists as to whether Acorn complied with the representation that it would procure insurance against defaults or other risks of loss on the Petters Notes. Accordingly, the Quans' summary judgment motions on this issue are denied.

### v. Blocked Account

The SEC also moves for summary judgment on whether the statement in SIA's flipbooks that "[a]dditional cash collateral is held in a segregated account" was false or misleading.  <u>See</u> Pl.'s Summ. J. App. I at 225, 244.  The SEC alleges the statement was true until February 29, 2009, when Defendants secretly used the cash collateral in the Blocked Account as part of their scheme to conceal the defaults on the Petters Notes.  Consistent with the parties' treatment of this issue, the Court analyzes the allegation in the context of scheme liability.

### b.  Alleged Scheme

The SEC moves for summary judgment on its claim that Quan engaged in a scheme to hide the defaults on the Petters Notes by: renegotiating the Petters Notes in February and May 2008; depleting the Blocked Account to pay interest on the overdue Petters Notes and extend a loan to Polaroid; issuing misleading account statements and performance reports that showed uninterrupted earnings; and issuing a March 10, 2008 newsletter to investors stating that "few defaults" had occurred and that the SCAF Funds had "experienced little to no write downs." Pl.'s Summ. J. App. II at 596.[8]

"Scheme liability" applies to deceptive conduct, as opposed to deceptive statements.  In re DVI, Inc. Sec. Litig., 639 F.3d 623, 643 n.29 (3d Cir. 2011), abrogated on other grounds by Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184 (2013).  Legitimate business transactions that do not have a deceptive purpose or effect cannot form the basis of scheme liability.  Simpson v. AOL Time Warner, Inc., 452 F.3d 1040, 1050 (9th Cir. 2006) ("Participation in a legitimate transaction, which does not have a deceptive purpose or effect, would not allow for a primary violation even if the defendant knew or intended that another party would manipulate the transaction to effectuate a fraud."); Lucent, 610 F. Supp. 2d at 360 (stating scheme liability is limited to conduct involving "sham"or "inherently deceptive transactions"); In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 505 (S.D.N.Y. 2005) (finding banking transactions not actionable under scheme liability because the transactions were not "shams" and did not "depend on any fictions").

Defendants have adduced evidence raising a genuine issue of fact as to whether the

---

[8] As the Quans have not moved for summary judgment on this issue, the evidence is viewed in the light most favorable to the Quans.

Petters Note renegotiations were business transactions that served a legitimate, as opposed to deceptive, purpose. The testimony of Acorn's president, Paul Seidenwar, is that Acorn executed the Forbearance Agreement to "improve [its] position." Defs.' Opp'n Ex. 4 at 129. Seidenwar further testified that he thought the Forbearance Agreement "was a good trade," and that Acorn's receipt of more current receivables as well as Polaroid's domestic receivables and inventory as collateral for the restructured loan was "a nice step in the right direction to try to get [the Petters Notes] back in performance." Id. Quan similarly describes the purpose of the Forbearance Agreement as a measure "to right the events of default and to right the deficiencies on the loan." Pl.'s Summ. J. App. II at 586. An employee of DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt am Main ("DZ Bank"), a lender to Acorn, also viewed the Forbearance Agreement as "a resolution to a potential problem." Defs.' Opp'n Ex. 2 at 108.

Further, a genuine issue of fact exists as to whether the funds in the Blocked Account were expended for a legitimate business purpose, and whether Defendants were under a duty to disclose that the Blocked Account had been depleted. Quan avers that use of the funds in the Blocked Account was a condition of the Forbearance Agreement. See Pl.'s Summ. J. App. II at 586 ("If we had assumed the position of requiring to take full possession of the blocked account, . . . we would never have completed the forbearance agreement."). Thus, a reasonable jury could find that the funds had been expended for the legitimate purpose of rectifying the default on the Petters Notes. Additionally, reasonable minds could differ on whether Quan, having stated in the flipbooks that cash collateral would be held in a segregated account, was under a duty to disclose that the cash collateral held in the Blocked Account had been spent. The Blocked Account was established to serve as collateral in the event of a default. The use of the funds in

the Blocked Account was arguably consistent with this purpose, because the funds were utilized

to address the defaults on the Petters Notes.  Additionally, the Forbearance Agreement required

the Petters entities to replace the funds in the Blocked Account at a rate of $3 million per month.

Thus, whether Quan's depleting of the Blocked Account caused the flipbook statement to be

misleading is a triable fact issue.

There is also some evidence that the May 2008 renegotiation of the Petters Notes was a

legitimate business transaction and not inherently deceptive.  Quan avers the May 2008

restructuring relieved Acorn of its obligation to meet new funding requests from PAC Funding

and allowed Acorn to secure "total collateral that was more than twice the outstanding Petters-

related debt to Acorn."  Second M. Quan Decl. ¶ 12.

A fact issue also exists as to whether the newsletter and performance reports were issued

for a deceptive purpose.  Arguably, at the time of the March 10, 2008 newsletter stating "few

defaults" had occurred, Acorn viewed the Petters Notes as "technically . . . in good standing" due

to the recent Forbearance Agreement.  Defs.' Opp'n Ex. 11 at 109; see also Second M. Quan

Decl. ¶ 9 (averring "the forbearance agreement brought current a total of 31 overdue PAC

Funding notes").  The performance reports and newsletter were issued on the heels of a slow

holiday season, which was the purported reason the Petters Notes—made current by the

Forbearance Agreement—had initially become overdue.  Prior to this time, performance on the

Petters Notes had been consistently reliable during Acorn's six-year lending relationship with

Petters' entities.  The statements in the March 2008 newsletter were made without the benefit of

the hindsight gained in September 2008, when Petters' massive Ponzi scheme was publicly

revealed.  See Gebhardt, 335 F.3d at 830 ("[T]he importance of the misrepresented facts should

not be judged with the advantage of hindsight."). Based on these circumstances, reasonable minds could disagree on whether the newsletter and performance reports were issued for a deceptive purpose. For these reasons, the SEC's summary judgment motion on scheme liability is denied.

### 3. Investment Advisers Act § 206(4), Rule 206(4)-8 (Count VIII)

The SEC also claims Quan and SIA are liable under Section 206(4) of the Advisers Act, which prohibits any investment adviser,[9] through the use of interstate commerce, from "engag[ing] in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6(4). Specifically, the SEC alleges Quan and SIA violated Rule 206(4)-8 promulgated under the Adviser Act. Rule 206(4)-8 states that an investment adviser to a pooled investment vehicle violates Section 206(4) by: (1) making "any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary to make the statements made . . . not misleading, to any investor or prospective investor in the pooled investment vehicle;" or (2) otherwise engaging "in any act, practice or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle." 17 C.F.R. § 275.206(4)-8(a).[10]

---

[9]  The definition of an "investment advisor" under the Advisers Act includes a "person who, for compensation, engages in the business of advising others, either directly or indirectly . . . as to the advisability of investing in . . . securities . . . ." 15 U.S.C. § 80b-2(11); see also Haligiannis, 470 F. Supp. 2d at 383 ("[P]eople who manage[ ] the funds of others for compensation are 'investment advisers' within the meaning of the statute.") (quoting Abrahamson v. Fleschner, 568 F.2d 862, 870 (2d Cir. 1977)). One who "effectively controls" an investment advisory firm and its decisionmaking is an investment advisor within the meaning of the Advisers Act. SEC v. Berger, 244 F. Supp. 2d 180, 193 (S.D.N.Y. 2001).

[10]  The SEC argues Quan and SIA breached their fiduciary duty to  the SCAF Funds' investors by violating Rule 206(4)-8. Pl.'s Summ. J. Br. at 33-34. The Quans respond that no fiduciary duty was owed to the SCAF Funds' investors, because SIA's client was the SCAF Funds

The language of Rule 206(4)-8 is nearly identical language to Sections 17(a)(2) and (a)(3) of the Securities Act and to Rules 10-b(5)(b) and (c) promulgated under the Exchange Act. However, the scope of Rule 206(4)-8 is broader in that it is not limited to fraud in connection with the offer, purchase or sale of a security.  See id.  "Facts showing a violation of Section 17(a) or 10(b) by an investment adviser will also support a showing of a Section 206 violation."  SEC v. Young, No. 09-1634, 2011 WL 1376045, at * 7 (E.D. Pa. Apr. 12, 2011) (quoting Haligiannis, 470 F. Supp. 2d at 383).  Scienter is not a required element under Section 206(4).  SEC v. Steadman, 967 F.2d 636, 647 (D.C. Cir. 1992) (reasoning the language of Section 206(4) resembles that of Section 17(a)(3) of the Securities Act, which does not require a showing of scienter).

The SEC and Quans' motions for summary judgment on the Adviser Act claim address the same representations and conduct at issue in the above-analyzed claims under Section 17(a) of the Securities Act, 10(b) of the Exchange Act, and Exchange Act Rule 10b-5.  For the same reasons summary judgment was denied on those claims, the SEC and the Quans' summary judgment motions are also denied on the Adviser Act claim.

### 4. Disgorgement and Other Relief

As discussed above, whether Quan is liable on the SEC's claims will be determined by a

themselves, not the Funds' investors.  Defs.' Mem. Opp'n Summ. J. [Docket No. 302] at 24-26 (citing Goldstein v. SEC, 451 F.3d 873, 881 (D.C. Cir. 2006) ("The adviser owes fiduciary duties only to the fund, not to the fund's investors.")).  Rule 206(4)-8 did not create a fiduciary duty to investors or prospective investors that was not otherwise imposed by law.  See Prohibition of Fraud by Advisers to Certain Pooled Investment, SEC Release No. 8766, 2006 WL 3814994, at *7 (December 27, 2006) (SEC action proposing rule later codified at 17 C.F.R. § 275.206(4)-8). However, the existence of a fiduciary duty is not required to prove a violation of Rule 206(4)-8, which prohibits an investment advisor to a pooled investment vehicle from making untrue or misleading statements or engaging in fraudulent acts with respect to "any investor or prospective investor in the pooled investment vehicle."  17 C.F.R. § 275.206(4)-8(a).

jury at trial.  As a result, the Court will stay its ruling on the SEC and Florene Quan's motions

that address disgorgement of the Hawaiian properties and other relief, and whether Florene Quan

holds a legitimate interest in the Hawaiian properties that would preclude her from being a

proper relief defendant.[11]

## B.  Motion to Exclude Expert Opinion

Defendants Quan, Acorn, SIA, and ACG III, LLC move to exclude the expert opinion

testimony of the SEC's retained expert, Michael Mayer, and to preclude the SEC from eliciting

expert opinion testimony from thirteen fact witnesses identified by the SEC as non-retained

experts.  The SEC opposes the motion.

Defendants argue Mayer is unqualified to testify about lending practices and that his

expert report is merely a factual narrative of the record evidence that is not necessary to assist

the jury in understanding the case.  Defendants also argue that specific aspects of Mayer's

testimony are irrelevant, improperly opine on witness credibility, and offer erroneous legal

conclusions.

The admission of expert testimony is governed by Rule 702 of the Federal Rules of

Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if: (a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue; (b) the testimony is based on
> sufficient facts or data; (c) the testimony is the product of reliable
> principles and methods; and (d) the expert has reliably applied the
> principles and methods to the facts of the case.

---

[11] At the hearing, counsel for Florene Quan stated his preference that the Court rule on this
portion of Florene Quan's motion, but acknowledged that Florene Quan would not be prejudiced if
the ruling were stayed.

When evaluating the admissibility of expert testimony, a trial court serves as the gatekeeper to ensure the reliability and relevance of the expert testimony offered into evidence. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999). "[R]ejection of expert testimony is the exception rather than the rule," and expert testimony should be admitted if it "advances the trier of fact's understanding to any degree." Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th Cir. 2006). "Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." Id. Similarly, the factual basis of an expert opinion generally goes to the credibility, rather than the admissibility, of the testimony. Bonner v. Isp Techs., Inc., 259 F.3d 924, 929 (8th Cir. 2001). Thus, "it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must the testimony be excluded." Id. at 929-30.

Mayer's education, specialized knowledge, and professional experience in the areas of finance, asset based lending, and hedge funds qualify him to testify as an expert in this case. He is a Chartered Financial Analyst, a Certified Fraud Examiner, and has performed financial investigations of brokerage firms, hedge funds, savings and loans, and banks. Exs. Pl.'s Resp. Mot. Exclude [Docket No. 320] Ex. 1 (Expert Report), Tab 1 at 1-2. He has also served as a consultant to asset based lenders and personally performed due diligence on prospective investments. Id. Ex. 2 at 55:15-56:11, 66:13-67:22.

Mayer's testimony will assist the jury in understanding the complicated terminology, concepts, and practices specific to asset based lending and the hedge fund industry. See SEC v. Johnson, 525 F. Supp. 2d 70, 77 (D.D.C. 2007) ("[I]n securities cases, expert testimony

commonly is admitted to assist the trier of fact in understanding trading patterns, securities industry practice, securities industry regulations, and complicated terms and concepts."); U.S. v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991) ("Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts."). Moreover, Mayer's testimony is based on sufficiently reliable sources and methodology. He relied on industry specific publications and on generally accepted industry standards such as the General Auditing Accounting Standards (GAAS) to describe industry standards and practices for the various safeguards referenced in the PPMs and flipbooks. See, e.g., Expert Report at 20-21, 32-33, 39-42, 47, 56-57. He reached his conclusions by applying the industry standards and practices to the facts of this case. See Johnson, 525 F. Supp. 2d at 76 (declining to exclude testimony where expert "derived his conclusion through a generally accepted auditing methodology, which he . . . applied consistently to the facts he reviewed"); Levinson v. Westport Nat'l Bank, No. 3:09-cv-00269, 2012 WL 4489260, at *6 (D. Conn. Sept. 28, 2012) (finding expert testimony "sufficiently reliable" where expert compared relevant industry standard practices with facts of case). The appropriate means of attacking Mayer's credentials and the factual basis for his opinion is cross examination, not exclusion. Robinson, 447 F.3d at 1100. Therefore, Mayer will be allowed to testify as an expert.

Defendants also move to preclude the SEC from eliciting expert opinion testimony from thirteen lay witnesses whom the SEC designated as lay witnesses and non-retained experts. Nine of those witnesses are professional money managers who invested in the SCAF Funds, and the other four are auditors who performed an audit of the SCAF Funds in 2007. The SEC states that it disclosed the witnesses as non-retained experts due to their training and experience, but that

the witnesses will be testifying about their personal knowledge of relevant facts such as written communications they received from Quan and his agents, their understanding of the investment Quan offered and the safeguards Quan promised, and their reasons for investing.  The SEC further states that, based on the lay witnesses' knowledge of hedge funds and asset based lending, expert matter may be embedded in and incidental to the witnesses' fact testimony.  The thirteen lay witnesses will be allowed to testify at trial.  Defendants will have the opportunity at trial to object to testimony by these witnesses if Defendants feel the testimony is crossing the line from fact testimony to expert opinion.  Accordingly, Defendants' Motion to Exclude Expert Opinion is denied.

## C.  Motion to Approve Stipulation

Receiver Hansen, on behalf of the Receivership Defendants, moves for approval of the Stipulation signed by all parties except the intervenors in this case.  Under the Stipulation, the SEC agrees to hold in abeyance its partial summary judgment motion against SCAF, LLC pending resolution of the claims against Quan.  Stip. ¶ 2.  Receiver Hansen and the SEC further agree that upon final conclusion in the District Court of claims against Quan, the SEC shall enter into a further stipulation with SCAF, LLC applying the judgment to the claims against SCAF, LLC.  Id. ¶ 3.

Receiver Hansen argues the Stipulation allows him to maintain a middle ground by neither acceding to the SEC's claims nor expending limited receivership assets to resist those claims at this time.  He further contends the Stipulation will allow him to use the results of Quan's trial as a reasonable guide for designing and implementing a possible settlement related to the Receivership entities.

Intervenors DZ Bank (a creditor to Receivership Defendants Livingston and Putnam) and the Preferred Investors (members of SCAF, LLC) object to Receiver Hansen's motion. Intervenor Sovereign Bank (a creditor to ACG II) joins in DZ Bank's objection. The intervenors argue: (1) Receiver Hansen lacks the authority to take the actions proposed in the Stipulation; (2) the outcome of the claims against Quan should not determine the outcome of the claims against the Receivership Defendants; and (3) the Receivership Defendants should not be held liable for the SEC's claims without the protections of the adversarial process.

Agreeing to the terms of the Stipulation is within Receiver Hansen's authority. The Receivership Order authorizes Receiver Hansen to "take any action which could be taken by the officers, directors, partners, members, shareholders, and trustees of the Receivership Entities." Receivership Order at 18. This provision allows Receiver Hansen to make the same decisions any defendant in litigation may make in the adversarial process: he can defend the suit, or he can settle based on an analysis of the merits, a business assessment of risk versus costs, or other reasons. Receiver Hansen is not obligated to proceed to a full trial on the merits.

The Receivership Order also requires Receiver Hansen to "take such action as necessary and appropriate to prevent the dissipation . . . of any funds or assets or for the preservation of any such funds and assets of the Receivership Estate." Id. at 17. The Stipulation advances that directive by allowing the Receiver to preserve the limited Receivership assets and to benefit from the information and guidance the Quan trial may have on the ultimate resolution of the SEC's claims against the Receivership Defendants.

Finally, as the SEC noted at the hearing, the Stipulation does not preclude the Receiver from raising future defenses; rather, it provides that following the Court's entry of final

judgment as to the SEC's claims against Quan, Receiver Hansen and the SEC "will enter into a further stipulation applying that judgment to the claims against SCAF, LLC."  Stip. ¶ 3 (emphasis added).  The terms of that further stipulation will be informed by the resolution of the claims against Quan.  Final judgment as to SCAF, LLC may only be entered after Receiver Hansen or the SEC have requested and received the approval of this Court.  See id. ¶¶ 3-4.

Therefore, because the Stipulation is within Receiver Hansen's authority, prevents the unnecessary dissipation of receivership assets, and does not commit the Receivership Defendants to a final settlement position, the Stipulation is approved.

**D.  Motion to Dismiss**

The Preferred Investors move to dismiss this action against SCAF, LLC with prejudice based on: (1) the SEC's failure to formally serve the Amended Complaint on SCAF, LLC, and (2) SCAF, LLC's failure to file an answer in this case.  The Preferred Investors argue that as a result of the allegedly insufficient service, SCAF, LLC has not been represented in this action and has not been afforded the opportunity to defend itself against the SEC's claims.  The SEC and Receiver Hansen oppose this motion.

The Motion to Dismiss is based on the mistaken premise that SCAF, LLC has not been served.  Receiver Hansen has filed documents confirming that he waived service of the Amended Complaint on the Receivership Defendants effective May 16, 2012.  See Hansen Aff. Ex. 1.  Additionally, the SEC agreed on June 8, 2012 to an indefinite extension of time in which to answer or otherwise respond to the Amended Complaint.  Id.  Therefore, the Preferred Investors' Motion to Dismiss is denied.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.    The SEC's Motion for Partial Summary Judgment [Docket No. 258] is **DENIED**;

2.    Defendant Marlon Quan's Motion for Partial Summary Judgment [Docket No.

271] is **DENIED**;

3.    Relief Defendant Florene Quan's Motion for Summary Judgment [Docket No.

269] is **DENIED IN PART** and **STAYED IN PART**;

4.    The Motion to Exclude Expert Opinion Testimony [Docket No. 286] is **DENIED**;

5.    The Receivership Defendants' Motion to Approve the Stipulation [Docket No.

277] is **GRANTED**; and

6.    The Preferred Investors' Motion to Dismiss [Docket No. 263] is **DENIED**.

BY THE COURT:


        s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  October 8, 2013.