## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| U.S. Securities and Exchange Commission, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Marlon Quan; Acorn Capital | ) | Civil No. 11-723 ADM/JSM |
| Group, LLC; Stewardship Investment | ) | |
| Advisors, LLC; Stewardship Credit | ) | |
| Arbitrage Fund, LLC; Putnam Green, LLC; | ) | |
| Livingston Acres, LLC; and ACG II, LLC, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| Florene Quan, | ) | |
| | ) | |
| Relief Defendant, | ) | |
| | ) | |
| Nigel Chatterjee; DZ Bank AG Deutsche | ) | |
| Zentral-Genossenschaftsbank, Frankfurt | ) | |
| am Main; Sovereign Bank; Topwater | ) | |
| Exclusive Fund III, LLC; Freestone Low | ) | |
| Volatility Partners, LP; and Freestone | ) | |
| Low Volatility Qualified Partners, LP; | ) | |
| | ) | |
| Intervenors, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Gary Hansen, | ) | |
| | ) | |
| Receiver. | ) | |

_____

John E. Birkenheier, Esq., Charles J. Kerstetter, Esq., Michael J. Mueller, Esq., Sally J. Hewitt, Esq., and Timothy S. Leiman, Esq., U.S. Securities and Exchange Commission, Chicago, IL, and James Alexander, Esq., United States Attorney's Office, Minneapolis, MN, on behalf of Plaintiff U.S. Securities and Exchange Commission.

Bruce E. Coolidge, Esq., and Laura Schwalbe, Esq., Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., and Christopher T. Casamassima, Esq., Wilmer Cutler Pickering Hale and Dorr LLP, Los Angeles, CA, on behalf of Defendants Marlon Quan, Stewardship Investment Advisors, LLC, Acorn Capital Group, LLC, ACG II, LLC, and Relief Defendant Florene Quan.

_____

## I.  INTRODUCTION

On June 26, 2014, the undersigned United States District Judge heard oral argument on Defendants Marlon Quan ("Quan"), Acorn Capital Group, LLC ("Acorn"), Stewardship Investment Advisors, LLC ("SIA"), and ACG II, LLC's ("ACG II") (collectively, "Defendants") Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial ("Post-Trial Motion") [Docket No. 517]; Plaintiff United States Securities and Exchange Commission's ("SEC") Motion for Remedies and Final Judgment ("Motion for Remedies") [Docket No. 532]; and the previously stayed portion of Relief Defendant Florene Quan's Motion for Summary Judgment [Docket No. 269].  For the reasons set forth below, Defendants' Post-Trial Motion is denied, the SEC's Motion for Remedies is granted in part and denied in part, and the stayed portion of Florene Quan's Motion for Summary Judgment is granted.

## II.  BACKGROUND

On February 11, 2014, afer a nine day trial, a jury found Marlon Quan and three entities owned and controlled by Quan liable for securities fraud.  The SEC's claims at trial were that Defendants violated securities laws by: (1) fraudulently selling interests in two hedge funds, Stewardship Credit Arbitrage Fund LLC ("SCAF LLC") and Stewardship Credit Arbitrage Fund, Ltd. ("SCAF Ltd.") (together the "SCAF Funds"), through the use of offering and marketing materials that included materially false or misleading representations; and (2) concealing defaults on the SCAF Funds' core investments—promissory notes issued by Thomas J. Petters (the "Petters Notes")—when those investments began failing in December 2007.  See generally Am. Compl. [Docket No. 160].

Quan founded the SCAF Funds in 2001 and operated the hedge funds through

Defendants SIA and Acorn.  SIA served as the investment advisor to the SCAF Funds.  Acorn was a commercial finance business that used the money invested in the SCAF Funds to finance loans to companies.  Stipulated Facts [Docket No. 475] ¶ 37.  Defendant ACG II is a subsidiary of Acorn.  From 2001 to 2009, more than 100 investors invested a total of over $500 million in the SCAF Funds.  Trial Tr. vol. VIII [Docket No. 549] at 1172.  During this period, the SCAF Funds paid SIA performance and management fees, and paid Acorn interest, origination, and consulting fees.  The total fees paid by the SCAF Funds to Acorn and SIA exceeded $95 million, $33 million of which was distributed to Quan.  Pl.'s Mem. Supp. Mot. Remedies [Docket No. 534] Ex. B.

Beginning in 2001 and continuing unil 2009, Quan met with investors and distributed Preferred Placement Memoranda ("PPMs") and marketing materials touting the risk management techniques that would be used to protect the SCAF Funds' investments.  The promised safeguards included the use of a lock box account, "full due diligence" on loan transactions, audits of "intermediaries," and the retention of cash collateral in a blocked account. See, e.g., Pl.'s Trial Exs. 52, 54, 91.

More than half of the SCAF Funds' portfolio was invested in loans to PAC Funding, LLC ("PAC Funding"), a company owned by Petters.  Pl.'s Trial Ex. 40.  PAC Funding purportedly used the borrowed funds to purchase electronic merchandise and resell it to "big box" retailers such as Costco and Sam's Club for a substantial profit.  Stipulated Facts ¶¶ 2, 8, 37.

In September 2008, a Petters employee and confidant confessed to law enforcement that Petters had been operating a multi-billion Ponzi scheme for over ten years.  Id.  The money that

PAC Funding had received from Acorn, using funds from the SCAF Funds, was never used to buy real merchandise.  Id. ¶ 37.  Instead, Petters used the majority of the money to repay other investors.  Id. ¶ 31.  When the Ponzi scheme collapsed, many investors, including the SCAF Funds, suffered severe losses.

The SEC filed this enforcement action in March 2011, alleging securities fraud.  The SEC's allegations were not that Quan knew of Petters's fraud.  Rather, the SEC alleged Quan and his entities committed a separate fraud by lying to existing and prospective investors in the SCAF Funds about anti-fraud measures and other risk management techniques that were never implemented.  The SEC further alleged that when the Petters Notes began to fail, Quan and his entities concealed the defaults by secretly restructuring the Petters Notes while continuing to inform investors through newsletters that all was well.  See generally Am. Compl.

The SEC claimed Defendants' misrepresentations and deceptive conduct violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)]; Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78t(a)]; Rule 10b-5 promulgated under the Exchange Act [17 C.F.R. § 240.10b-5]; Section 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(4)]; and Rule 206(4)-8 promulgated under the Advisers Act [17 C.F.R. § 275.206(4)-8].  The SEC also alleged Quan was liable for aiding and abetting violations of the Exchange Act and Advisers Act.  Am. Compl. ¶¶ 195-235.[1]

---

[1] The Amended Complaint also alleged claims against SCAF LLC and its subsidiaries Putnam Green, LLC and Livingston Acres, LLC (collectively, the "Receivership Defendants").  A receiver was appointed over those entities in April 2012.  In October 2013, the Court approved a Stipulation in which the receiver and all parties except the intervenors in this case agreed that the SEC would hold its partial summary judgment motion against the Relief Defendants in abeyance

The SEC named Quan's wife Florene Quan as a relief defendant, seeking disgorgement of two Hawaiian properties worth over $3 million that were purchased by Quan in 2004 and 2006. The properties were transferred to Florene Quan for $20 in July 2008 through two separate warranty deeds. Am. Compl. ¶¶ 236-239.

On October 8, 2013, this Court issued an Order denying the SEC and Defendants' motions for partial summary judgment. See Summ. J. Order. In the same Order, the Court also denied a motion to exclude the expert opinion testimony of the SEC's retained expert, Michael Mayer. Id. at 35-38. The Court also denied in part and stayed in part Florene Quan's summary judgment motion, reserving for after trial the issue of whether Florene Quan is a proper relief defendant. Id. at 34- 35.

The jury trial commenced on January 29, 2014. At the close of the SEC's case-in-chief, Defendants moved for judgment as a matter of law. Trial Tr. vol. VI [Docket No. 547] 1004-05. The Court denied the motion, finding that if the jury were to accord full credibility to the SEC's fourteen witnesses and hundreds of trial exhibits, the evidence would be sufficient to support the SEC's claims. Id.

The jury reached a verdict on February 11, 2014. The Special Verdict Form addressed seven claims. See Special Verdict Form [Docket No. 501].[2] The jury found liability on all of the

---

pending the resolution of the claims against Quan. Stipulation [Docket No. 276]; Mem. Opinion and Order, Oct. 8, 2013 [Docket No. 347] ("Summ. J. Order") at 38-40. Therefore, the SEC's claims against the Receivership Defendants were not included in the trial and are not at issue in these motions.

[2] The claims on the Special Verdict Form were as follows. Claim I: against all Defendants for violations of Section 10(b) and Rule 10b-5; Claim II: against Quan for aiding and abetting violations of Section 10(b) and Rule 10b-5 by SCAF LLC; Claim III: against Quan for liability as a control person under Section 20(a) of the Exchange Act; Claim IV: against all Defendants for

SEC's claims except the alleged violation of Section 17(a)(1), and the claim of Quan's aiding and abetting violations of Section 10(b) and Rule 10b-5 by SCAF.  Id.  Judgment consistent with the jury's verdict was entered on February 19, 2014.  See Judgment [Docket No. 505].

Defendants now renew their motion for judgment as a matter of law and also move for a new trial, arguing the verdict cannot be sustained because it is inconsistent, non-unanimous, against the greater weight of the evidence, and based on inadmissible testimony by the SEC's expert witness.

The SEC opposes Defendants' motion, and has filed a motion for remedies and a final judgment against Defendants.  The SEC requests injunctive relief, disgorgement of ill-gotten gains, prejudgment interest, and a civil penalty against Defendants.

Also before the Court is the stayed portion of Florene Quan's summary judgment motion. Florene Quan argues she is not properly named as a relief defendant as she has a legitimate interest in the two Hawaiian properties titled in her name.  The SEC alleges the properties may be disgorged as proceeds of Marlon Quan's fraud.

## III.  DISCUSSION

### A.  Defendants' Motion for Judgment as a Matter of Law and New Trial

#### 1.  Consistency of Verdict

The decision whether to grant a new trial under Federal Rule of Civil Procedure 59(a) is committed to the discretion of the district court.  Pulla v. Amoco Oil Co., 72 F.3d 648, 656 (8th

---

violations of Section 17(a)(1); Claim V: against  Quan, Acorn, and SIA for violations of Section 17(a)(2) and against each Defendant for violations of Section 17(a)(3); Claim VI: against Quan and SIA for violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder; and Claim VII: against Quan for aiding and abetting violations by SIA of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.  See Special Verdict Form.

Cir. 1995).  A motion for a new trial based on an inconsistent verdict shall be granted "only if there was 'no principled basis upon which to reconcile the jury's inconsistent findings.'" <u>Top of Iowa Coop. v. Schewe</u>, 324 F.3d 627, 633 (8th Cir. 2003) (quoting <u>Bird v. John Chezik Homerun, Inc.</u>, 152 F.3d 1014, 1017 (8th Cir. 1998)).  Courts have a "duty to harmonize inconsistent verdicts, viewing the case in any reasonable way that makes the verdicts consistent." <u>Anheuser-Busch, Inc. v. John Labatt Ltd.</u>, 89 F.3d 1339, 1347 (8th Cir. 1996) (citing <u>Gallick v. Baltimore & Ohio R.R. Co.</u>, 372 U.S. 108, 119 (1963)).

Defendants argue a new trial is required because the jury's findings are irreconcilably inconsistent in two respects: (1) the finding that Defendants violated Section 10(b) cannot be harmonized with the finding that Defendants did not violate Section 17(a)(1); and (2) the finding that Quan violated Section 10(b) cannot be reconciled with the finding that he did not assist SCAF LLC in a violation of Section 10(b).

### a.  Liability under Section 10(b) but not Section 17(a)(1)

Defendants contend the jury's findings of liability under Section 10(b) and Rule 10b-5 but not under Section 17(a)(1) are irreconcilable because the same standard applies to claims.  Thus, Defendants argue they should have been liable under both or neither of these claims.

The language of Rule 10b-5[3] is nearly identical to that of Section 17(a).  Both provisions prohibit securities fraud by forbidding three categories of deceptive behavior.  Specifically, Rule 10b-5 makes it unlawful:

---

[3]  Rule 10b-5 was promulgated under Section 10(b), which makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).

for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Similarly, Section 17(a) makes it unlawful:

for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

Thus, to establish a violation under either of these anti-fraud provisions, the SEC must prove a defendant: (1) engaged in prohibited conduct (i.e., employed a fraudulent scheme, made a material misstatement or omission, or engaged in a fraudulent business practice); (2) in connection with the offer, sale, or purchase of a security; (3) by means of interstate commerce. See SEC v. Shanahan, 646 F.3d 536, 541 (8th Cir. 2011) (involving misstatements and

omissions); <u>SEC v. Lucent Techs., Inc.</u>, 610 F. Supp. 2d 342, 350 (D.N.J. 2009) (involving deceptive conduct).  Further, scienter is required to prove a violation of Section 10(b), Rule 10b-5, and Section 17(a)(1), while Sections 17(a)(2) and (3) are proven by showing a defendant acted at least negligently.  <u>Shanahan</u>, 646 F.3d at 541 (citing <u>Aaron v. SEC</u>, 446 U.S. 680, 695 (1980)); <u>SEC v. True North Fin. Corp.</u>, 909 F. Supp. 2d 1073, 1122 (D. Minn. 2012).  Scienter requires proof of intent to deceive or severe recklessness.  <u>Shanahan</u>, 646 F3d at 543.

Here, the jury found Quan liable under Section10(b) and Rule 10b-5, and also liable under Section 17(a)(2)-(3), but not liable under Section 17(a)(1).  These findings can be harmonized by interpreting the jury's verdict as finding that Defendants did not employ a fraudulent scheme, which is prohibited under Rule 10b-5(a) and Section 17(a)(1), but Defendants did make a material misrepresentation or omission, which is prohibited under Rule 10b-5(b) and Section 17(a)(2), and did engage in fraudulent business practices, which are prohibited under Rule 10b-5(c) and Section 17(a)(3), and Defendants did act with scienter.  This rationale by the jury would have resulted in liability in Claim I of the Special Verdict Form for violating Rule 10b-5, no liability in Claim IV for violating Section 17(a)(1), and liability in Claim V for violating Sections 17(a)(2) and (3).[4]

Defendants argue that a finding of no liability for employing a fraudulent scheme under Section 17(a)(1) cannot be reconciled with a finding of liability for material misrepresentations made with scienter under Section 17(a)(2), because a fraudulent scheme may be effectuated solely by fraudulent statements.  Defs.' Reply Mem. Supp. J. Matter Law New Trial [Docket No.

---

[4]  The Special Verdict Form divided the Section 17(a) claim into two separate claims based on the different state of mind requirements for Section 17(a)(1) (scienter) versus Sections 17(a)(2) and (3) (negligence).  <u>See</u> Special Verdict Form at Claims IV-V.

536] at 5-6.  However, the Eighth Circuit has specifically considered whether a defendant may be liable for a fraudulent scheme based solely on misrepresentations or omissions, and has held that "a scheme liability claim must be based on conduct beyond misrepresentations or omissions."  Pub. Pension Fund Grp. v. KV Pharm. Co., 679 F.3d 972, 987 (8th Cir. 2012).  Defendants recognized this principal in their proposed jury instructions, which state in relevant part that Section 17(a)(1) "applies to deceptive *conduct*, not deceptive statements," and that "a single material misstatement or omission, standing alone, is insufficient to establish a device, scheme, or artifice to defraud."  Defs.' Proposed Jury Instructions [Docket No. 439] at 24-25 (emphasis in original).  Therefore, the jury's finding of no liability under Section 17(a)(1) is not inconsistent with the findings of liability under Section 10(b), Rule 10b-5, and Section 17(a)(2)-(3).

### b.  Primary Section 10(b) Liability but not Aiding and Abetting

Defendants also argue the verdict is inconsistent because the jury found Quan liable for violating Section 10(b), but not liable for aiding and abetting a Section 10(b) violation by SCAF LLC.  To find Quan liable for aiding and abetting a Section 10(b) violation by SCAF LLC, the jury would have had to find that: (1) SCAF LLC violated Section 10(b) and Rule 10b-5; (2) Quan had knowledge that SCAF LLC was violating Section 10(b) and Rule 10b-5; and (3) Quan provided substantial assistance to SCAF LLC in its violation.  See Jury Instructions [Docket No. 491] at Jury Instruction No. 23.  Defendants argue Quan controlled SCAF LLC, and if SCAF LLC did not violate Section 10(b), then Quan cannot have violated Section 10(b).  Conversely, if SCAF LLC did violate Section 10(b), then Quan should have been held liable for aiding and abetting SCAF LLC's violation.

The jury's findings can be reasonably reconciled on the basis that SCAF LLC was not a defendant at trial, and thus the SEC's evidentiary focus during trial was on Quan's role at SIA and Acorn, rather his role at SCAF LLC.  As a result, the jury may have concluded that they lacked sufficient evidence to determine Quan's role in SCAF LLC or that Quan had aided and abetted a Section 10(b) violation by SCAF LLC.  Therefore, the jury's verdict is consistent and does not warrant a new trial.

### c.  Waiver of Right to Seek New Trial Based on Inconsistent Jury Verdict

Furthermore, even if the verdict is found to be inconsistent, Defendants waived their right to seek a new trial by failing to move for resubmission of the verdict to the jury before the jury was discharged.  The Eighth Circuit has repeatedly held that "[i]f a party feels that a jury verdict is inconsistent, it must object to the asserted inconsistency and move for resubmission of the inconsistent verdict before the jury is discharged or the party's right to seek a new trial is waived."  Parrish v. Luckie, 963 F.2d 201, 207 (8th Cir. 1992); see also Lockard v. Mo. Pac. R.R., 894 F.2d 299, 304 (8th Cir. 1990), cert. denied, 498 U.S. 847 (1990); Brode v. Cohn, 966 F.2d 1237, 1239 (8th Cir. 1992) (noting possibility that plaintiff waived right to seek new trial because there was "no indication in the record on appeal that [plaintiff] moved to have the alleged inconsistencies resubmitted to the jury before entry of judgment.").  "The purpose of the rule is to allow the original jury to eliminate any inconsistencies without the need to present the evidence to a new jury.  This prevents a dissatisfied party from misusing procedural rules and obtaining a new trial for an asserted inconsistent verdict."  Lockard, 894 F.2d at 304 (internal citation omitted).

Here, Defendants did not move to have the alleged inconsistencies resubmitted to the jury

before it was discharged.  After the verdict had been read and the jurors polled, the Court

allowed the jury to retire to the jury room, and then asked on the record and outside the jury's

presence if counsel had further business for the Court that day.  Defense counsel replied: "I will

just state for the record that the verdict is internally contradictory."  Trial Tr. vol. X [Docket No.

551] at 1384.  At the hearing on Defendants' post-trial motion, Defendants acknowledged that

they did not ask the Court to resubmit the alleged inconsistencies or to present the jury with

additional, potentially reconciling questions.  See Hrg. Tr., June 26, 2014 [Docket No. 565] at 8.

By foregoing the opportunity to make such a request before the jury was discharged, Defendants

have waived their right to seek a new trial on the basis of an alleged inconsistent verdict.

### 2.  Unanimity of Verdict

Defendants also argue a new trial should be granted because the jury instructions did not

require the jury to unanimously agree on which particular misstatement or omission violated

Rule 10b-5 and Section 17(a).

A district court has considerable discretion in framing jury instructions, and "need not

give every proposed instruction as long as the court adequately presents the law and the issues to

the jury."  Fleming v. Harris, 39 F.3d 905, 907 (8th Cir. 1994).  Instructions do not have to be

"technically perfect or even a model of clarity."  Gill v. Maciejewski, 546 F.3d 557, 563 (8th

Cir. 2008).  Rather, the relevant question is "whether the instructions, taken as a whole and

viewed in the light of the evidence and applicable law, fairly and adequately submitted the issues

in the case to the jury."  Id.

Defendants contend that a misstatement or omission is a required element under Rule

10b-5 and Section 17(a), and thus the jury should have been given a specific unanimity

12

instruction requiring unanimous agreement on at least one specific misstatement or omission that constituted a violation.  Defendants argue that because no such instruction was given, different members of the jury could have found liability based on different misstatements of fact without unanimously agreeing that any one statement constituted a violation.  The SEC responds that misstatements or omissions are merely means of satisfying the required elements of Rule 10b-5 and Section 17(a), and thus a unanimity instruction on the specific misstatement or omission made by Defendants was not required.

"[A] federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime."  Richardson v. United States, 119 S.Ct. 1707, 1710 (1999); accord United States v. Rice, 699 F.3d 1043, 1048 (8th Cir. 2012).  For example, if an element of robbery is force or the threat of force, and some jurors find the defendant used a gun to threaten force while other jurors concluded the defendant used a knife, "that disagreement—a disagreement about means—would not matter as long as all 12 jurors unanimously concluded that the Government had proved the necessary related element, namely, that the defendant had threatened force."  Richardson, 119 S.Ct at 1710.

To determine whether particular words in a statute comprise an element of an offense (thereby requiring unanimity) or are merely the means used to commit the offense (thereby not requiring unanimity), a court must consider: (1) the language of the statute; (2) the history or tradition of how similar offenses are treated; and (3) the potential unfairness of treating the particular words as a means, rather than element, of the offense.  See id. at 1710-11.

### a. Language

Here, the language of Rule 10b-5 and Section 17(a) clearly demonstrates that making material misstatements or omissions is just one of three alternative means by which the provisions may be violated. The provisions may also be violated by means of a fraudulent scheme or fraudulent business practices. Even within the subsection pertaining to misrepresentations and omissions, the language is broadly worded to prohibit "any" untrue statement of a material fact "or" omission. See Rule 10b-5(b); Section 17(a)(2). Thus, the language of Rule 10b-5 and Section 17(a) supports the conclusion that juror unanimity is not required to identify which particular misstatement or omission a defendant used to violate these provisions.

### b. Tradition

Courts interpreting federal fraud statutes traditionally do not require a jury to unanimously agree on the particular acts a defendant used to commit the fraud. See, e.g., Rice, 699 F.3d at 1048 (mail fraud); United States v. Lyons, 472 F.3d 1055, 1068-69 (9th Cir. 2007) (same); United States v. Reeder, 170 F.3d 93, 105 1st Cir. 1999) (wire fraud); United States v. Daniel, 2013 WL 2636180, at *7 (N.D. Ill. June 12, 2013) (mail and wire fraud).[5] For example, in Rice, the Eighth Circuit held that a jury is not required to unanimously agree on the particular acts used by a defendant to commit wire fraud. 699 F.3d at 1048. The wire fraud statute is

---

[5] Analyzing how courts have traditionally treated the federal mail fraud and wire fraud statutes is particularly instructive here, because Section 17(a) was modeled after the federal mail fraud statute, 18 U.S.C. § 1341. SEC v. Stoker, 865 F. Supp. 2d 457, 463 n.7 (S.D.N.Y. 2012). In turn, the mail fraud statute includes identical language to that found in the federal wire fraud statute, 18 U.S.C. § 1343. Compare 18 U.S.C. § 1341 (prohibiting "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises") with 18 U.S.C. § 1343 (same).

similar to the securities fraud provisions at issue here, in that it prohibits "any scheme or artifice

to defraud, or for obtaining money or property by means of false or fraudulent pretenses,

representations, or promises."  18 U.S.C. § 1343.  The elements of wire fraud are: "(1) intent to

defraud, (2) participation in a scheme to defraud, and (3) the use of a wire in furtherance of the

fraudulent scheme."  Rice, 699 F.3d at 1047.  Rice was alleged to have carried out a scheme to

defraud under the wire fraud statute by concealing defaulted leases, selling inaccurate leases, and

providing inaccurate accountings.  Following his jury conviction, the defendant argued on appeal

that the jury should have been required to unanimously agree on which means he had employed

in the scheme to defraud.  Id. at 1047.  In rejecting this argument, the Eighth Circuit stated:

> The general rule is that the jury need not agree on the "underlying
> brute facts" of a verdict, such as the means the defendant used to
> commit an element of the crime. Richardson v. United States, 526
> U.S. 813c, 817, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999) (citing
> Schad v. Arizona, 501 U.S. 624, 631–32, 111 S.Ct. 2491, 115
> L.Ed.2d 555 (1991) (plurality opinion)). In fraud cases jurors need
> not agree on "the precise manner in which the scheme violated the
> law," only the "general thrust" of the scheme. United States v.
> Blumeyer, 114 F.3d 758, 769 (8th Cir.1997). Similarly, the First
> Circuit has recognized that the jury need not agree on each piece of
> evidence offered to prove the defendant's participation in the
> fraudulent scheme, United States v. Reeder, 170 F.3d 93, 105 (1st
> Cir.1999), and the Ninth Circuit has pointed out that the jury "need
> not be unanimous on the particular false promise" made by the
> defendant, United States v. Lyons, 472 F.3d 1055, 1068 (9th Cir.
> 2007).

Id. at 1048.  Applying the traditional rule in fraud cases to the securities fraud provisions at issue

here also supports the conclusion that jurors do not need to unanimously agree on which

particular misstatement or omission was used by a defendant to violate Rule 10b-5 and § 17(a).

### c.  Potential Unfairness

The danger of unfairness in not requiring unanimity as to underlying facts arises when a

statute "covers many different kinds of behavior of varying degrees of seriousness." Richardson, 119 S.Ct. at 1711.  Where such a statute is at issue, failure to require unanimity as to the factual basis supporting each statutory element may cause a jury to conclude that a defendant violated the statute, even though there may be "wide disagreement among the jurors about just what the defendant did, or did not, do." Id.  No such unfairness is present here, because Rule 10b-5 and Section 17(a) do not cover "many different kinds of behavior of varying degrees of seriousness." Rather, the provisions are confined to varieties of fraudulent conduct in the sale of securities. See United States v. Yeaman, 194 F.3d 442, 454 (3d Cir. 1999) (stating Section 17(a) "is limited to fraud in connection with the offer and sale of securities in interstate commerce," and holding denial of specific unanimity instruction "did not in any way frustrate Congress's intent in passing Section 17(a) or jeopardize any fairness concept embodied in the Due Process Clause").

Thus, the three factors to consider, language, tradition, and fairness, all support the conclusion that jurors are not required to unanimously agree on which particular misstatement or omission violated Rule 10b-5 and Section 17(a).  Accordingly, the Court did not err in refusing to give the specific unanimity instruction requested by Defendants.

Defendants also argue that because the jury did not receive a specific unanimity instruction, there is no assurance that the jury's verdict rests on a permissible basis.  Defendants contend the jury may have reached a verdict based on a claimed misrepresentation that was not supported by legally sufficient evidence, and thus a new trial is required.  See Defs.' Mem. Supp. J. Matter Law New Trial [Docket No. 525] ("Defs.' Mem. Supp. JMOL") at 14-15.  However, "[w]hen the district court submits to the jury two or more grounds for conviction, one for which there was insufficient evidence, and it is impossible to tell on what grounds the jury decided the

defendant's guilt, [a court] cannot reverse the jury's general verdict of guilty." United States v. Boyle, 700 F.3d 1138, 1143 (8th Cir. 2012) (quoting United States v. Dreamer, 88 F.3d 655, 658 (8th Cir. 1996)). This is because jurors are "well equipped to analyze the evidence," so when one ground for conviction is supported by the evidence and another is not, the jury is presumed to have convicted on the ground that was supported by the evidence. Id. (quoting Griffin v. United States, 112 S.Ct. 466, 474 (1991)). As explained below, legally sufficient evidence exists to support a verdict based on numerous misrepresentations. The jury's verdict rests on a permissible basis.

### 3. Sufficiency and Weight of Evidence

#### a. Scienter-based Claims

Defendants renew their motion for judgment as a matter of law on the Section 10(b) claim, arguing the SEC failed to prove as a matter of law that Defendants acted with scienter.

Rule 50(b) of the Federal Rules of Civil Procedure governs renewed motions for judgment as a matter of law. Under Rule 50(b), the court may allow judgment on the verdict, order a new trial, or direct the entry of judgment as a matter of law. Fed. R. Civ. P. 50(b)(1)-(3). The standard of review for granting a Rule 50(b) motion is whether sufficient evidence exists to support the jury verdict. A motion for judgment as a matter of law should only be granted when "all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party." Washburn v. Kan. City Life Ins. Co., 831 F.2d 1404, 1407 (8th Cir. 1987) (citation omitted). In deciding a motion for judgment as a matter of law, the court must view the evidence in the light most favorable to the party who prevailed before the jury, making all reasonable inferences in that party's favor. Id. (citation omitted). The court

must not substitute its own judgment for that of the trier of fact.  Ryther v. KARE 11, 864 F.

Supp. 1510, 1519 (D. Minn. 1994) (citing Nelson v. Boatmen's Bancshares, Inc., 26 F.3d 796,

803 (8th Cir. 1994)).

Defendants contend there is no evidence Quan acted with scienter, because he was

unaware of Petters' fraud.  Quan lost over $42 million in funds belonging to his family, his

charitable foundation, his employees, and Acorn, that were invested in Petters' scheme.

Defendants also argue the SEC's only evidence of scienter was that Quan earned fees from his

role in the SCAF Funds, and the desire for compensation alone is insufficient to establish a

motive to commit fraud.

Both arguments lack merit.  First, the fraud alleged by the SEC did not include

allegations that Quan knew of and facilitated Petters' fraudulent scheme.  Rather, the SEC

alleged Quan acted with intentional deceit or severe recklessness by lying to his own investors

about the precautions that would be taken to safeguard their investments, and by taking actions

to conceal defaults on the Petters Notes when those investments began to fail.

Second, scienter under Section 10(b) may be inferred from "strong circumstantial

evidence of conscious misbehavior or recklessness."  Edison Fund v. Cogent Inv. Strategies

Fund, Ltd., 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) (quotation omitted).  A defendant's

"knowledge of facts or access to information contradicting their public statements" serves as

strong circumstantial evidence of scienter under Section 10(b) and Rule 10b-5.  Id. at 228.

Viewing the evidence in the light most favorable to the SEC and making all reasonable

inferences in the SEC's favor, the Court finds abundant evidence, including 14 witnesses and

hundreds of exhibits, supporting a reasonable inference that Quan acted with scienter.  For

example, Quan approved and distributed PPMs and marketing materials that falsely represented that investors' investments in the SCAF Funds would be protected by the following:

- A "lock box" account that would operate by requiring payments of a borrower's accounts receivable to come from a borrower's <u>customers</u> (i.e., the big box retailers who were the "Buyers" in the transaction), rather than the <u>borrower</u>, thereby allowing for verification that a borrower's transactions with its customers were legitimate.  Pl.'s Trial Exs. 52, 54, 91; Trial Tr. vol. II [Docket No. 543] 163, 165-66, 231; Trial Tr. vol. III [Docket No. 544] 355-57; Trial Tr. vol. IV [Docket No. 545] 489-90, 492-93.  Quan knew payments on PAC Funding's transactions were being made into the lock box account by PAC Funding (the borrower) rather than PAC Funding's customers (the "Buyers").  Trial Tr. vol. V [Docket No. 546] 677; Trial Tr. vol. VIII, 1166-68.

- Retention of a major accounting firm "to examine the books of intermediaries," of which PAC Funding was the largest.  Pl.'s Trial Exs. 52, 91; Trial Tr. vol. II, 275.  Quan admitted he never retained a major accounting firm to examine the books of any intermediary.  Trial Tr. vol. VIII, 1164-65.

- Performance of due diligence, including asset appraisals, on-site field examinations, and ongoing analyses, to determine the fair market value of the collateral securing the loans.  Pl. Trial Exs. 52, 54; Trial Tr. vol. II, 275; Trial Tr. vol. III, 347, 349-51, 355.  To the contrary, Acorn never inspected any of the merchandise collateral securing the PAC Funding loans.  Trial Tr. vol. V, 695-96.  Additionally, Quan knew of but never told investors about a purported

confidentiality agreement with Petters that prevented Acorn from conducting the promised due diligence.  Trial Tr. vol. II, 320-21; Trial Tr. vol. V, 774-75; Trial Tr. vol. VIII, 1173-83.

Further, in February 2008, Quan entered into a forbearance agreement on $110 million in Petters Notes that had gone into arrears.  Trial Tr. vol. VIII, 1188-89.  The delinquent notes represented more than 25% of the SCAF Funds' assets.  Id. at 1189.  Just weeks after forbearing on the delinquent Petters Notes, Quan sent investors a newsletter stating the SCAF Funds were performing well and that "few defaults have occurred."  Id.; Pl.'s Trial Ex. 58.  Quan also represented to investors that the SCAF Funds maintained a cash collateral account.  Evidence established that Quan emptied the account without telling investors in February 2008 as part of the forbearance agreement on the Petters Notes.  Pl.'s Tr. Ex. 52, 91; Trial Tr. vol. II, 159-62, 250-51; Trial Tr. vol. VIII, 1190.

Thus, ample evidence was adduced to support the jury's verdict that Quan acted with scienter.

### b.  Negligence-based Claims

Defendants additionally argue they are entitled to a new trial on the negligence-based claims because the verdict on those claims was against the weight of the evidence.  A trial court may only grant a new trial if it believes "that the verdict was so contrary to the evidence as to amount to a miscarriage of justice."  Butler v. French, 83 F.3d 942, 944 (8th Cir. 1996).  "In determining whether a verdict is against the weight of the evidence, the trial court can . . . weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict."  White v. Pence, 961 F.2d 776, 780 (8th Cir.1992) (quotation marks

omitted).   However, "a trial court may not grant a new trial simply because the trial court would have found a verdict different from the one the jury found."  Butler, 83 F.3d at 944.  Rather, "[t]he court should reject a jury's verdict only where, after a review of all the evidence giving full respect to the jury's verdict, the court is left with a definite and firm conviction that the jury has erred."  Ryan v. McDonough Power Equip., Inc., 734 F.2d 385, 387 (8th Cir.1984).

Defendants contend a new trial is warranted on the negligence-based claims because the SEC failed to introduce sufficient evidence that any of the Defendants: (1) made misstatements concerning investment safeguards, or (2) engaged in a "cover up" when the Petters Notes were failing.  Defendants first argue the safeguards were accurately described.  This argument was made at trial and was rejected by the jury.  Defendants next contend Quan's decision not to tell investors about the February 2008 forbearance agreement on the defaulted Petters Notes was not a "cover up," because Quan had no duty to disclose the forbearance agreement to investors.  However, Quan was not merely silent about the forbearance agreement.  A month after Quan agreed to forbear on over $110 million in defaulted Petters Notes, Quan sent investors a newsletter stating "few defaults have occurred."  Moreover, given the evidence discussed above, the jury's verdict was not contrary to the weight of the evidence, and no miscarriage of justice has occurred.

### 4. Expert Witness

Defendants next argue they are entitled to a new trial because the SEC's expert witness, Michael Mayer, was unqualified to testify as an expert and was improperly permitted to testify as a summary witness.  Defs.' Mem. Supp. JMOL at 31.  "[A] district court has wide discretion in admitting and excluding evidence."  Harris v. Chand, 506 F.3d 1135, 1139 (8th Cir. 2007).  The

Eighth Circuit "will not set aside a jury verdict unless the district court clearly and prejudicially abused its discretion in determining whether or not to admit evidence." Shaw Group, Inc. v. Marcum, 516 F.3d 1061, 1068 (8th Cir. 2008). To warrant a new trial, an evidentiary error must have been so prejudicial that a new trial, absent the error, would be likely to produce a different result. Pointer v. DART, 417 F.3d 819, 822 (8th Cir. 2005); Gill, 546 F.3d at 562. For the reasons set forth in the Summary Judgment Order and in the trial transcript, the Court maintains its view that the admission of Mayer's testimony was proper, and certainly was not a prejudicial factor in swaying the jury toward their verdict. The request for a new trial premised upon improper expert testimony is denied.

**B. SEC's Motion for Remedies**

The SEC moves for a judgment that (1) permanently enjoins Defendants from committing further violations of federal securities fraud; (2) orders Defendants to disgorge all ill-gotten fees, including pre-judgment interest; and (3) imposes a civil monetary penalty as to each Defendant.

**1. Permanent Injunction**

A district court has authority to enter a permanent injunction enjoining future securities laws violations pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)]. The purpose of the injunctive relief is to protect the investing public and to enforce the securities laws. SEC v. Bonastia, 614 F.2d 908, 912 (3d Cir. 1980). To obtain a permanent injunction, the SEC must prove that a violation of the law has occurred and that there is a reasonable likelihood of future violations if Defendants are not enjoined. SEC v. Comserv

Corp., 908 F.2d 1407, 1412 (8th Cir. 1990).  In determining the reasonable likelihood of future

violations, courts consider:  the degree of the defendant's scienter, the isolated or recurrent

nature of the violation, the defendant's recognition that his conduct was wrongful, the likelihood

that the defendant's professional occupation will allow for future violations, and the defendant's

sincerity in assuring against future violations.  SEC v. M & A W., Inc., 538 F.3d 1043, 1055 (9th

Cir. 2008); True North, 909 F. Supp. 2d at 1124.

Here, the  jury found Quan and his entities acted with scienter when they violated the

securities laws.  The violations were also recurrent; over the course of several years, marketing

materials and PPMs were continuously distributed that misled potential and existing investors

about the safeguards that would be used to protect their investments from fraud.  Further, Quan

has not fully acknowledged the wrongful nature of his conduct.  Rather than focusing on his own

lies and deceit about the safety and performance of the SCAF Funds, Quan continues to shift the

blame to Petters, stating he has now learned he "cannot have the same degree of confidence in

[his] own judgment about the integrity of others."  Defs.' Mem. Opp'n Mot. Remedies [Docket

No. 552] Ex. 1 ("Quan Decl.") ¶ 6.  Moreover, although Quan states that he does not intend to

return to his career as a self-employed hedge fund manager, nothing prevents him from changing

his mind in the future.  See SEC v. Lipson, 129 F. Supp. 2d 1148, 1158 (N.D. Ill. 2001) aff'd 278

F.3d 656 (7th Cir. 2002) ("[Defendant] testifies that he does not intend in the future to engage in

the business of purchasing, controlling, or being an officer or director of a public corporation.

Unfortunately there is no way to ensure that [defendant] will not change his mind next week or

next month or next year.").  Based on these considerations, the Court finds a reasonable

likelihood that future violations may occur, and concludes a permanent injunction is required to

protect the investing public.

## 2. Disgorgement

"Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." SEC v. First City Fin. Corp., Ltd., 890 F.2d 1215, 1230 (D.C. Cir. 1989); see also SEC v. Brown, 579 F. Supp. 2d 1228, 1245 (D. Minn. 2008) aff'd 658 F.3d 858 (8th Cir. 2011) ("Disgorgement with prejudgment interest is appropriate to discourage future violations of the securities laws and to make the investors whole."). "The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474-75 (2d Cir. 1996). "The amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation; any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty." Id. at 1475 (internal quotation and citation omitted) (alteration in original). A defendant's inability to repay is not a consideration in determining the amount to be disgorged. SEC v. Warren, 534 F.3d 1368, 1370 (11th Cir. 2008).

### a. Disgorgement Amount

The SEC argues the Defendants, jointly and severally, should be ordered to disgorge $95,607,917 in fees collected by Acorn and SIA from the SCAF Funds from 2001 through 2009. See Pl.'s Mem. Supp. Mot. Remedies at 12-13.

Defendants oppose the request for disgorgement on three grounds. First, Defendants argue that disgorgement in the form of a money judgment is a legal not an equitable remedy and is not authorized by statute or within the Court's equitable authority. Defendants contend this

Court's equitable power is limited to ordering payment of specifically identifiable funds within Defendants' possession, and may not be used to order disgorgement in the form of a general debt.

This argument lacks legal authority.  Defendants have failed to cite a single securities fraud case in which disgorgement of a monetary sum was held to be a legal remedy, or which required the SEC to trace the amount disgorged to specific funds or property in a defendant's possession.  To the contrary, "virtually every federal court of appeals has recognized disgorgement as an appropriate equitable remedy under the securities laws." SEC v. Buntrock, No. 02-C-2180, 2004 WL 1179423, at *3 (N.D. Ill. May 25, 2004) (holding disgorgement is an equitable, rather than legal remedy, and thus available to the SEC in enforcement actions). Moreover, "the Federal Reporter is replete with instances in which judges . . . deeply familiar with equity practice have permitted the SEC to obtain disgorgement without any mention of tracing.  Indeed, it is . . . uncontroversial that tracing is not required in disgorgement cases." FTC v. Bronson Partners, LLC, 654 F.3d 359, 374 (2d Cir. 2011) (internal citation omitted). "[D]isgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset." SEC v. Banner Fund Int'l, 211 F.3d 602, 617 (D.C. Cir. 2000).  Thus, the Court has the equitable authority to order disgorgement in an amount equal to Defendants' ill-gotten gains without requiring that the amount disgorged be tied to specific funds or assets within Defendants' possession and control.

Defendants next argue the $95 million in gross revenues the SEC seeks to disgorge is an excessive amount, because disgorgement is limited to illegally obtained profits, rather than gross revenues.  Defendants contend Acorn and SIA's operating expenses must be deducted from

gross revenues, which sets the net profit amount at $35.6 million, rather than $95 million.  This

argument also fails, because "the overwhelming weight of authority hold[s] that securities law

violators may not offset their disgorgement liability with business expenses."  Brown, 658 F.3d

at 861 (alteration in original); SEC v. Hughes Capital Corp., 917 F. Supp. 1080, 1087 (D.N.J.

1996) (same).  Thus, Acorn and SIA's operating expenses will not be deducted from the

disgorgement amount.

Third, Defendants argue the disgorgement amount sought by the SEC is excessive

because it includes both legally and illegally-derived profits, rather than being limited to profits

causally connected to the fraud.  Defendants contend that the $95 million amount includes

revenues that were generated prior to Defendants' involvement with PAC Funding, which began

in 2004.  The pre-2004 revenues were legally obtained, argue Defendants, because they were

earned prior to the violations of law the SEC established at trial.  Defendants further contend that

the $95 million amount includes revenues generated from legitimate borrowers who were not

affiliated with Petters.  The SEC responds that all of SIA and Acorn's fees are causally

connected to the fraud because but for Defendants' lies about the SCAF Funds' anti-fraud

safeguards and the massive Petters defaults, investors would not have invested in and remained

in the SCAF Funds.

Both positions have some merit.  Defendants are correct that fees predating Acorn and

SIA's involvement with PAC Funding should be subtracted from the disgorgement amount.  The

SEC's evidentiary focus at trial was on Defendants' involvement with PAC Funding.  The SEC

argued at trial that Defendants' promises about implementing safeguards were false because the

safeguards did not operate as represented with respect to PAC Funding.  Defendants did not

begin loaning money to PAC Funding until 2004.  Stipulated Facts ¶ 37.  Thus, the $14,994,330

in fees earned by SIA and Acorn prior to 2004 will be subtracted from the disgorgement

amount.[6]        However, the fees earned by SIA and Acorn from 2004 through 2009 are causally

connected to Defendants' fraud, regardless of whether the revenue was derived from PAC

Funding or legitimate borrowers.  Investors would likely not have invested in the SCAF Funds

had they known the promised anti-fraud safeguards were not being implemented for the PAC

Funding investments, which constituted a majority of the SCAF Funds' portfolio.  Even more

significantly, investors would likely not have remained invested in the SCAF Funds had they

known that over $110 million in Petters Notes purchased from PAC Funding were in default.

Thus, $80,613,589 in fees earned by Acorn and SIA from 2004 to 2009 represents a reasonable

approximation of the ill-gotten gains causally connected to Defendants' fraud, and disgorgement

of that amount will be ordered.

    The parties agree that payments made by Defendants to settle class action litigation

brought by investors against Defendants shall reduce Defendants' liability under this

disgorgement award.  Therefore, upon receiving verification from Defendants of the settlement

payments, the SEC shall recognize those amounts as having been paid as disgorgement.

### b.  Prejudgment Interest

    Courts ordering disgorgement may also order prejudgment interest on the disgorged

amount.  See Brown, 579 F. Supp. 2d at 1245 ("Disgorgement with prejudgment interest is

appropriate to discourage future violations of the securities laws and to make the investors

---

[6] The Court recognizes that Defendants made "a number of loans" to other Petters entities prior to 2004.  Id. ¶ 36.  However, the trial evidence did not prove whether the promised safeguards were applied to these earlier loan transactions.  Therefore, the  2004 date is the best point to begin a reasonable approximation of the fees causally connected to Defendants' securities violations.

whole."); <u>SEC v. O'Hagan</u>, 901 F. Supp. 1461, 1473 (D. Minn. 1995) (awarding prejudgment

interest on disgorgement figure).  "Prejudgment interest, like disgorgement, prevents a defendant

from profiting from his securities violations."  <u>O'Hagan</u>, 901 F. Supp. at 1473.  In essence,

ordering payment of prejudgment interest prevents a defendant from obtaining the benefit of an

interest-free loan due to his unlawful conduct.  <u>SEC v. Moran</u>, 944 F. Supp. 286, 295 (S.D.N.Y.

1996).  The rate of interest commonly used by courts when ordering prejudgment interest in

connection with disgorgement is the rate applied by the Internal Revenue Service ("IRS") for the

underpayment of federal income tax.  <u>First Jersey Sec.</u>, 101 F.3d at 1476.

The SEC requests payment of prejudgment interest for the time period spanning January

1, 2009 to December 31, 2013.  The Court grants this request and prejudgment interest is ordered

for the requested time period using the IRS underpayment rate.

### c.  Joint and Several Liability

The SEC contends Quan and his entities must be held jointly and severally liable for

Defendants' total disgorgement obligation based on the jury's finding for the SEC on the

"control liability" claim against Quan under Section 20(a) of the Exchange Act.  Defendants

argue joint and several liability is contrary to law and unwarranted.

Joint and several liability is authorized under Section 20(a) of the Exchange Act, which

provides in relevant part that "[e]very person who, directly or indirectly, controls any person

liable under any provision of this chapter or of any rule or regulation thereunder shall also be

liable jointly and severally with and to the same extent as such controlled person."  15 U.S.C. §

78t(a).  Thus, when an entity has received gains through unlawful conduct and its owner and

controller has collaborated in the conduct and profited from the violations, the owner may be

held liable by a disgorgement order on a joint and several basis.  First Jersey Sec., 101 F.3d at

1475-76; see also SEC v. Kenton Capital, Ltd., 69 F. Supp. 2d 1, 16 n.14 (D. D.C. 1998) (finding

defendant liable for disgorgement based on control person status).  Further, "[i]t is a well settled

principle that joint and several liability is appropriate in securities laws cases where two or more

individuals or entities have close relationships in engaging in illegal conduct."  SEC v. Calvo,

378 F.3d 1211, 1215 (11th Cir. 2004).

The jury found against Quan on the "control person liability" claim under Section 20(a)

of the Exchange Act.  See Special Verdict Form at 4.  Additionally, Quan's ownership and

control of Acorn, ACG II, and SIA demonstrates his close relationship with those entities and

makes him a necessary participant in their conduct.  Thus, Quan will be held jointly and

severally liable with Acorn, ACG II, and SIA for the disgorgement obligation and prejudgment

interest.

### 3. Civil Penalty

The SEC also moves for the imposition of a civil penalty against Defendants under

Section 21(d)(3) of the Exchange Act, Section 20(d) of the Securities Act, and Section 209(e) of

the Advisers Act.  These statutes provide for three tiers of penalties, with the third and highest

tier applying to violations involving "fraud, deceit, manipulation, or deliberate or reckless

disregard of a regulatory requirement" and which "directly or indirectly resulted in substantial

losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§

78u(d)(3)(B), 77t(d)(2), 80b-9(e)(2).

The purpose of civil penalties is to punish the wrongdoer and discourage future violations

of the securities laws.  Brown, 643 F. Supp. 2d at 1090.  In deciding whether to impose civil

penalties and the amount of the fine, courts consider several factors, including:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

Id. (quoting SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007)).  Courts have broad discretion in imposing civil penalties, and need not impose any penalty if it determines a penalty would not be appropriate under the circumstances.  See, e.g., SEC v. Simone, No. 07-cv-3928, 2013 WL 4495664, at *3 (E.D.N.Y. Aug. 19, 2013) (declining to impose a civil penalty based where "disgorgement alone will serve the goals of deterrence and forestall future violations").

The SEC initially argued that the maximum third-tier penalties are appropriate against Quan, Acorn, and SIA because they acted with scienter, and because their pervasive lies resulted in over $221 million in losses to investors.  At the hearing, the SEC acknowledged that the maximum penalty was likely not appropriate based on Quan's inability to pay, and asked the Court instead to impose a penalty in an amount that will deter others from violating the securities laws.  Hrg. Tr., June 26, 2014, at 32.  Defendants argue that if any penalty is imposed, a minimum penalty should be assessed because Quan is insolvent and his entities are defunct.

The Court finds that the substantial disgorgement award of over $80 million, plus prejudgement interest, is sufficient to deter future violations of the securities laws.  Moreover, Defendants' financial condition makes it highly unlikely that any civil penalty assessed in excess of the disgorgement obligations would be paid.  Under these circumstances, a civil penalty will not be imposed.

**C. Relief Defendant Florene Quan's Motion for Summary Judgment**

The SEC has named Florene Quan, Quan's wife of thirty years, as a relief defendant based on allegations that she holds title to two Hawaii properties that are proceeds of Quan's fraud and thus subject to disgorgement. Am. Compl. at 46, 49. Florene Quan has moved for summary judgment, arguing she is not a proper relief defendant because she holds a legitimate interest in the Hawaiian properties and is not merely a custodian of properties belonging to her husband.[7]

The Hawaiian properties were purchased in November 2004 and May 2006 for a combined total of approximately $1.5 million. Pl.'s App. Resp. Defs.' Mot. Summ. J. [Docket No. 299] ("Pl.'s Summ. J. Resp. App.") at 00056-58. The funds for the purchases were drawn from the Quans' joint checking account, which in turn was funded with proceeds from Marlon Quan's businesses. Id. at 00057-58. One of the properties is a vacant land parcel that was valued at $972,600 in 2013. Pl.'s App. Supp. Summ. J. Vol. II [Docket No. 262] at 383. The other property includes a residence that was built in 2007 and appraised at over $2.2 million in 2008. Id. at 379. The residence was financed with a construction loan made to Marlon Quan from HSBC Bank (the "HSBC Loan") for which Marlon Quan is solely liable. Id. at 588.

Although Florene Quan is not personally liable on the HSBC Loan, she avers she made some mortgage payments on the HSBC Loan from her personal bank account with funds she earned as a high school teacher. Relief Def.'s Ex. Index Mem. Supp. Summ. J. [Docket No. 275]

---

[7] Florene Quan had also argued she is entitled to summary judgment because she does not hold assets that are the proceeds of fraud, reasoning that no fraud occurred before 2006, the year the properties in Hawaii were acquired. In October 2013, the Court denied summary judgment on this ground, holding that genuine issues of fact existed as to whether Quan's conduct prior to 2006 violated the anti-fraud provisions of the securities laws. See Summ. J. Order at 15-29, 34.

Ex. 1 ("F. Quan Decl.") ¶¶ 4, 11.[8] She also used funds from her personal bank account to pay gardening services, homeowner association fees, and cleaning expenses for the Hawaiian properties. Id. ¶¶ 11-12. She also made non-monetary contributions to the Hawaiian properties, including designing the house that was built on one of the parcels, overseeing construction, cleaning, and assisting with attempts to sell the properties. Id. ¶ 12.

The properties were initially titled in Marlon Quan's name. Pl.'s App. Summ J. Vol. II at 384-93. In July 2008, Marlon Quan transferred the properties to Florene Quan in separate warranty deeds for a total of $20. Id. at 384, 389. Quan avers he made the transfers for estate tax purposes after obtaining estate planning advice from counsel in February and April 2007 and in May 2008. Id. at 589-90.

The SEC contends the properties were transferred to Florene Quan for nominal value when Marlon Quan knew that he and SIA were being sued by SCAF Ltd.'s largest shareholder for failure to pay redemptions in cash. Am. Compl ¶ 237; BNY AIS Nominees Ltd. V. Quan, No. 08-cv-976 (D. Conn. May 23, 2008). Marlon Quan and his family maintain the residential property as a vacation home. Pl.'s App. Summ. J. Vol. II. at 590-91.

Forene Quan argues she is not a proper relief defendant because she holds a legitimate ownership interest in the Hawaiian properties, and is not a mere custodian of them. She asserts two independent bases for her ownership interest: (1) the Hawaiian properties are marital property because they were acquired during her marriage to Marlon Quan; and (2) her independent financial and non-monetary contributions to the properties give rise to an ownership interest in the property.

---

[8] Bank records indicate Florene Quan's annual average taxable income from teaching was approximately $48,255 from 2005 to 2009. Pl.'s Summ. J. Resp. App. at 00069.

The SEC responds that a relief defendant wife does not have a legitimate claim to an ill-gotten asset obtained as a result of her husband's fraud.  The SEC further contends the transfer of the Hawaiian properties from Marlon to Florene Quan for nominal value and at a time he was being sued bears the hallmarks of a fraudulent transfer.  To this end, the SEC argues that allowing the Quans to keep the Hawaiian properties at the expense of defrauded investors would be unfair.

### 1. Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

### 2. Relief Defendant Standard

"A relief defendant, sometimes referred to as a 'nominal defendant,' has no ownership interest in the property that is the subject of litigation but may be joined in the lawsuit to aid the recovery of relief."  Janvey v. Adams, 588 F.3d 831, 834 (5th Cir. 2009).  "A relief defendant is not accused of wrongdoing, but a federal court may order equitable relief against such a person

where that person (1) has received ill-gotten funds, and (2) does not have a legitimate claim to those funds." Id.

The typical nominal defendant "is a bank or trustee, which has only a custodial claim to the property." SEC v. Colello, 139 F.3d 674, 677 (9th Cir. 1998). Because the nominal defendant has possession of the property that is the subject matter of the litigation, he or she is joined "purely as a means of facilitating collection." SEC v. Cherif, 933 F.2d 403, 414 (7th Cir. 1991). A nominal defendant's non-interested status makes that person's relation to the suit "merely incidental and it is of no moment to him whether the one or the other side in the controversy succeeds." Id. (quotation marks and alterations omitted). "Because of the non-interested status of the nominal defendant, there is no claim against him and it is unnecessary to obtain subject matter jurisdiction over him once jurisdiction over the defendant is established." Id.

An ownership interest or legitimate claim in property that is the subject of litigation will preclude a person or entity from being a proper relief defendant. SEC v. Founding Partners Capital Mgmt., 639 F. Supp. 2d 1291, 1294 (M.D. Fla. 2009); see also Colello, 139 F.3d at 677 ("[T]he lack of a legitimate claim to the funds is the defining element of a nominal defendant."); SEC v. Chiase, No. 10-CV-5110, 2011 WL 6176209, at *3 (D.N.J. Dec. 12, 2011) ("The touchstone is whether the party from which the SEC seeks disgorgement has any legitimate claim to the money."). Possession of the "full bundle of ownership rights" is not required; any legitimate claim to the property at issue is sufficient to preclude treating the claim holder as a relief defendant. Founding Partners, 639 F. Supp. 2d at 1294. "If a party performed some service or rendered some consideration in exchange for the property, that party generally has an

ownership interest in the property and thus cannot be joined as a nominal defendant." CFTC v. Sarvey, No. 08-C-192, 2008 WL 2788538, at *4 (N.D. Ill. July 17, 2008).

### 3. Analysis

The declaration of Florene Quan avers that in the course of her marriage, she made financial and non-financial contributions to the Hawaiian properties to preserve and enhance those assets. She used a portion of her independent and lawfully earned wages to contribute to mortgage payments, gardening services, dues, and other upkeep for the Hawaiian properties. She also designed and oversaw construction of the house that was built on one of the properties, and has been personally involved in the care of the home. The SEC does not dispute that these contributions were made.

Florene Quan's direct contributions to the Hawaiian properties distinguish her from the relief defendants in cases cited by the SEC for the SEC's broad proposition that a relief defendant wife does not have a legitimate claim to an ill-gotten asset acquired by her husband's fraud. In each of those cases, the relief defendant failed to produce evidence that she gave value toward the ill-gotten assets. See, e.g., SEC v. Cavanagh, 155 F.3d 129, 137 (2d Cir. 1998) (holding nominal defendant wife had no legitimate claim to fraudulent proceeds where "she did not even know she had received the stock, that the stock had been sold, or that $500,000 in proceeds had been transferred to her bank account"); Chiase, 2011 WL 6176209, at *3, *5 (finding relief defendant wife had no legitimate claim to ill-gotten funds because there was no evidence to suggest she had performed services that would have entitled her to the funds or that she had any legitimate claim to the funds); SEC v. DCI Telecomms, Inc., 122 F. Supp. 2d 495, 502 (S.D.N.Y. 2000) (holding complaint adequately stated claim against relief defendant wife

where complaint alleged she did not provide value for wrongfully-obtained assets).  In contrast to these relief defendants, Florene directly contributed financially and nonfinancially to the Hawaiian properties.

Based on these contributions, Florene Quan has a legitimate claim to the Hawaiian properties to the extent of her direct and untainted contributions.  See Sarvey, 2008 WL 2788538, at *4 (finding parties' provision of services established legitimate claim to fraudulent funds and prevented them from being nominal defendants).  Although her legitimate claim does not amount to full fledged ownership rights in the Hawaiian properties, it does make her more than a disinterested custodian and precludes her from being a proper relief defendant.  See Founding Partners, 639 F. Supp. 2d at 1294.[9]

Contrary to the SEC's contention, this result does not allow Florene Quan to keep the fruits of her husband's fraud; rather, it merely recognizes that Florene Quan, who has been accused of no wrongdoing and is not a defendant in this case, cannot be ordered to disgorge property in which she has a legitimate claim.  See Sarvey, 2008 WL 2788538, at * 5 ("[T]he

---

[9] Because the Court has determined that Florene Quan's direct contributions to the Hawaiian properties give her a legitimate claim to the properties, it is not necessary to decide whether she holds an ownership interest in the properties by her marriage to Marlon Quan at the time he acquired the properties.  Nevertheless, the Court recognizes that in New Jersey, where the Quans reside, marital property is defined as encompassing real and personal property "'legally and beneficially acquired by" one or both spouses during the marriage.  Goldman v. Mautner, 2012 WL 1288749, at *10 (Super. Ct. N.J. April 7, 2012) (quoting N.J.S.A. 2A:34-23(h)) (emphasis added).  The word "legal" within the phrase "legally and beneficially" means "conforming to or permitted by law."  Sheridan v. Sheridan, 589 A.2d 1067, 1070-71 (N.J. Super. Ct. Ch. Div. 1990).  Therefore, the phrase prohibits the equitable division of assets obtained with illicit funds where the proposed division is based on a theory that the assets are marital property.  Id. at 1071 ("[T]he Legislature did not intend its judges to be tellers or its courtrooms counting houses for the division of tainted assets purchased with dirty money."); see also McMerty v. Herzog, 702 F.2d 127, 129-30 (8th Cir. 1983) (holding wife had no interest in property bought with her husband's wrongfully acquired funds where wife did not contribute to the property).  Thus, Florene Quan's interest in the properties is likely limited to the value of her untainted contributions.

issue here is not who has the greatest right to the funds. . . . [T]he only question is whether [the relief defendants] have any legitimate ownership in the property at issue.  If they do, they may not be impled as merely nominal defendants.").  Nothing in this holding prevents the SEC from foreclosing on Marlon Quan's interest in the Hawaiian properties to satisfy his disgorgement obligations.

The SEC's allegations that the Hawaiian properties were fraudulently transferred do not demand a different outcome.  The SEC has not filed a fraudulent transfer claim against Florene Quan and did not join her as a defendant in this litigation.  Instead, the SEC has named her as a relief defendant, meaning she is not a real party in interest and there is no claim against her. Cherif, 933 F.3d at 414; see also Sarvey, 2008 WL 2788538, at *5 ("Plaintiffs may not name parties as nominal defendants while also implying that they violated the law. . . . If the Commission wants to assert[] that [defendants] obtained the property by some means that implies complicity in wrongdoing, it should implead them as outright defendants, not nominal defendants.").

Therefore, Florene Quan's legitimate claim to the Hawaiian properties precludes her from being a proper relief defendant, and she is dismissed from the case.[10]

---

[10] This Memorandum Opinion and Order fully resolves the claims against Quan, SIA, Acorn, and ACG II.  As stated earlier, the claims against receivership defendants SCAF LLC and its subsidiaries Putnam Green, LLC and Livingston Acres, LLC were not included in the trial, pursuant to a Stipulation among the receiver and all parties except the intervenors in this case.  See supra at 4 n.1.  The Stipulation provides that upon the conclusion of the trial or other final determination by this Court of the claims against Quan, "SCAF [LLC] and the SEC shall enter into a further stipulation applying that judgment to the claims against SCAF [LLC] and requesting the Court to enter judgment as to SCAF [LLC] in accordance with that further stipulation." Stipulation ¶ 3.  The Stipulation further provides that "[i]f SCAF [LLC] and the SEC are unable to reach a further stipulation, the Court, upon motion of either . . . SCAF [LLC] or the SEC, may enter judgment with respect to SCAF [LLC] in a manner consistent with the determination of the claims made by the SEC against Quan." Id. ¶ 4.  Thus, final judgment as to SCAF LLC and its subsidiaries will not be

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.      Defendants' Renewed Motion for Judgment as a Matter of Law and Motion for a

New Trial [Docket No. 517] is **DENIED**;

2.      The SEC's Motion for Remedies and Final Judgment [Docket No. 532] is

**GRANTED IN PART** and **DENIED IN PART**;

3.      Relief Defendant Florene Quan's Motion for Summary Judgment [Docket No.

269] is **GRANTED**, and she is **DISMISSED** from this case.

The Court further directs the Clerk of Court to enter final judgment as to Defendants

Marlon Quan, Acorn Capital Group, LLC, Stewardship Investment Advisers, LLC, and ACG II,

LLC as follows:

### A.

**IT IS HEREBY ORDERED** that Defendants Marlon Quan, Acorn Capital Group, LLC,

Stewardship Investment Advisers, LLC, and ACG II, LLC (collectively, "Defendants"), their

agents, affiliates, servants, employees, attorneys, and those persons in active concert or

participation with them who receive actual notice of this Partial Final Judgment by personal

service or otherwise, are permanently restrained and enjoined from violating Section 17(a)(2)

and 17(a)(3) of the Securities Act of 1933 [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)] in the offer or

sale of any security by the use of any means or instruments of transportation or communication

in interstate commerce or by use of the mails, directly or indirectly to: obtain money or property

---

entered until after SCAF LLC or the SEC have requested and received the approval of this Court.

by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon purchasers or prospective purchasers of such securities.

## B.

**IT IS FURTHER ORDERED** that Defendants, their agents, affiliates, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this Partial Final Judgment, by personal service or otherwise, are permanently restrained and enjoined from violating or aiding and abetting violations of Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b) ] and Rule 10b–5 promulgated thereunder [17 C.F.R. § 240.10b–5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a) to employ any device, scheme, or artifice to defraud;

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

## C.

**IT IS FURTHER ORDERED** that Defendants Marlon Quan and Stewardship

Investment Advisors, LLC, their agents, affiliates, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this Partial Final Judgment, by personal service or otherwise, are permanently restrained and enjoined from violating or aiding and abetting violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b–6(4)] and Rule 206(4)–8 thereunder [17 C.F.R. § 275.206(4)–8], by making use of the mails or any means or instrumentality of interstate commerce, directly or indirectly:

(a) to make any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in a pooled investment vehicle; or

(b) otherwise to engage in any act, practice or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in a pooled investment vehicle.

## D.

**IT IS FURTHER ORDERED**, that Defendants are liable, jointly and severally, for disgorgement of $80,613,589 together with prejudgment interest calculated from January 1, 2009 to December 31, 2013, using the Internal Revenue Service delinquent tax rate for unpaid taxes. Such payment shall be made to the Clerk of this Court.

## E.

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Partial Final Judgment.

**F.**

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil

Procedure, the Court hereby directs the Clerk to enter this Partial Final Judgment.

**LET PARTIAL FINAL JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  September 19, 2014.