# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

U.S. Securities and Exchange Commission,    )
        )
        Plaintiff,    )
        )    **MEMORANDUM OPINION**
        v.    )    **AND ORDER**
        )    Civil No. 11-723 ADM/JSM
Marlon Quan; Acorn Capital    )
Group, LLC; Stewardship Investment    )
Advisors, LLC; Stewardship Credit    )
Arbitrage Fund, LLC; Putnam Green, LLC;    )
Livingston Acres, LLC; and ACG II, LLC,    )
        )
        Defendants,    )
        )
Nigel Chatterjee; DZ Bank AG Deutsche    )
Zentral-Genossenschaftsbank, Frankfurt    )
am Main; Sovereign Bank; Topwater    )
Exclusive Fund III, LLC; Freestone Low    )
Volatility Partners, LP; and Freestone    )
Low Volatility Qualified Partners, LP;    )
        )
        Intervenors,    )
        )
        and    )
        )
Gary Hansen,    )
        )
        Receiver.    )

---

Gary Hansen, Esq., Oppenheimer Wolff & Donnelly LLP, Minneapolis, MN, on behalf of Receiver Gary Hansen, Receiver for Stewardship Credit Arbitrage Fund, LLC; Putnam Green, LLC; and Livingston Acres, LLC.

Jonathan T. Shepard, Esq., Pryor Cashman LLP, New York, NY, on behalf of Intervenors Topwater Exclusive Fund III, LLC; Freestone Low Volatility Partners, LP; and Freestone Low Volatility Qualified Partners, LP.

Hille R. Sheppard, Esq., Sidley Austin LLP, Chicago, IL, on behalf of Intervenor DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt am Main.

Michael D. Blanchard, Esq., Morgan, Lewis & Bockius LLP, Boston, MA, and James M. Susag, Esq., Larkin Hoffman Daly & Lindgren, Ltd., Minneapolis, MN, on behalf of Intervenor Sovereign Bank.

Timothy S. Leiman, Esq., and John E. Birkenheier, Esq., U.S. Securities and Exchange Commission, Chicago, IL, on behalf of Plaintiff U.S. Securities and Exchange Commission.

_____

## I.  INTRODUCTION

On October 13, 2015, the undersigned United States District Judge heard oral argument on Defendants Stewardship Credit Arbitrage Fund, LLC ("SCAF"), Putnam Green, LLC ("Putnam Green"), and Livingston Acres, LLC's ("Livingston Acres") (collectively, the "Receivership Entities") Motion for Approval of Stipulation Regarding Entry of Judgment Against the Receivership Entities [Docket No. 650].  The Court also heard oral argument on Receiver Gary Hansen's Motion for Approval of Distribution Plan [Docket No. 654].

The Motions address whether the Receiver may consent to judgment against the Receivership Entities for securities fraud and, if so, whether the Receiver's proposed plan for the distribution of approximately $18.9 million in funds held by the Receiver (the "Receivership Assets") is fair and equitable.

Plaintiff United States Securities and Exchange Commission (the "SEC") supports both Motions.  See SEC Reply [Docket No. 669].  The Motions are opposed by Intervenors Topwater Exclusive Fund III, LLC; Freestone Low Volatility Partners, LP; and Freestone Low Volatility Qualified Partners, LP's (the "Class P Investors").  See Class P Investors' Br. Opp'n [Docket No. 664].  Intervenor DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt am Main ("DZ Bank") supports the Motion for Approval of Distribution Plan.  See DZ Bank's Reservation of Rights [Docket No. 659] 1–2.  Intervenor Sovereign Bank did not file a written response to the Motions but at the hearing stated its support for the Distribution Plan.  For the reasons set forth below, both Motions are granted.

## II. BACKGROUND[1]

### A. SEC Action

In March 2011, the SEC filed this enforcement action against Defendant Marlon Quan ("Quan") and entities owned and controlled by him. The SEC alleged that Quan and his entities violated securities laws by: (1) fraudulently selling interests in two hedge funds through the use of offering and marketing materials that included materially false or misleading misrepresentations about anti-fraud measures that would be used to protect the hedge funds' investments; and (2) concealing defaults on the hedge funds' core investments—promissory notes issued by Thomas J. Petters (the "Petters Notes")—when those investments began failing in December 2007. See generally Am. Compl. [Docket No. 160].

Defendant SCAF is one of the hedge funds that was managed by Quan. Over half of the funds from investors in SCAF were used to purchase Petters Notes. Stipulated Facts [Docket No. 475] ¶¶ 35, 37. In September of 2008, Petters was arrested and was later convicted of perpetrating a massive Ponzi scheme through the sale of the Petters Notes. Id. ¶¶ 1–3, 8, 34. Investors in SCAF suffered losses of over $84 million. See Mem. Supp. Receiver's Mot. Approve Distribution Plan [Docket No. 656] Ex. A.

The SEC's allegations were not that Quan knew of Petters' fraud, but that Quan and his entities, including SCAF, lied to existing and prospective hedge fund investors about anti-fraud measures that would be taken to safeguard their investments. The SEC alleged that the Defendants' marketing materials and private placement memoranda ("PPMs") promised to use risk management techniques that were never implemented. The SEC further alleged that when

---

[1] The factual background of this complex case is set forth in further detail in prior orders and is incorporated by reference. See Mem. Op. & Order, May 3, 2011 [Docket No. 51]; Mem. Op. & Order, Apr. 30, 2012 [Docket No. 149]; Mem. Op. & Order, Oct. 8, 2013 [Docket No. 347].

the Petters Notes began to fail, Quan and his entities concealed the defaults by secretly

restructuring the Petters Notes while informing investors through newsletters and account

statements that all was well.

## B.  Receiver Appointed

In April 2012, the Court determined a receiver was necessary to oversee SCAF and its

subsidiaries Putnam Green and Livingston Acres.  See Mem. Op. & Order, Apr. 30, 2012

[Docket No. 149] ("Receivership Order").  Gary Hansen was appointed as receiver to act on

behalf of the Receivership Entities, collect and preserve assets of the Receivership estate, and,

after judgment was entered, make recommendations to the Court regarding distribution of the

Receivership Assets.  Id. at 16–19, 23.  The Receivership Assets consist of approximately $18.9

million in recoveries from SCAF's failed investments.  See Mem. Op. & Order, May 3, 2011

[Docket No. 51] 14; Order, Dec. 12, 2011 [Docket No. 76].

## C.  First Stipulation

In May 2012, Receiver Hansen determined that an active defense of the Receivership

Entities would be costly and would require the expenditure of funds that would otherwise be

available for distribution to those with claims against the Receivership Entities.  See Stipulation,

June 6, 2013 [Docket No. 276] ("First Stipulation") 3.  Receiver Hansen also concluded that the

Receivership Entities' defense would be largely duplicative of the defense already being

presented by defendants Quan, Acorn Capital, LLC ("Acorn"), Stewardship Investment

Advisors, LLC ("SIA"), and ACG II, LLC (collectively, the "Non-Receivership Defendants").

Id.

As a result, the Receivership Entities, the SEC, and the Non-Receivership Defendants

4

entered into a Stipulation (the "First Stipulation") in June 2013.  The SEC stipulated that the
Receivership Entities would not be required to file a response to the First Amended Complaint or
actively participate in the trial of this action, and the SEC would not seek a default judgment
against the Receivership Entities.  Id.  The parties further agreed that after the claims against
Quan were resolved in this Court, the SEC would enter into a second Stipulation with the
Receivership Entities applying the judgment received by Quan and the Non-Receivership
Defendants to the claims against the Receivership Entities.  Id.  The First Stipulation was
approved by this Court on October 8, 2013.  See Mem. Op. & Order, Oct. 8, 2013 [Docket No.
347] 38–40.

**D.  Trial**

The SEC's claims against the Non-Receivership Defendants were tried in early 2014.  On
February 11, 2104, a jury found Quan and the other Non-Receivership Defendants liable on
multiple counts of securities fraud, including violations of Section 10(b) and Rule 10b-5 of the
securities laws.  See Special Verdict Form [Docket No. 501]; 15 U.S.C. § 78j(b); 15 C.F.R. §
240.10b-5.  The jury also found that Quan was not liable for aiding and abetting a Section 10(b)
violation by SCAF.  See Special Verdict Form at 3.  Judgment consistent with the jury's verdict
was entered on February 19, 2014.  See J. [Docket No. 505].

On December 12, 2014, the Court entered an Amended Partial Final Judgment ordering
the Non-Receivership Defendants to disgorge approximately $95 million.  See Am. Partial Final
J. [Docket No. 602].

**E.  Second Stipulation**

The Receivership Entities and the SEC have now entered into the subsequent anticipated

5

Stipulation (the "Second Stipulation").  <u>See</u> Stipulation, Sept. 17, 2015 [Docket No. 653].  The

Second Stipulation provides that the Receivership Entities will consent to have judgment entered

against them consistent with the February 19, 2014 Judgment and in the same amount as the

December 12, 2014 Amended Judgment entered against the Non-Receivership Defendants.  <u>See</u>

<u>id.</u> Ex. A ¶ 2, Ex. B.

**F.  Proposed Distribution Plan**

In addition to entering into the Second Stipulation, Receiver Hansen has drafted a

Distribution Plan for the Receivership Assets.

**1.  Claimants**

The Receiver has identified the following categories of creditors and investors asserting

claims against the Receivership Assets.

| Category | Number of Claimants | Total Claims |
|---|---|---|
| Bank lenders (DZ Bank, Sovereign Bank) | 2 | $34 million |
| Service providers | 2 | $210,000 |
| Preferred investors in SCAF  ("Class P Investors") | 3 | $5.75 million |
| Non-preferred investors in SCAF ("Class A Investors") | 59 | $78 million |

DZ Bank asserts a claim of at least $11.8 million, which includes secured loans of

$5,843,267.  <u>See</u> Mem. Supp. Receiver's Mot. Approve Distribution Plan 6–7.  Over $3 million

of DZ Bank's claim is for costs and expenses incurred in recovering assets on behalf of the

Receivership Estate prior to the establishment of the Receivership.  <u>Id.</u> at 7.

Sovereign Bank asserts a $22.5 million secured claim based on a secured loan made to

Defendant ACG II.  <u>Id.</u> at 8.  The Receivership Assets include over $2 million in settlement

funds from a Petters-related bankruptcy action that were allocated to Sovereign Bank as payment toward its $22.5 million claim.  See id. at 8; Sullivan Aff. [Docket No. 27] ¶¶ 12, 39–42, 58–72, 79–83, Exs. 5–6; Mem. Supp. DZ Bank's Mot. Approve Allocation [Docket No. 109] 3–6, 8–9.

Service provider Ikon Office Solutions, Inc. ("Ikon") performed document handling services for Defendant SIA, a Non-Receivership Defendant.  Mem. Supp. Receiver's Mot. Approve Distribution Plan at 9.  Ikon asserts a claim of $113,032.  Id.  Service provider Pinnacle Fund Administration, LLC ("Pinnacle") performed legal services for Quan and responded to subpoenas issued by the SEC and SIA.  Id. at 9–10.  Pinnacle asserts a claim for $96,738.  Id. at 9.

The Class P Investors are investors in SCAF's Class P shares.  See Shepard Decl. [Docket No. 665] Ex. B ("Class P Amendment"), Ex. C ("Class P PPM").  They assert claims totaling over $5.75 million.  Mem. Supp. Receiver's Mot. Approve Distribution Plan 10, Ex. A. Under SCAF's governing documents, Class P shares were guaranteed a rate of return that was not tied to the market performance of SCAF's investments.  See Class P Amendment ¶ 2; Class P PPM at 1–2.  Class P shares were also entitled to a liquidation preference over SCAF's other class of shares (Class A shares) in the event of SCAF's dissolution.  See Class P Amendment ¶ 4; Class P PPM at 1.

The Class A Investors are investors in SCAF's Class A shares.  They assert claims totaling approximately $78 million.  Mem. Supp. Receiver's Mot. Approve Distribution Plan 3, Ex. A.  In contrast to the Class P shares, the rate of return for the Class A shares was tied to the performance of SCAF's investments.  See Shepard Decl. Ex. A. ("SCAF LLC Agreement") ¶ 3.8.  Thus, the Class A shares were potentially a more lucrative investment but carried greater

risk than the Class P shares.

In January 2015, Receiver Hansen convened representatives of the banks, the SEC, and the Class P Investors to determine whether they could agree on a distribution plan that was acceptable to the Receiver and could be jointly recommended to the Court. The SEC and DZ Bank agreed to jointly recommend distribution of $6 million to DZ Bank based on its $13.8 million claim. The SEC and Sovereign Bank agreed to jointly recommend distribution of $1.6 million to Sovereign Bank based on its $22.5 million claim. No agreement was reached with the Class P Investors.

### 2. Proposed Distribution

Receiver Hansen proposes that after payment of Receivership expenses the Receivership Assets should be distributed as follows:

- $6,000,000, plus a proportionate share of the interest earned on the Receivership Assets since January 21, 2015,[2] to DZ Bank (approximately 50% of its claims);

- $1,600,000, plus a proportionate share of the interest earned on the Receivership Assets since January 21, 2015, to Sovereign Bank (approximately 7.8% of its claims);

- The balance (approximately $11.4 million) to the Class A Investors (except Class A Investors related to the Defendants) and Class P Investors, pro rata (approximately 13.4% of their claims); and

- No distribution to service providers, based on the Receiver's determination that their claims are for services that were provided to entities that were not Receivership Entities.

Mem. Supp. Receiver's Mot. Approve Distribution Plan 6.

---

[2] Because the SEC and the banks reached an agreement on January 21, 2015, the Receiver treats the amounts allocated to the banks as if segregated on that date, with interest earned since that date credited to the banks.

### G.  Present Motions

The Receiver now moves for Court approval of the Second Stipulation and the Distribution Plan.  The Class P Investors oppose both Motions.  With regard to the Second Stipulation, the Class P Investors argue that judgment against the Receivership Entities is inconsistent with the jury verdict because the jury found that SCAF was not liable for securities violations.  The Class P Investors thus contend that SCAF's assets cannot be subject to an equitable distribution plan and must instead be distributed according to SCAF's governing documents, which provide a contractual liquidation preference to Class P Investors over the Class A Investors.

The Class P Investors also argue that even if SCAF could be held liable and its assets were disgorged, the Distribution Plan is fundamentally unfair because it ignores the Class P Investors' contractual liquidation preference and because it treats Class A and Class P Investors equally even though the Class A Investors knowingly assumed a greater risk of investment loss.

### III.  DISCUSSION

### A.  Motion to Approve Second Stipulation

The Second Stipulation provides for judgment to be entered against the Receivership Entities for securities violations and their assets to be disgorged.  If approved, the distribution of the Receivership Assets would be impacted.  The Court has broad powers to fashion relief for securities violations and has wide discretion in determining to whom and how the assets in an equity receivership will be distributed.  See SEC v. Homeland Commc'ns Corp., No. 07-80802, 2010 WL 2035326, at *2 (S.D. Fla. May 24, 2010).  Conversely, if the Second Stipulation is not approved, judgment would not be entered against the Receivership Entities and the Receivership

Assets would be then distributed according to the Receivership Entities' organizational documents and other formalistic, rather than equitable, rules of priority.

The Receiver argues that the Second Stipulation should be approved because it properly applies the effect of the jury verdict to the Receivership Entities. The jury found that the Non-Receivership Defendants (Quan and entities he controlled) made material misrepresentations to prospective investors and engaged in transactions and a course of conduct designed to conceal from investors that SCAF's largest investment (the Petters Notes) was experiencing significant defaults. The Receiver contends if the Receivership Entities, which were also controlled by Quan, went to trial, the same evidence of misrepresentations, transactions, and course of conduct would be introduced against the Receivership Entities. Accordingly, the Receiver believes that a jury would similarly find against the Receivership Entities and that judgment would be entered against them as it was against the Non-Receivership Defendants.

The Class P Investors argue that collateral estoppel prevents the Receiver from holding SCAF liable for securities violations. The Class P Investors reason that the jury, in finding that Quan committed securities fraud but did not aid and abet a securities violation by SCAF, necessarily concluded that SCAF did not commit securities fraud. Thus, the Class P Investors argue Receiver Hansen lacks authority to enter into the Second Stipulation because the First Stipulation requires the Receiver to apply the judgment rendered at trial to SCAF, and the judgment at trial was that SCAF was not liable for securities violations.

The Class P Investors' argument lacks merit. The finding that Quan was not liable on the aiding and abetting claim does not compel the conclusion that the jury determined that SCAF did not commit securities fraud. At trial, the jury was instructed that to find Quan liable for aiding and abetting a Rule 10(b) violation by SCAF, it must determine: (1) SCAF was violating

10

Section 10(b) and Rule 10b-5; (2) Quan had knowledge that SCAF was violating Section 10(b) and Rule 10b-5; and (3) Quan provided substantial assistance to SCAF in its violation of Section 10(b) and Rule 10b-5.  Jury Instructions [Docket No. 491] at Jury Instruction No. 23.  The jury's finding of no aiding and abetting liability could have been based on its determination that one or more of the latter two elements had not been proven.  SCAF was not a defendant at trial, and thus the SEC's evidentiary focus at trial was on Quan's role at SIA and Acorn, rather than his role at SCAF.  As a result, the jury may have concluded that it lacked sufficient evidence to determine Quan's role in SCAF or that Quan had aided and abetted a securities violation by SCAF.  Therefore, the jury's finding that Quan was not liable for aiding and abetting a SCAF securities violation does not necessarily mean the jury found SCAF not liable for securities fraud.  Accordingly, the Second Stipulation consenting to judgment against SCAF is not precluded by the jury verdict, nor is it inconsistent with that verdict.

The Court further finds that the Receiver is fully authorized to agree to the terms of the Second Stipulation.  The Receivership Order authorizes Receiver Hansen to "take any action which could be taken by the officers, directors, partners, members, shareholders, and trustees of the Receivership Entities."  Receivership Order at 18.  As such, Receiver Hansen stands in the shoes of an officer and director of the Receivership Entities and has the authority and responsibility to assess whether in his professional judgment the Preferred Investors' collateral estoppel defense has merit and whether the Receivership Entities would prevail at trial.  The Receivership Order also requires Receiver Hansen to "take such action as necessary and appropriate to prevent the dissipation . . . of any funds or assets or for the preservation of any such funds and assets of the Receivership Estate."  Id. at 17.

Here, Receiver Hansen has analyzed the results of the trial and has made an assessment

of the risks versus the costs of subjecting the Receivership Entities to a trial on the merits.  The

Receiver has determined that a trial on the claims against the Receivership Entities would likely

be decided against them and that defending against the claims would dissipate Receivership

Assets that already fall far short of the claims against the Receivership.  Therefore, entering into

the Second Stipulation is a reasonable and prudent exercise of the Receiver's authority, and the

Second Stipulation is approved.

**B.  Motion to Approve Distribution Plan**

The Court next considers the Receiver's proposed plan for distributing the $18.9 million

in Receivership Assets.  A district court has broad powers and wide discretion in approving an

equitable distribution plan for receivership funds.  SEC v. Great White Marine & Recreation,

Inc., 428 F.3d 553, 556 (5th Cir. 2005); Homeland Commc'ns Corp., 2010 WL 2035326, at *2.

The standard for deciding whether to approve such a plan is whether the plan is fair and

equitable.  SEC v. Wang, 944 F.2d 80, 88 (2d Cir. 1991) ("The district court's task is to decide

whether, in the aggregate, the plan is equitable and reasonable."); SEC v. Credit Bancorp, Ltd.,

No. 99-11395, 2000 WL 1752979, at *28 (S.D.N.Y. Nov. 29, 2000) ("[T]he fundamental

principle governing adoption of a distribution plan is that it should be equitable and fair, with

similarly-situated investors treated alike.").  Whether a plan is fair and equitable depends upon

the circumstances of the particular case, and courts have approved different types of plans in

different situations.  Id.  No specific distribution scheme is required as long as the distribution is

fair and equitable.  Homeland Commc'ns Corp., 2010 WL 2035326, at *2; see also SEC v. Enter.

Trust Co., No. 08-1260, 2008 WL 4534154, at *3 (N.D. Ill. Oct. 7, 2008) ("There are no hard

rules governing a district court's decisions in matters like these.  The standard is whether a

distribution is equitable and fair in the eyes of a reasonable judge.").

In exercising its broad discretion, a court "may reject formalistic arguments that would otherwise be available in a traditional lawsuit." Broadbent v. Advantage Software, Inc., 415 F. App'x 73, 78 (10th Cir. 2011). In other words, "remedies to which claimants might be entitled to under other law may be suspended if such a measure is consistent with treating all claimants fairly." Credit Bancorp, 2000 WL 1752979, at *28. A distribution plan that is supported by both the SEC and the receiver is entitled to deference from the Court. See SEC v. Byers, 637 F. Supp. 2d 166, 175 (S.D.N.Y. 2009) (giving deference to a distribution plan proposed by the receiver and supported by the SEC); Wang, 944 F.2d at 88 (stating that "line-drawing" between potential claimants under a distribution plan is "appropriately left to the experience and expertise of the SEC in the first instance").

As explained above, Receiver Hansen has identified four categories of creditors and investors with claims to the Receivership Assets: bank lenders, service providers, the Class P Investors, and the Class A Investors. Under the Receiver's proposed Distribution Plan, 40% of the $18.9 million in Receivership Assets would be distributed to DZ Bank and Sovereign Bank, and the remaining 60% would be distributed to the defrauded Class P and Class A Investors on a pro rata basis. No payment would be made to the service providers because their claims are for services provided to the Non-Receivership Defendants and not the Receivership Entities. The service providers have not objected to the proposed Distribution Plan and the Court finds that omitting them from the distribution of Receivership Assets is fair and equitable.

### 1. Class P Investors' Objection to Pro Rata Distribution

The Class P Investors argue the Distribution Plan is fundamentally unfair because it treats Class P Investors and Class A Investors equally instead of honoring the Class P Investors' contractual liquidation preference. The Class P Investors further contend that they should be

favored over Class A investors because the Class A Investors opted not to purchase the more conservative Class P shares and instead chose to invest in the riskier but potentially more lucrative Class A shares.

In support of their arguments, the Class P Investors cite to cases in which distribution plans have been approved that favor one class of investors over another based upon the level of risk the investors assumed in making their investments.  See SEC v. Enter. Trust Co., 559 F.3d 649, 652 (7th Cir. 2009); Wang, 944 F.2d at 86–87.  However, there is no hard and fast rule that investors should be treated differently based on the risk level of their investment.  Indeed, although the court in Wang upheld a distribution plan that treated one class of investors less favorably than others, the Wang court stated that, were it to draft a plan, it might have chosen to ignore the risk-based distinctions between investors.  Wang, 944 F.2d at 88.  In ultimately upholding the plan, the Wang court noted that "[t]his kind of line-drawing" is "appropriately left to the experience and expertise of the SEC in the first instance."  Id.  Here, the SEC supports the Distribution Plan's equal treatment of both classes of investors.

The circumstances here also differ from those in Enterprise Trust Company, where investor losses were caused by the defendants' risky trading.  559 F.3d at 650.  There, investors who had given the defendants permission to trade their investments were treated less favorably than those who had not given permission to trade, because the less favored investors had knowingly assumed the risks associated with trading.  Id. at 652.  Here, investor losses were not caused by market risk.  Rather, the losses were caused by Defendants' false promises about anti-fraud protections that were never implemented—a risk that no investor knowingly assumed.

Under the circumstances of this case, the Distribution Plan's equal treatment of Class A

and Class P Investors is fair and equitable.  The Class A Investors are similarly situated to the

Class P Investors in that both classes were fraudulently induced to invest in SCAF based on false

representations that safeguards would be used to protect their investments.  The Class A

Investors' willingness to expose themselves to market highs and lows did not make them any

less defrauded by the false representations.  No investor would likely have purchased shares in

SCAF had they known the representations as to how their investments would be protected were

not true.  Because the Class A Investors were equally defrauded, they are entitled to share

equally in the disgorged Receivership Assets.  To allow Class P Investors to recover in full while

similarly defrauded Class A Investors are left to recover less than 8% of their claims would be

unfair and inequitable.  Therefore, the Distribution Plan's pro rata distribution to SCAF investors

is approved.[3]

### 2. Class P Investors' Objection to DZ Bank's Distribution

The Class P Investors also argue that the Distribution Plan is not equitable because it

allows DZ Bank to receive more than 50% of its claim even though DZ Bank was aware that

Quan and his entities were not employing the represented safeguards such as requiring retailers

to make payments into a "lockbox account."  Preferred Investors' Br. Opp'n 19 n.9.  The Class P

Investors contend that DZ Bank, which was not defrauded, should not recover more than 50% of

its claim while the defrauded Class P Investors would only recover approximately 13% of their

---

[3] The proposed Distribution Plan excludes Class A Investors who are related to Defendants. See Mem. Supp. Receiver's Mot. Approve Distribution Plan 6.  With the exception of Marlon Quan's sister, Gail Quan, the related Class A Investors consist of Marlon Quan, his wife Florene Quan, and entities or accounts owned or controlled by them. Id. Ex. A.  The Court is satisfied that Gail Quan is more similarly situated as an investor to the other Class A Investors than to Marlon Quan, Florene Quan, and their entities and accounts.  Therefore, Gail Quan will be included in the pro rata distribution to investors, which will entitle her to receive approximately $15,000 on her $118,000 claim.

claims.

The proposed $6 million distribution to DZ Bank is justified for at least two reasons. First, authority exists to support DZ Bank's assertion that its secured claim of $5,843,267 should have priority over other claims. Courts often recognize the preferential rights of secured creditors. See, e.g., SEC v. Vescor Capital Corp., 599 F.3d 1189, 1195 (10th Cir. 2010) ("[A]ppointment of a receiver does not determine any rights nor destroy any liens."); SEC v. Madison Real Estate Grp., LLC, 647 F. Supp. 2d 1271, 1277 (D. Utah 2009) ("It is well-established that a receiver appointed by a federal court takes property subject to all liens priorities or privileges existing or accruing under the laws of the State.") (quotations omitted).

Second, more than $3 million of DZ Bank's other claimed costs and expenses were incurred to recover assets on behalf of the Receivership Entities prior to Receiver Hansen's appointment. Had DZ Bank not incurred those expenses, the Receiver would have had to expend Receivership Assets to seek the same recoveries. Moreover, the recoveries may have been less successful had they been delayed until after the Receiver was appointed. Based on these considerations, and in light of the SEC's recommendation that DZ Bank receive $6 million under the Distribution Plan, the Court finds the proposed distribution to DZ Bank to be fair and equitable.

### 3. Payment of Receiver's Costs to Defend Future Unsuccessful Challenges to Plan

The Receiver requests the Court to order that if a claimant challenges the Distribution Plan through an appeal or other effort and is ultimately unsuccessful, the Receiver's legal fees and costs in responding to the challenge shall be deducted from the challenging claimant's distribution. No objections have been raised to this request. The Court agrees that the

Receiver's costs in litigating future unsuccessful challenges to the Distribution Plan should be borne solely by the unsuccessful claimant rather than by all claimants.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Defendants Stewardship Credit Arbitrage Fund, LLC; Putnam Green, LLC; and Livingston Acres, LLC's (the "Receivership Entities") Motion for Approval of Stipulation Regarding Entry of Judgment Against the Receivership Entities [Docket No. 650] is **GRANTED**;

2.  Receiver Gary Hansen's Motion for Approval of Distribution Plan [Docket No. 654] is **GRANTED**;

3.  The assets under the control of the Receiver (the "Receivership Assets") shall be distributed as follows:

    a.  The Receiver shall reserve an amount sufficient in his judgment to pay future reasonable Receivership expenses;

    b.  The Receiver shall distribute $6,000,000, plus a proportionate share of the interest earned on the Receivership Assets since January 21, 2015, to DZ Bank;

    c.  The Receiver shall distribute $1,600,000, plus a proportionate share of the interest earned on the Receivership Assets since January 21, 2015, to Sovereign Bank;

    d.  The Receiver shall distribute the balance of the Receivership Assets to the Class A Investors (except Marlon Quan, Florene Quan, and their entities or accounts) and Class P Investors, pro rata; and

    e.  Upon termination of the Receivership, the Receiver shall distribute any remaining reserved amount to the Class A Investors (except Marlon Quan, Florene Quan, and their entities and accounts) and Class P Investors, pro

rata; and

4.      If any claimant to the Receivership Assets challenges the Distribution Plan and is ultimately unsuccessful, the Receiver's legal fees and expenses in responding to that challenge shall be deducted from the challenging claimant's distribution, if any, and not from the distributions to other claimants.

5.      The Court directs the Clerk of Court to enter final judgment as to the Receivership Entities as follows:

The Securities and Exchange Commission ("SEC"), has filed a Complaint and Defendants Stewardship Credit Arbitrage Fund, LLC; Putnam Green, LLC; and Livingston Acres, LLC's (the "Receivership Entities") have each entered a general appearance; consented to the Court's jurisdiction over the Receivership Entities and the subject matter of this action; consented to entry of this Final Judgment; waived findings of fact and conclusions of law; and waived any right to appeal from this Final Judgment; and the Receivership Entities each have admitted the facts set forth in the Consent [Docket No. 653, Ex. A] and acknowledged that their conduct violated the federal securities laws.  Based on the foregoing and all the files, records, and proceedings herein:

## I.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the Receivership Entities and their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise each are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)]

and Rule 10b–5 promulgated thereunder [17 C.F.R. § 240.10b–5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a) to employ any device, scheme, or artifice to defraud;

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

## II.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that the Receivership Entities and their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise each are permanently restrained and enjoined from violating Section 17(a)(2) and 17(a)(3) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a)  to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(b)  to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

## III.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that the Receivership Entities are jointly and severally liable for disgorgement of $80,613,589, representing amounts obtained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $15,578,083.73, for a total of $96,191,672.73.  To satisfy this disgorgement obligation, the Receiver in this matter shall make payment of the assets from the Estates of the Receivership Entities as directed by the Court in its orders for distribution until such time as the Court grants a motion to dissolve the Receivership.

## IV.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that the Consent is incorporated in this Final Judgment with the same force and effect as if fully set forth herein, and that the Receivership entities shall comply with all of the undertakings and agreements set forth therein.

## V.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  December 8, 2015.